**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN B. CHRISTIANSEN, on behalf of himself and a class of similarly situated investors, | Case No.: 1:22-cv-10292-VEC |
| Plaintiff, | |
| v. | ORAL ARGUMENT REQUESTED |
| SPECTRUM PHARMACEUTICALS, INC., THOMAS J. RIGA, FRANCOIS J. LEBEL, and NORA E. BRENNAN, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**PAUL HASTINGS LLP**
Kevin P. Broughel
James L. Ferguson
200 Park Avenue
New York, New York 10166
Telephone: 212-318-6000
Facsimile: 212-319-4090
kevinbroughel@paulhastings.com
jamesferguson@paulhastings.com

**PAUL HASTINGS LLP**
Christopher H. McGrath
(admitted *pro hac vice*)
695 Town Center Drive
17th Floor
Costa Mesa, California 92626-1924
Telephone: 714-668-6200
Facsimile: 714-979-1921
chrismcgrath@paulhastings.com

*Counsel for Defendants*

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     SUMMARY OF FACTS ....................................................................................... 2

    A.    Spectrum's Development of Poziotinib .................................................... 2

    B.    Dose Optimization and Confirmatory Study ........................................... 3

    C.    Decision on NDA ..................................................................................... 4

    D.    Spectrum's Disclosures ............................................................................ 6

    E.    Spectrum's Alleged Misstatements .......................................................... 7

III.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) ............... 8

    A.    Securities Lawsuits Are Subject To A Substantially Higher Pleading
       Standard ..................................................................................................... 8

    B.    Plaintiff Does Not Adequately Allege Any False Or Misleading
       Statements ................................................................................................. 10

        1.    Plaintiff Fails to State A Claim Based on Spectrum's Statements
           Regarding Dose Optimization .................................................... 10

        2.    Plaintiff Fails to State a Claim Based on Spectrum's Statements
           Regarding the Confirmatory Study ............................................. 14

        3.    Spectrum's Statements Regarding the Likelihood of FDA
           Approval and Related Risk Disclosures Are Not Actionable ................. 18

    C.    Plaintiff Does Not Sufficiently Allege Defendants Acted With Scienter ............ 21

        1.    Plaintiff Fails to Plead Scienter Based on Stock Sales ............................ 22

        2.    Plaintiff Fails to Plead Scienter Based on Circumstantial Evidence
           of Conscious Misbehavior or Recklessness ............................................ 23

IV.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a) ..................... 25

V.      CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AnaptysBio, Inc.*,
  2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ........................................................................17

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ...................................................................................3

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
  2020 WL 60186 (N.D. Ill. Jan. 6, 2020) ...............................................................................21

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ......................................................................... *passim*

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008) .............................................................................12, 25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ................................................................................................9, 25

*Axar Master Fund, Ltd. v. Bedford*,
  308 F. Supp. 3d 743 (S.D.N.Y. 2018) ...................................................................................11

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
  2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023) .........................................................................18

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014) .................................................................................................25

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ...................................................................................................3

*In re Columbia Lab'ys, Inc. Sec. Litig.*,
  2013 WL 10914123 (D.N.J. June 11, 2013) .....................................................................12, 25

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020) ..............................................................................21, 22

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ................................................................................................23

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ..............................................................................................................8

*In re EDAP TMS S.A. Sec. Litig.*
  2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) .......................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008).....................................................................................21

*In re Forest Lab'ys., Inc. Deriv. Litig.*,
  450 F. Supp. 2d 379 (S.D.N.Y. 2006).....................................................................................22

*Fort Worth Employers' Ret. Fund v. Biovail*,
  615 F. Supp. 2d 218 (S.D.N.Y. 2009).....................................................................................12

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019).....................................................................................................8

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).....................................................................................................9

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)...............................................................................13, 19

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................................22, 24

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y.)......................................................................................17, 23, 25

*Gross v. AT&T Inc.*,
  2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021).......................................................................16

*Hou Liu v. Intercept Pharm., Inc.*,
  2020 WL 148931 (S.D.N.Y. Mar. 26, 2020) .........................................................................20

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
  445 F. App'x 368 (2d Cir. 2011) ............................................................................................24

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)..............................................................................................10, 24

*Kovtun v. VIVUS, Inc.*,
  2012 WL 44776478 (N.D. Cal. Sept. 27, 2012) ...................................................................18

*Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*,
  838 F.3d 76 (1st Cir. 2016).....................................................................................................25

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014).......................................................................................22

*In re Medimmune, Inc. Sec. Litig.*,
  873 F. Supp. 953 (D. Md. 1995)..............................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

*In re MELA Scis, Inc. Sec. Litig,*
  2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)..........................................................................14

*In re Mindbody, Inc. Sec. Litig.,*
  489 F. Supp. 3d 188 (S.D.N.Y. 2020)......................................................................8, 9, 11, 21

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000)..........................................................................................8, 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
  575 U.S. 175 (2015)........................................................................................................16

*In re Philip Morris Int'l Inc. Sec. Litig.,*
  437 F. Supp. 3d 329 (S.D.N.Y. 2020).........................................................................14, 17

*In re PXRE Grp., Ltd., Sec. Litig.,*
  600 F. Supp. 2d 510 (S.D.N.Y.).......................................................................................23

*Richardson v. N.Y. City Bd. of Educ.,*
  711 F. App'x 11 (2d Cir. 2017) ........................................................................................3

*Rosenzweig v. Azurix, Corp.,*
  332 F.3d 854 (5th Cir. 2003) ...........................................................................................25

*Rosi v. Aclaris Therapeutics, Inc.,*
  2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ................................................................20

*Russo v. Bruce,*
  777 F. Supp. 2d 505 (S.D.N.Y. 2011).............................................................................25

*S. Cherry St., LLC v. Hennessee Grp. LLC,*
  573 F.3d 98 (2d Cir. 2009)..............................................................................................10

*In re Sanofi Sec. Litig.,*
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) .......................................................................9, 12, 14, 19

*In re Sanofi-Aventis Sec. Litig.,*
  774 F. Supp. 2d 549 (S.D.N.Y. 2011).............................................................................19

*In re Scholastic Corp. Sec. Litig.,*
  252 F.3d 63 (2d Cir. 2001)..............................................................................................22

*SEC v. Kelly,*
  817 F. Supp. 2d 340 (S.D.N.Y. 2011)...............................................................................8

*Sharette v. Credit Suisse Int'l,*
  127 F. Supp. 3d 60 (S.D.N.Y. 2015).................................................................................21

iv

## TABLE OF AUTHORITIES

**Page(s)**

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)..................................................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................................8, 9, 25

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)...............................................................9, 12, 14, 17

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)................................................................11

*In re Viropharma, Inc., Sec. Litig.*,
2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ......................................................5

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017)................................................................................21

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011)................................................................................21

**Statutes and Rules**

21 C.F. R. § 314.101(a)(1)..................................................................................................5

15 U.S.C. § 78u-4(b)(2) ...............................................................................................9, 24

15 U.S.C. § 78u-5(c) ...........................................................................................................9

Fed. R. Civ. P. 9(b) .............................................................................................................8

Prescription Drug User Fee Act.......................................................................................3

Private Securities Litigation Reform Act of 1995 ................................................. *passim*

Securities Exchange Act of 1934

Section 10(b)..................................................................................................8, 25

Section 20(a) .........................................................................................................25

Rule 10b-5..........................................................................................................8, 25

**Other Authorities**

Erin Williams, et al., *Improving the Time to Activation of New Clinical Trials at a
National Cancer Institute-Designated Comprehensive Cancer Center*,
JCO Oncology Practice (VOL. 16, ISSUE 4) (2020) ........................................17

v

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Luo v. Spectrum Pharm., Inc., et al.*,
  Case No. 2:21-cv-0162-CDS-BNW (D. Nev.) ............................................................................8

Defendants Spectrum Pharmaceuticals, Inc. ("Spectrum" or "the Company") and Thomas J. Riga, Francois Lebel and Nora E. Brennan (the "Individual Defendants," and collectively with the Company, (the "Defendants")) respectfully submit this memorandum in support of their motion to dismiss the Consolidated Class Action Complaint (the "CCAC").

## I.      INTRODUCTION

Spectrum is a biopharmaceutical company dedicated to developing and commercializing life-saving pharmaceutical drugs for the treatment of rare cancer and blood disorders.  One candidate, Poziotinib (sometimes referred to as "pozi"), was developed as an oral treatment for certain mutation-based non-small cell lung cancers ("NSCLC") for which no targeted therapy had been approved and for patients where previous treatments had failed.  In February 2022, the U.S. Food & Drug Administration ("FDA") accepted Spectrum's New Drug Application ("NDA") based on a 2020 trial's objective response rate ("ORR") of 28%, which was higher than then existing non-targeted therapies.  The FDA scheduled Poziotinib for a review and advisory vote by a group of independent cancer experts advising the FDA (the Oncologic Drugs Advisory Committee or "ODAC") on September 22, 2022.  Four of the 13 ODAC members voted to recommend accelerated approval of Poziotinib, and nine voted against.  Not surprisingly, Spectrum's share price fell after the disappointing ODAC recommendation.  This lawsuit ensued.

Plaintiff's reflexive securities class action is a classic case of fraud by hindsight, which the Private Securities Litigation Reform Act of 1995 ("PSLRA") was enacted to eradicate.  The CCAC is based almost entirely on views that FDA staff expressed either in a briefing document made public shortly before the ODAC meeting or at the meeting itself, which Plaintiff juxtaposes in selective fashion against certain of Defendants' statements.  Plaintiff fails to allege any particularized facts establishing that the challenged statements concerning (1) ongoing

discussions with the FDA regarding dose optimization, (2) an additional planned confirmatory trial for Poziotinib, and (3) likelihood of FDA approval and related risk warnings were false or misleading when made.  The challenged statements include inactionable opinions subject to scientific disagreement regarding dose optimization, and patently forward-looking statements regarding the prospect of FDA approval.  Plaintiff takes statements about the confirmatory study design out of context, attempting to convert a prospective description of the study protocol into a statement about present enrollment status.  And Plaintiff's contention that there was no "alignment" between the Company and the FDA on the PINNACLE study dosing regimen is belied by the FDA Briefing Book itself.

Plaintiff does not plead a strong inference of scienter for the same fundamental reason— he cannot identify a false or misleading statement, much less one that Defendants knew or should have known would deceive investors.  Aside from the conclusory assertion that Defendants had actual knowledge that their statements were false or misleading—which they were not—Plaintiff relies entirely on motive allegations.  But those too fall short, alleging only routine capital raising efforts by Spectrum and negligible stock sales by two Individual Defendants.  Indeed, the relevant facts, including Spectrum's continued investment in Poziotinib and a split ODAC vote, negate any inference of scienter.

For these and the reasons discussed below, the Court should dismiss the CCAC.

## II.    SUMMARY OF FACTS

### A.    Spectrum's Development of Poziotinib

Spectrum is a biopharmaceutical company focused on acquiring, developing, and commercializing novel and targeted oncology therapies.  Among other candidates, the Company focused on Poziotinib, a drug under investigation for the treatment of NSCLC, which account for

approximately 85% of all lung cancers.[1]  Poziotinib's targeted patient population included previously treated patients (second-line patients) with certain genetic mutations.  Poziotinib is administered orally and is believed to inhibit certain cellular activity linked to cellular growth in NSCLC.  CCAC ¶ 2; Ex. 2 (Spectrum Pharm., Inc., Annual Report (Form 10-K) (Mar. 17, 2022) (FYE Dec. 31, 2021) ("Annual Report")) at 4.  In 2017, Spectrum commenced a Phase 2 global clinical trial with sites in the U.S., Canada and Europe ("ZENITH20"), which consisted of several patient "Cohorts."  *Id.*  In July 2020, Spectrum announced that Cohort 2 achieved an ORR of 28% and met its pre-specified primary endpoint for efficacy.  *Id.*  On February 11, 2022, the FDA accepted its NDA based on the positive results of Cohort 2 and set an action date of November 24, 2022 (a date mandated by the Prescription Drug User Fee Act, referred to as a "PDUFA date.").  *Id.*; CCAC ¶ 8.  The following month, the Company announced that Cohort 4 also had achieved its primary endpoint, with a confirmed ORR of 41%.  Annual Report at 4.

**B.      Dose Optimization and Confirmatory Study**

Patients in Cohort 2 (on which the NDA was premised) received 16mg once per day orally.  Annual Report at 4.  In Cohort 4, however, approximately 22 of the 70 patients received an alternative dosage, a twice daily ("BID") dose of 8mg of Poziotinib.  *Id.*  Spectrum also initiated an exploratory study, Cohort 5, that treated a limited number of patients with lower doses, including 6 and 8 mg BID, some of whom matched the patient population in Cohort 2 (second-line NSCLC with HER2 exon 20 mutations).  FDA Briefing Book at 14, 16 and 22.

---

[1] *See* Ex. 1 (Sept. 22, 2022, FDA Briefing Document, NDA 2156433, Poziotinib) ("FDA Briefing Book") at 10. The CCAC refers to and incorporates by reference the FDA Briefing Book as well as other Spectrum-related FDA and ODAC regulatory materials, SEC filings, press releases, media, news and analyst reports, conference and earnings call transcripts, and stock data, which are all also a matter of public record or, in some cases, facts not reasonably subject to dispute.  *See* CCAC at p. 1.  Consequently, these materials may be appropriately considered on a motion to dismiss.  *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 743 n.1 (S.D.N.Y. 2018); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014); *Richardson v. N.Y. City Bd. of Educ.*, 711 F. App'x 11, 13-14 (2d Cir. 2017).

Spectrum's NDA sought approval of the single 16mg dose based on the Cohort 2 study data results, but the FDA stated its agreement that the NDA should include additional lower dosing data from Cohorts 4 and 5.  *Id.* at 14 (November 9, 2020 and July 16, 2021 meeting references).

At the same time, Spectrum and the FDA were finalizing the protocol for a Phase 3 study to confirm the safety and efficacy of Poziotinib (the "PINNACLE" study), which, by design, would continue for several years beyond the potential approval date of November 24, 2022.[2] The FDA encouraged, but did not mandate, that PINNACLE be substantially enrolled by the PDUFA date.[3]  PINNACLE was designed to test what the FDA deemed the "preferable" dosing regimen of 8mg BID.  FDA Briefing Book at 14 (referring to a December 2021 meeting where it and Spectrum both "*agreed that the 8mg BID regimen as the starting dosage was preferable in the confirmatory trial*") (emphasis added).  In the interim, ongoing ZENITH20 clinical trials would continue generating alternative dosage data to be submitted to the FDA.  *Id.* at 15 (FDA references anticipated receipt of Cohort 5 data at February, July and September, 2022 meetings).

###    C.    Decision on NDA

The FDA's "Benefit-Risk Framework" identified five categories for consideration regarding Poziotinib's accelerated approval.  FDA Briefing Book at 33-34 (analysis of condition, current treatment options, benefits, risks, and risk management).  The Framework focused on, *inter alia*, patient need, the life-threatening nature of the condition being targeted, available first and second line therapies, Spectrum's efficacy data, preference of patients for Poziotinib's oral administration, as well as adverse event and dosage data.  *See id.* at 33-34.  The status of patient

---

[2] FDA Briefing Book at 24, 34 (primary patient analysis and results anticipated no earlier than 2026).
[3] FDA Briefing Book at 24 ("Postmarketing trials *should* be underway at the time of submission of a marketing application for accelerated approval.") (emphasis added).

enrollment in the confirmatory study was one of five bullet points identified within the risks and risk management considerations. *Id*. at 34. To aid its decision, the FDA convened an ODAC expert panel for September 22, 2022. CCAC ¶ 16.[4] ODAC met on September 22 after receiving advance written submissions from the FDA and Spectrum, and at the meeting received presentations by FDA and Company personnel, and also oncologists from the MD Anderson Cancer Center and AdventHealth Cancer Institute, which had conducted Poziotinib trials, as well as patient representatives. ODAC Minutes at 5. Ultimately, the ODAC vote considered "*whether the current benefits of poziotinib outweigh its risks for the treatment of patients with NSCLC with HER2 exon 20 insertion mutations?*" *Id.* at 8. The final recommendation of ODAC was four voting "Yes" in favor of Poziotinib's approval, and nine voting "No." *Id.* Committee members voting "Yes" stated that "poziotinib showed sufficient efficacy, the toxicities were manageable, and the drug could provide another option for patients." *Id.* Certain Committee members "acknowledged the importance of dose optimization, but also noted that it is very difficult to execute." *Id.*[5] Two months after the ODAC meeting, the FDA issued a Complete

---

[4] *See* Ex. 3 (Final Summary Minutes of the ODAC Meeting Sept. 22-23, 2022 ("ODAC Minutes)) at 8. Upon receipt of an NDA, the FDA first conducts a threshold review to confirm that the NDA is sufficiently complete to permit a "substantive review." 21 C.F. R. § 314.101(a)(1). Once the FDA has accepted an NDA for substantive review, the FDA may refer the NDA to "advisory committees" of industry experts who provide guidance to the FDA on the NDA's sufficiency, as well as on proposed labeling. *See In re Viropharma, Inc., Sec. Litig.*, No. CIV.A. 02-1627, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003). Although not binding, the FDA "*will not issue a final determination on the issues at hand until input from the Advisory Committee process has been considered and all reviews have been finalized*." FDA Briefing Book at 1 (emphasis added).

[5] The FDA informed ODAC in its advance materials that weeks before, on August 11, 2022, the FDA had granted accelerated approval to Enhertu (fam—trastuzumab-deruxtecan-nxki) including treatment for NSCLC patients whose tumors have Poziotinib's targeted HER2 exon 20 mutations based on Enhertu's ORR of 58% and a longer duration of response than Poziotinib, and advised ODAC it may be considered a "standard of care" in the second line setting. FDA Briefing Book at 8, 21. Certain ODAC members cited Enhertu's approval as one reason they voted "No" on Poziotinib. *See* Ex. 4 (Hayley Virgil, *FDA ODAC Vote Indicates Benefit of Poziotinib Does Not Outweigh Risk for HER2 Exon 20 Ins+ NSCLC,* CANCERNETWORK.COM, Sept. 26, 2022 (quoting certain ODAC panel members describing Enhertu as a more favorable, now available alternative to Poziotinib)).

Response Letter indicating the NDA could not be approved in its present form and required

additional data including a randomized controlled study prior to approval.  CCAC ¶ 38.

D.      **Spectrum's Disclosures**

During the Class Period, Spectrum kept investors apprised of the progress of the

Poziotinib NDA, and detailed the risks associated with its development at length in its public

filings.  For example, on March 17, 2022, the Company reported its 2021 financial results and

furnished an update on Fast Track acceptance of the Poziotinib NDA and PDUFA date, as well

as recent positive data from Cohort 4.[6]  On May 12, 2022, Spectrum reported its first quarter

2022 financial results and advised that the Poziotinib ODAC meeting was scheduled for

September 22-23, 2022.[7]  Each press release and SEC filing either contained or referenced

fulsome risk disclosures and cautionary notes concerning forward-looking statements by the

Company.[8]  Among other particularized risk factors, the Company warned investors:

- Competition for patients in conducting clinical trials may prevent or delay product development . . . . (Annual Report at 26);

- The commencement and completion of these clinical trials may be delayed by various factors, including scheduling conflicts with participating clinicians and clinical institutions, difficulties in identifying and enrolling patients who meet trial eligibility criteria, failure of patients to complete the clinical trial, delays in accumulating the required number of clinical events for data analysis delay, or failure to obtain the required approval to conduct a clinical trial at a prospective site . . . . (*Id.* at 16);

- FDA officials could interpret such data in different ways than we or our partners do which could delay, limit, or prevent regulatory approval (*Id.*);

---

[6] *See* Ex. 5 (Press Release, Spectrum Pharm., Inc., *Spectrum Pharmaceuticals Reports Fourth Quarter 2021 and Full Year 2021 Financial Results and Corporate Update* (Mar. 17, 2022)).  Spectrum also filed its Annual Report on that date.

[7] *See* Ex. 6 (Press Release, Spectrum Pharm., Inc., *Spectrum Pharmaceuticals Reports First Quarter 2022 Financial Results and Provides Corporate Update* (May 12, 2022)).  Spectrum also filed its Spectrum Pharm., Inc. Forms 10-Q for the periods ending March 31, 2022 (on May 12, 2022) (Ex. 7) ("Q1 Form 10-Q") and June 30, 2022 (on August 11, 2022) (Ex. 8) ("Q2 Form 10-Q") with the SEC.

[8] *See* Exs. 2, 7, 8; Annual Report at 1, 13-45; Q1 Form 10-Q at 22, 28; Q2 Form 10-Q at 24, 30.

- Any failure or significant delay in completing clinical trials for our drug products, or in receiving regulatory approval for the sale of any drugs . . . may severely harm our business and reputation and may cause our stock price to decline (*Id.* at 16);

- Commencement and completion of clinical trials may be delayed by many factors that are beyond our control, including:

  - [D]elays in reaching agreement on acceptable terms with contract research organizations (CROs) and clinical trial sites (*Id.*);

  - [D]elays in obtaining Institutional Review Board, or IRB, approval at each site (*Id.*);

  - Slower than anticipated patient enrollment or our inability to recruit and enroll patients to participate in clinical trials for various reasons (*Id.*);

- Certain potentially competitive products to our in-development products are in various stages of development, some of which have pending applications for approval with the FDA or have been approved by regulatory authorities in other countries (*Id.* at 18).

- Obtaining regulatory approval of a new drug is an uncertain, lengthy and expensive process, and success is never guaranteed (*Id.* at 28).

*See also* Q1 Form 10-Q at 22, 28 ("Cautionary Note Regarding Forward-Looking Statements" – risk factors include: our approval, or timing of approval, of our products by the FDA; actions by the FDA and other regulatory agencies; the timing and/or results of pending or future clinical trials, and reliance on contract research organizations).

  **E.**  **Spectrum's Alleged Misstatements**

The challenged statements, CCAC ¶¶ 122-47, fall into three general categories:

  1.  *Statements regarding appropriate dosage for Poziotinib's NDA.* According to Plaintiff, Defendants falsely represented that the Company had adequate data to optimize the 8mg BID dosage for Poziotinib, and misrepresented that it had "aligned" with the FDA on using the 8mg BID dosage in the confirmatory study. *See* CCAC ¶¶ 123-24, 128-32. Plaintiff asserts that Spectrum did not have adequate data to determine the optimal dose, did not have agreement from the FDA to use the 8mg BID in the confirmatory study, and understated the likelihood of further questions by the FDA on dosing. *See id.* ¶¶ 124-29

7

2.      *Statements regarding status of enrollment of the confirmatory study*.  According to Plaintiff, Defendants falsely stated that Spectrum had actually begun enrolling patients in the confirmatory study as opposed to merely opening sites so patient recruitment could commence.  *See* CCAC ¶¶ 125-27, 138-44.

3.      *Statements regarding the likelihood of approval by the FDA and related risk warnings*.  Plaintiff argues that Defendants overstated the NDA's likelihood of success, and that certain of Spectrum's risk factors related to approval were false because Defendants knew well in advance that Poziotinib would not be approved.  *See* CCAC ¶¶ 133-37, 145-47.

### III.      PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b)[9]

### A.      Securities Lawsuits Are Subject To A Substantially Higher Pleading Standard

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: (1) a material misrepresentation or omission of fact; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  A complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA[10], *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313, 321 (2007), and must allege with particularity "*why* the statements were fraudulent."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d

---

[9] Although not expressly asserted in the CCAC, were Plaintiff to argue its action includes claims under subsections (a) and (c) of Rule 10b-5, such a "scheme" claim fails for the same reasons stated herein, and because Plaintiff has nowhere successfully alleged such a "scheme." *See In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020) (subsections (a) and (c) cannot "be used as a back door into liability" under Rule 10b-5); *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (courts routinely reject attempts to bypass the elements necessary to impose misstatement liability under subsection (b) by labelling the alleged misconduct a "scheme").
[10] *See Novak v. Kasaks*, 216 F.3d 300, 306, 310 (2d Cir. 2000) (PSLRA imposed stricter nationwide pleading standards to deter dubious and opportunistic strike suits).  A similar opportunistic suit was filed against Spectrum in August 2021 in Nevada when a Rolvedon facility initially failed to pass inspection (but was subsequently approved by the FDA).  A motion to dismiss that matter is pending.  *See Luo v. Spectrum Pharm., Inc., et al.*, Case No. 2:21-cv-0162-CDS-BNW (D. Nev.) (also referencing earlier Poziotinib trials).

455, 462 (2d Cir. 2019) (emphasis added); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d

87, 99 (2d Cir. 2007) (same).  Allegations that are conclusory or unsupported by factual

assertions are insufficient.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000).

Under the PSLRA safe harbor, a forward-looking statement is not actionable if it (i) is identified

as such and accompanied by "meaningful cautionary statements;" or (ii) is immaterial; or (iii) the

plaintiff fails to prove such statement was said by person with actual knowledge that it was false

or misleading. 15 U.S.C. § 78u-5(c); *In re Sanofi Sec. Litig.* ("*Sanofi*"), 87 F. Supp. 3d 510, 535

(S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi* ("*Tongue*"), 816 F.3d 199 (2d Cir. 2016)

(statements about FDA approval "classically forward-looking").  Statements of opinion are "not

actionable unless the speaker disbelieved the statement at the time it was made, the opinion

contained 'one or more embedded factual statements that can be proven false,' or the opinion

'implied facts that can be proven false.'"  *In re Mindbody*, 489 F. Supp. 3d at 202 (quoting

*Abramson v. Newlink Genetics Corp*., 965 F.3d 165, 175 (2d Cir. 2020)).

Plaintiff also must allege with particularity facts giving rise to a strong inference that the

defendant acted with the "required state of mind."  15 U.S.C. § 78u-4(b)(2).  "For an inference of

scienter to be strong, a reasonable person must deem it cogent and at least as compelling as any

opposing inference one could draw from the facts alleged[,]" and the court must take into

account plausible opposing inferences.  *ATSI Commc'ns*, 493 F.3d at 99 (quoting *Tellabs*, 51

U.S. at 324).  The requisite mental state is one "embracing intent to deceive, manipulate, or

defraud."  *Tellabs*, 551 U.S. at 319.  Plaintiffs may satisfy this requirement by alleging facts

showing "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong

circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns,* 493 F.3d at

99.  To adequately plead motive, "plaintiffs must assert a concrete and personal benefit to the

9

individual defendants resulting from the fraud"; motives "generally possessed by most corporate

directors and officers do not suffice." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). If no

motive or opportunity (other than a generalized business motive) is shown, the circumstantial

evidence of conscious misbehavior "must be correspondingly greater" and show "highly

unreasonable" behavior or that which evidences "an extreme departure from the standards of

ordinary care." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d

Cir. 2022) (quoting *Kalnit*, 264 F.3d at 142); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573

F.3d 98, 109 (2d Cir. 2009) (recklessness is a "state of mind approximating actual intent, and not

merely a heightened form of negligence").

B.    **Plaintiff Does Not Adequately Allege Any False Or Misleading Statements**

1.    **Plaintiff Fails to State A Claim Based on Spectrum's Statements Regarding Dose Optimization**

Plaintiff posits that it was false and misleading for Spectrum to say that it had

"optimized" dosage at 8mg BID, and that there was "alignment" between the FDA and the

Company on using that dosage for the PINNACLE study, when the FDA allegedly "did not

agree with Spectrum's proposed design for the PINNACLE Study to treat patients with 8 mg of

pozi BID due to Spectrum's inadequate dose optimization data." *See* CCAC ¶¶ 90, 123-32. But

Plaintiff ignores the context in which these statements were made, and fails to allege

contemporaneous facts showing that any challenged statements were false when made. For

example, the CCAC does not plead any facts contradicting Defendants' statement that Spectrum

had learned to optimize *some* of the tolerability issues faced on the 16mg QD dose. CCAC

¶ 123. Nor does the CCAC establish that the FDA was not in "alignment" with Spectrum

regarding the dosing regimen to be used in the PINNACLE study. Plaintiff seizes upon a single

participant's comment at the September 22 ODAC meeting, that the FDA "did not come to any

10

formal agreement about the 8-mg BID dose." CCAC ¶ 16. However, this comment itself suggests there was at least an "informal agreement" upon which Spectrum's "belief" regarding alignment was based. Moreover, the FDA Briefing Book undermines Plaintiff's theory, reporting that *"the Applicant and FDA agreed that the 8 mg BID regimen as the starting dosage was preferable in the confirmatory trial*." FDA Briefing Book at 14. (emphasis added) (referencing December 2021 meeting).

In addition, a number of the challenged statements are inactionable expressions of opinion regarding the safety and efficacy of either the 16mg or 8mg BID doses. *See, e.g.,* CCAC ¶¶ 123 ("*I think* over time, we have learned to optimize some of the tolerability … with the BID dosage"); 128 ("*we believe* that 16 QD is a safe and effective dose and obviously aligned with FDA on the confirmatory study to go with the 8-milligram BID . . .") (emphasis added); *see In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 219 (S.D.N.Y. 2022) (examples of opinion statements include "I think," "I believe," and "I like how things are going."); *In re Mindbody,* 489 F. Supp. 3d at 202 (opinions not actionable unless speaker disbelieved the statement, or opinion contained or implied facts that can be proven false); *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 753 (S.D.N.Y. 2018) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015) ("[f]or a statement of opinion or belief to be actionable as an untrue statement of material fact, a complaint must plead facts sufficient to show that the defendant did not hold the belief . . . professed")). As discussed above, Plaintiff does not adequately plead that Defendants' statements contained false facts. And Plaintiff offers no facts demonstrating that the speaker, Riga, did not genuinely believe his statements about dose optimization or alignment with the FDA. Absent particularized facts indicating that defendants "held a private opinion different from [their] public opinions,"

plaintiff's allegations "are simply insufficient to state a claim for securities fraud." *Sanofi*, 87 F. Supp. 3d at 544 (quoting *Salomon*, 350 F. Supp. 2d at 493).

Even if the FDA ultimately reached a different conclusion with respect to whether Spectrum's existing data was sufficient to determine the optimal dose of Poziotinib to be used in the PINNACLE trial, the Second Circuit and other courts have rejected claims that statements about the design of clinical trials or interpretation of clinical trial results were false or misleading where (as here) the only factual support offered is contrary opinions expressed by the FDA staff or advisory panel members. *Tongue*, 816 F.3d at 214 ("At bottom, Plaintiffs' allegations regarding Defendants' stated opinion about the [clinical] trial results are little more than a dispute about the proper interpretation of data, a dispute this Court rejected as a basis for liability . . . Defendants' statements were not misleading simply because the FDA disagreed with Defendants' interpretation of the data"); *Fort Worth Employers' Ret. Fund v. Biovail*, 615 F.Supp. 2d 218, 231 (S.D.N.Y. 2009) (no duty to disclose FDA feedback critical of the design of an ongoing study); *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953, 966 (D. Md. 1995) (no duty to disclose the FDA's questions about a clinical trial design).

As explained in *Sanofi*, 87 F. Supp. 3d at 543, "reasonable persons may disagree over how to analyze data and interpret results." Indeed, opinions differed even amongst the Poziotinib ODAC panel members, with four participants recommending accelerated approval. ODAC Minutes at 8; *see In re Columbia Lab'ys, Inc. Sec. Litig.*, 2013 WL 10914123, at *4 (D.N.J. June 11, 2013) (four panel votes in favor of approval of the NDA indicated "there were not glaring flaws in [drug development] that Defendants knew or should have known directed non-approval"); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 471 (S.D.N.Y. 2008) (finding no scienter in case of 11-1 Advisory Panel vote against approval, noting that FDA

briefing book "[did] not in fact have the significance attributed to it by plaintiffs," and that

"[company] had its side of the case and the FDA staff had its side."), *aff'd sub nom. State Univs.*

*Ret. Sys. of Ill. v. AstraZeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).

Finally, Plaintiff's claim that the dose optimization statements were false and misleading

because Spectrum knew but did not disclose that the FDA still had questions about the adequacy

of available dosing data suffers from a fatal flaw:  Spectrum never stated the FDA had no further

questions regarding dosing, or that a final decision had been reached on the optimal dose.  In

fact, Defendants explicitly acknowledged the opposite.  CCAC ¶¶ 130 ("*It's very logical that the*

*FDA could have additional questions on dosing and wanting to hear from industry experts on*

*how to bring that issue to resolution.*"); 128 (describing the question of which dosing regimen

should be used as a "*conundrum*," about which the FDA likely "*would like to hear from industry*

*experts at the ODAC panel*") (emphasis added).  Plaintiff is splitting hairs suggesting that the

phrase "could have questions" is meaningfully different than "will have questions," but assuming

*arguendo* there is a distinction, Spectrum expressly acknowledged the FDA's dosing questions

on multiple occasions.  *See, e.g.*, Ex. 9 (Jefferies Healthcare Conference – Fireside Chat (June 9,

2022 Tr.) ("*FDA had some concerns regarding dosing.  … I think there are dosing questions*

*that exist.*") (emphasis added)), Ex. 10 (Spectrum Pharm. Inc., FQ2 Earnings Call Tr. (August

11, 2022)) at 7 ("[W]e don't know for sure, but we expect that topic [of dosing] will come up

during ODAC and we're fully prepared to address any further questions.").

Finally, to the extent Plaintiff asserts that Spectrum was obligated to disclose FDA

concerns or questions regarding dose optimization, (*e.g.*, CCAC ¶¶ 131, 137), Plaintiff misses

the mark.  The law is clear that "there is no affirmative duty to disclose the substance of interim

feedback received from the FDA during the pendency of a drug application."  *See Gillis v. QRX*

13

*Pharma Ltd.*, 197 F. Supp. 3d 557, 584 (S.D.N.Y. 2016). As the Second Circuit has explained, "Defendants need not [disclose] the FDA feedback merely because it tend[s] to cut against their projections—Plaintiffs [are] not entitled to so much information as might have been desired to make their own determination about the likelihood of FDA approval by a particular date." *Tongue*, 816 F.3d at 211-12; *see also In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 352 (S.D.N.Y. 2020) (investors would not expect every view of the data taken by defendants was shared by the FDA and a corporate defendant need not disclose all negative facts that tend to cut against their projections of FDA approval); *Sanofi*, 87 F. Supp. 3d 510, 541–42 (similar, collecting cases); *In re MELA Scis, Inc. Sec. Litig*, 2012 WL 4466604, at \*13–14 (S.D.N.Y. Sept. 19, 2012) (no duty to disclose FDA feedback expressing concerns about ongoing clinical trials). Likewise, investors "would fully expect that defendants and the FDA were engaged in a dialogue, as they were here, about the sufficiency of various aspects of the clinical trials and that inherent in the nature of a dialogue are differing views." *Tongue*, 816 F.3d at 211.

## 2. Plaintiff Fails to State a Claim Based on Spectrum's Statements Regarding the Confirmatory Study

Plaintiff also alleges that Defendants affirmatively represented that Spectrum had enrolled patients in the PINNACLE trial. CCAC ¶¶ 125-27, 138-44. But again, Plaintiff divorces Defendants' statements from their context, selectively cutting and pasting a virtually identical description of the PINNACLE study design that clearly describes the protocol but does not represent the current status of implementation. Plaintiff challenges the following statement, repeated in a number of Spectrum's public disclosures:

> A study for poziotinib has been initiated to confirm the clinical benefit seen in Cohort 2, as required for accelerated approval. The trial, Study SPI-POZ-301 (PINNACLE), *is designed to enroll* 268 patients with previously treated NSCLC harboring HER2 exon 20 mutations. *Patients are being randomized* 2-to-1 into one of two treatment arms using 8mg of poziotinib orally administered BID (twice daily) versus 75mg/m2 of docetaxel

14

administered intravenously every three weeks.  The primary endpoint *will be* Progression Free Survival.

*See* CCAC ¶¶ 125, 126, 138, 140 (emphasis added).  In context, Defendants' statement is most appropriately read as a description of the PINNACLE protocol and design, *not* as an announcement of patient enrollment.  In other words, the phrase repeatedly seized on by Plaintiff, "are being randomized," is just a description of the study protocol, not a statement about what was currently happening in the field.  This is confirmed by the overall prospective context in which the statement is made.  For example, during the May 12, 2022 earnings call, Defendants said "*we are actively engaged in opening these sites as we speak*" (implying the sites were merely being opened or not even yet open, not already enrolling patients).  Ex. 11 (Spectrum Pharm., Inc., FQ1 Earnings Call Tr. (May 12, 2022)) at 7 (emphasis added).  The understanding that the Company was speaking of its future plans is further supported by an analyst question during the same May 12 earnings call: "Can you just talk more about the types of patients that *you're anticipating enrolling* into the study?" (i.e., not already enrolled in the study).  *Id.* (emphasis added).

The August 11, 2022 earnings call similarly described the study in the future tense, stating "Patient[s] *will be* evaluated," and "*will be* allowed to cross over to [the] pozi arm."  Ex. 10 (Spectrum Pharm., Inc., FQ2 Earnings Call Tr. (Aug. 11, 2022)) at 5.  Indeed, on prior occasions, Spectrum had specifically announced when it had enrolled its first patient, and the only fair inference is that it would have done so here had it intended to convey that message.[11]

---

[11] *See, e.g.*, Exs. 12, 13, 14, 15 (Press Releases, Spectrum Pharm., Inc.: *Spectrum Pharmaceuticals Expands Poziotinib Clinical Trial Into First-Line Therapy and Doses First Patient* (Sept. 12, 2018); *Spectrum Pharmaceuticals, Inc. Announces Enrollment of First Patient in a Phase 3 Trial of Qapzola* (Aug. 14, 2017); *Spectrum Pharmaceuticals Begins Enrolling Patients in Registrational Trial of SPI-2012, a Novel, Long Acting G-CSF in Patents with Breast Cancer* (Jan. 29, 2016); *Spectrum Pharmaceuticals Commences Patient Enrollment in Randomized Phase 2b Clinical Trial of Ozarelix for Hormone-Dependent Prostate Cancer* (Aug. 14, 2012).

Read in light of the surrounding text as well as the broader context of industry and Company practices, as it must be, the challenged statement describes how the study will operate prospectively, and is not a real-time announcement that patients had already been enrolled. *Omnicare,* 575 U.S. at 190 (a reasonable investor "reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," and "takes into account the customs and practices of the relevant industry"); *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (Whether a statement is false or "'mislead[ing]' is 'evaluated not only by 'literal truth,' but by 'context and manner of presentation.'").[12]  That a single analyst at JPM misunderstood the disclosure, CCAC ¶ 17, is irrelevant; falsity turns on what *Defendants* disclosed.  CCAC ¶ 125; *Novak*, 216 F.3d at 314 (corporate officers not responsible for inaccurate statements in analyst reports).  Notably, other analysts did not misunderstand Defendants' statement,[13] and subsequent reports by the same JMP analyst do not repeat the error.[14]  Plaintiff cites no other analyst similarly misinterpreting these statements in May or August, or otherwise reporting that patients had been enrolled.[15]

Plaintiff also challenges a response to an analyst question during the August 11, 2022 earnings call.  CCAC ¶¶ 142-43.  During that Q&A, an analyst inquired about whether sites were open and the status of enrollment in the confirmatory trial.  *Id.* at 144.  Lebel responded "*So*

---

[12] *See also Gross v. AT&T Inc.*, 2021 WL 9803956, at *5 (S.D.N.Y. Sept. 27, 2021), (evaluating allegedly false statement "in the context of [Defendant's] entire statement"), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022).

[13] *See* Ex. 16, (E. White, Wainwright Analyst Report (May 13, 2022) at 1 ("The design of the study *randomizes* patients 2:1 using 8mg poziotinib orally administered . . . ." (emphasis added))).

[14] *See* Exs. 17, 18, 19, 20 (R. Benjamin, JMP Analyst Reports (June 7, 2022); (Aug. 12, 2022); (Sept. 13, 2022) and (Sept. 21, 2022)); *see Bristol-Myers*, 28 F.4th at 352 (judicial notice of other analyst reports appropriate where relying on the same public information).

[15] Among others, it is uncontroverted that Spectrum was actively followed by analysts from Wainwright, Cantor Fitzgerald, JMP, B. Riley FBR, Inc. and Jefferies.

16

*we're – again, were very active in opening site[s]. But as I'm sure you know, it takes a long time to open sites. We have some site[s] open. I'm not going to give you numbers today. I'm not going to speak directly to enrollment today.*" *Id.* (emphasis added). This did not represent that patients had been enrolled, which is distinct from having sites open. Spectrum's measured response—confirming only that the Company is engaged in opening multiple sites where patients might be recruited and that such a process takes time—undermines Plaintiff's claim.[16] Lebel's express declination to respond to the analyst's question is not confirmation of enrollment, if anything, it merely communicates no willingness to engage on that topic. *See In re AnaptysBio, Inc.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021) (noting defendants did not have duty to answer all questions from analysts).

Similarly, when Lebel is asked where Spectrum needs to be on enrollment, he responds: "So we have discussed directly with the agency if there was a particular threshold that we had to achieve by PDUFA da[te] and the information we got from the [agency is] that this would be a multifactorial judgment that there's not a single number that one has to achieve . . . ." CCAC ¶ 142. Plaintiff claims this statement is somehow false or misleading, but immediately concedes that the FDA did not in fact require a specific number of patients to be enrolled by November 24, 2022. *Id.* ¶ 143.[17] Contrary to Plaintiff's unsubstantiated assertions, Defendants never

---

[16] *See* Erin Williams, et al., *Improving the Time to Activation of New Clinical Trials at a National Cancer Institute-Designated Comprehensive Cancer Center*, JCO ONCOLOGY PRACTICE (VOL. 16, ISSUE 4) (2020) (due to a combination of regulatory hurdles, competing institutional interests, and industry demands, "a new clinical trial often takes upwards of 6 months from receiving a protocol to activation of the trial and potential enrollment of the first patient."); *Bristol-Myers,* 28 F.4th at 352 (judicial notice of scientific publications appropriate).

[17] As discussed, *supra*, Spectrum had no duty to disclose interim communications with the FDA. *See Tongue*, 816 F.3d at 211-14 (no duty to disclose FDA feedback, even if investors "would have been interested in knowing about" it); *In re Philip Morris*, 437 F. Supp. 3d at 352-54 (no duty to disclose all negative facts that tended to cut against their projections of FDA approval); *Gregory v.ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 411 (S.D.N.Y.) (no duty to disclose that clinical trial study design and protocol amendments were contrary to FDA recommendations), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

represented that Spectrum had enrolled any patients in the trial as of a date certain, it is uncontroverted that substantial enrollment in the planned study was to be evaluated as of November 24, 2022, and Plaintiff has not demonstrated how Defendants could know with certainty on August 11 where enrollment would stand more than three months later.

### 3.    Spectrum's Statements Regarding the Likelihood of FDA Approval and Related Risk Disclosures Are Not Actionable

According to Plaintiff, Defendants falsely represented the likelihood of success for the Poziotinib NDA.  *See* CCAC ¶ 136-37.[18]  Plaintiff also claims that Spectrum's related risk warnings in public filings concerning the potential for delays or inabilities to secure approval were false because the risks had already materialized, and Defendants somehow knew that Poziotinib would not be approved.  *See* CCAC ¶¶ 133-37, 145-47.  But it is well-established that predictions regarding FDA approval are forward-looking statements and thus within the PSLRA safe harbor protections.  *See In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, No. 21-cv-8255, 2023 WL 2308151, at *8 (S.D.N.Y. Mar. 1, 2023) (courts in the Southern District of New York have consistently held statements about FDA approval are classically forward-looking because they address what defendants expect to occur in the future); *Kovtun v. VIVUS, Inc.,* 2012 WL 44776478, at *11-12 (N.D. Cal. Sept. 27, 2012) ("Projections about the likelihood of FDA approval are forward-looking statements . . . [that] fall under the PSLRA's safe harbor rule."), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015).  Defendants' statements about potential FDA approval prior to the PDUFA date were inherently forward-looking, and

---

[18] Plaintiff points to Riga's statement that Spectrum was on "the cusp of not just one, but two FDA approvals with the action dates in the next five months."  CCAC ¶ 136; Ex. 21 (Spectrum Pharm., Inc. JMP Sec. Life Scis. Conf. Tr. (June 16, 2022) ("JMP Tr.") at 2).  Again, Plaintiff is cherry-picking.  At the same conference, Riga also stated that dual approvals are "a challenge that we accept with open arms, pending FDA approvals."  JMP Tr. at 3.  In other words, Defendants acknowledged that approvals would be a "challenge" and were far from guaranteed.

Spectrum's public filings contained meaningful cautionary language regarding the risk factors that could negatively affect Poziotinib's chances of approval. For example, Spectrum warned of the potential for disagreements with the FDA regarding how to interpret study results (*i.e.*, whether data was adequate to determine dose optimization), the potential for delays due to "difficulties in identifying and enrolling patients who meet trial eligibility criteria" or "[s]lower than anticipated patient enrollment or our inability to recruit and enroll patients to participate in clinical trials for various reasons," and the potential impact of competing drug candidates from other companies, all of which could prevent FDA approval. Annual Report at 16, 18, 26, 28; Spectrum May 12, 2022 Press Release (forward-looking statements include those relating to "the likelihood and timing of the FDA approval of poziotinib"); *see also Sanofi*, 87 F. Supp. 3d at 535-36 (statements "that a regulatory authority such as the FDA could deny or delay approval of [the drug]" triggered safe harbor). Additionally, Plaintiff has not sufficiently alleged that these forward-looking statements were made by a person with actual knowledge of their falsity. *See infra*, 23-25. This failure provides an independent ground for applying the PSLRA safe harbor. *See Sanofi*, 87 F. Supp. 3d at 529.[19]

The remainder of Plaintiff's allegations are a baseless attempt to weaponize certain cautionary disclosures in Spectrum's Annual Report incorporated by reference into Form 10-Q filings in May and August 2022. CCAC ¶¶ 133-35, 145-47. Plaintiff argues that "delay" in

---

[19] Additionally, such statements are non-actionable expressions of corporate optimism. *See, e.g.*, CCAC ¶ 136-37 ("on the cusp" of FDA approvals). *Gillis*, 197 F. Supp. 3d at 585, 590 (expressions of confidence in drug's eventual approval were inactionable opinion where no allegation that defendants did not honestly believe statements made at that time or facts upon which defendants relied were false, and no conflict between statements and alleged omission); *In re EDAP TMS S.A. Sec. Litig.* No. 14-CV-6069 (LGS), 2015 WL 5326166, at *9-10 (S.D.N.Y. Sept. 14, 2015) (finding statements that FDA approval process was "on track" and making "progress" to be puffery because they did no more than place a "positive spin on developments"); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565-66 (S.D.N.Y. 2011) (statement "[w]e are still planning and we continue to plan for a [drug] launch also in the U.S. in the second half of 2006" was non-actionable corporate optimism).

enrolling patients in the confirmatory clinical trials had begun to be experienced by May and August, 2022 and therefore Spectrum's risk disclosures were somehow false. That is a non-starter. First, the PDUFA date of November 24, 2022 by which substantial enrollment and regulatory approval would be evaluated was more than six months from May and three months from August, so at the time the filings were made no such risk had yet been realized. Second, Plaintiff fails to allege that the enrollment status of the confirmatory trial was singularly dispositive as to whether Poziotinib would be approved, as opposed to a multi-factorial decision. *See* FDA Briefing Book at 33-34. Relatedly, Plaintiff misapprehends the nature of the risk being addressed in the Annual Report. The cited portion is set forth under the heading: "Clinical trials may fail to demonstrate the safety and efficacy of our drug products, *which could prevent or significantly delay obtaining regulatory approval*." Annual Report at 16 (emphasis added). In other words, the over-arching risk at stake is the inability to achieve regulatory approval, not the potential for clinical trial delay, which is just one of many factors that could conceivably contribute to non-approval. *See id.* (identifying multiple factors, including FDA contrary interpretation of data, safety and efficacy, adverse events, a variety of potential clinical trial problems, etc.). Thus, for Plaintiff's allegations to be actionable, Defendants would have to have known with near certainty that regulatory approval was unachievable as a result of clinical trial delay in May and August, which Plaintiff fails to allege. *See Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LFL), 2021 WL 1177505, at *19-20 (S.D.N.Y. Mar. 29, 2021) (when risk disclosures were issued, risk that noncompliance with FFDCA would result in adverse action "had neither transpired nor become a 'near certainty'" even if the "alleged noncompliance had occurred"); *Hou Liu v. Intercept Pharm., Inc.*, 2020 WL 148931, at *12 (S.D.N.Y. Mar. 26, 2020) ("The statement that the use of Ocaliva 'may result in side effects, adverse reactions or

20

misuse' was made in context that these events could affect Intercept's income. If, when the statements were made, any misuse or adverse events had affected Intercept's earnings negatively, then the statement would have been misleading. But there are no such allegations."); *Williams v. Globus Med., Inc.*, 869 F.3d 235, 242-43 (3d Cir. 2017) (disclosure that sales could be adversely affected if independent distributors ceased doing business with company not misleading even though company had terminated relationship with one such distributor but sales had not yet been affected); *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 536 (S.D.N.Y. 2020) (risk disclosures not misleading because risk at issue had not "already materialized").[20] Of course, both Form 10-Q SEC filings also well predated the anticipated ODAC meeting on September 22, which Spectrum expected might provide "resolution" of the FDA's dose optimization questions, and clarity concerning the confirmatory study.[21]

### C.    Plaintiff Does Not Sufficiently Allege Defendants Acted With Scienter

"For an inference of scienter to be strong, a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Mindbody,* 489 F. Supp. 3d at 202. Plaintiff's scienter allegations come nowhere close to establishing the "strong inference" required.

---

[20] *See also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 133 (2d Cir. 2011) (risk disclosure that defendant "may" place support bids in auctions not misleading when plaintiff failed to allege facts that defendant "knew with certainty" the market would fail without support bids); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (risk that noncompliance with securities regulations "would actually cause a loss to the company or its shareholders" had not materialized); *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186, at *8 (N.D. Ill. Jan. 6, 2020) (risk disclosures still operative because risk had not yet materialized while Tribune remained in discussions with DOJ regarding governmental approval of merger), *aff'd sub nom. Water Island Event-Driven Fund, LLC v. Tribune Media Co.*, 39 F.4th 402 (7th Cir. 2022).

[21] Significantly, this allegation concerning the June 30, 2022 Form 10-Q is the only false statement attributed to CFO Brennan, as she was only appointed to that position effective May 25, 2022. CCAC ¶ 49. Plaintiff particularly fails to plead Brennan's knowledge of any facts or access to information that would have contradicted the contents of that SEC filing. *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015).

### 1.    Plaintiff Fails to Plead Scienter Based on Stock Sales

Plaintiff's scienter allegations rely heavily on stock sales by the Individual Defendants and Spectrum. While "motive and opportunity to defraud may be inferred from 'insider trading activity,' . . . 'the mere fact that insider stock sales occurred does not suffice to establish scienter.'" *CBS Corp.*, 433 F. Supp. 3d at 543. Rather, "[f]or trades to be evidence of scienter, the plaintiffs must allege "that the sales were 'unusual' or 'suspicious.'" *Id*. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001).

Plaintiff alleges minimal stock sales by two individual defendants Lebel ($3,554.22 in April and $10,538.04 in June) and Brennan ($2,819.51 in June). CCAC ¶ 157. But there are no allegations that these trades were unusual in amount, or timing, or out of line with prior sales. *See Bristol-Myers*, 28 F.4th at 355; *In re Forest Labs., Inc. Deriv. Litig.*, 450 F. Supp. 2d 379, 389 (S.D.N.Y. 2006) ("corporate insiders sell company stock as a matter of course."). To the contrary, these de minimis sales were made pursuant to 10b5-1 plans and were small fractions of the Individual Defendants' holdings.[22] *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) (such trades not indicative of scienter), *aff'd,* 604 F. App'x 62 (2d Cir. 2015); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 n.14 (S.D.N.Y. 2011) (court may take judicial notice of 10b5-1 plans and consider them on a motion to dismiss). Tellingly, Plaintiff alleges no stock sales at all by CEO Riga, which also negates any inference of scienter. *CBS Corp.*, 433 F. Supp. 3d at 545 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("The fact

---

[22] *See* Ex. 22 (April and June 2022 Form-4 filed by Francois Lebel); Ex. 23 (June 2022 Form-4 filed by Nora Brennan).

22

that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so they could sell their stock at a huge profit.'")).

Plaintiff also alleges that via an April 2019 "at the market" or "ATM" Agreement Spectrum raised proceeds of $9.4 million.  CCAC ¶ 154.  Plaintiff claims this is indicative of scienter because "Defendants were motivated to take a risky gamble and prematurely rush the Pozi NDA and the PINNACLE Study without the dose optimization data required by the FDA and mislead investors because Spectrum was in a precarious financial condition and needed to raise cash."  *Id*. ¶ 156.  But even crediting Plaintiff's speculation, this kind of routine and generic capital raising "motive" is insufficient.  *See ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d at 414 (pharmaceutical company's desire to raise capital "exactly the sort of generalized 'motives' that the courts in this District regularly reject as bases for inferring scienter"); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y.) (motivation of corporation to raise money far too generalized, even where failure to raise funds would trigger events that "threaten the 'survival' of a company"), *aff'd sub nom Condra v. PXRE Grp., Ltd.*, 357 F. App'x 393 (2nd Cir. 2009); *see also Cozzarelli v. Inspire Pharms. Inc*., 549 F.3d 618, 627 (4th Cir. 2008) ("If we inferred scienter from every bullish statement by a pharmaceutical company that was trying to raise funds, we would choke off the lifeblood of innovation in medicine by fueling frivolous litigation—exactly what Congress sought to avoid by enacting the PSLRA.").

### 2. Plaintiff Fails to Plead Scienter Based on Circumstantial Evidence of Conscious Misbehavior or Recklessness

Absent any cognizable motive, the circumstantial evidence of conscious misbehavior "must be correspondingly greater" and show "highly unreasonable" behavior or that which evidences "an extreme departure from the standards of ordinary care."  *Bristol-Myers,* 28 F.4th at

355; *Kalnit*, 264 F.3d at 142.  No such "correspondingly greater" "extreme departures" are alleged with particularity in the CCAC.  Plaintiff merely alleges in conclusory fashion that Defendants collectively had "actual knowledge" of the materially false and misleading nature of the statements they made or at least acted "recklessly."  CCAC ¶ 152.  Such superficial allegations cannot support the requisite strong inference of scienter.  *Glaser*, 772 F. Supp. 2d at 591 ("conclusory statements that defendants 'were aware' of certain information" or "'would have' or 'should have' had such knowledge" cannot support a strong inference of scienter).  Here, Plaintiff has not shown how knowledge of clinical trial results, enrollment status, or the FDA's feedback put Defendants on notice that approval was so unlikely that their optimistic statements would mislead investors.  In other words, even assuming each Defendant knew each fact alleged in the Complaint, that would not add up to knowingly or recklessly making a false statement about dose optimization, patient enrollment, or the likelihood of FDA approval.  *See Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) ("Appellants have not alleged any facts indicating that the content of the reports or data to which Appellees were privy was inconsistent with their statements.").

Moreover, Plaintiff impermissibly alleges scienter against all Defendants as a group, without showing the requisite state of mind for *each* defendant.  15 U.S.C. § 78u-4(b)(2).  Plaintiff does not allege with particularity how Riga, Lebel or Brennan *each individually* had knowledge of how ODAC or the FDA would come out, which might render any statements about the likelihood of approval false.  As noted earlier, the 9-4 divided vote by ODAC alone eviscerates Plaintiff's claim that either dose optimization questions or lack of enrollment in the confirmatory study were insurmountable impediments to a positive recommendation for Poziotinib.  Moreover, Defendants could not have known in advance of the FDA's accelerated

24

approval of Enhertu in August, weeks before the September ODAC meeting, and how that might affect the recommendation of ODAC or the determination of the FDA. *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d at 471 ("Nothing appears in the complaint showing that there was a consensus of the management that the risks . . . made the drug unlikely to be approved.").[23]

In sum, Plaintiff has failed to plead any theory of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324.[24]

## IV.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a)

It is well-established that where a plaintiff fails to establish a primary violation of Section 10(b) and Rule 10b-5, it necessitates dismissal of the related Section 20(a) claims. *ATSI Commc'ns*, 493 F.3d at 108; *Russo v. Bruce*, 777 F. Supp. 2d 505, 528 (S.D.N.Y. 2011) (collecting cases).

## V.     CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss should be granted.

---

[23] To the extent Plaintiff implicitly alleges Lebel's resignation on January 4, 2023 from Spectrum (CCAC ¶ 39) is somehow relevant to inferring scienter, that allegation also goes nowhere. *See Rosenzweig v. Azurix, Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (resignation of key official more likely probative of the fact the company was failing than of improprieties); *see also ProNAi Therapeutics*, 297 F. Supp. 3d at 415 (one resignation not sufficient to establish scienter).

[24] To the contrary, given Spectrum's continued investment in the clinical trials for Poziotinib and its pursuit of FDA approval of its NDA, it is implausible that Defendants did not genuinely believe they could address the FDA's dose optimization questions and ultimately enroll and complete the confirmatory study. This is particularly true where, as here, the FDA authorized the Company to conduct its confirmatory trial. *Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*, 838 F.3d 76, 81 (1st Cir. 2016) (investment in clinical trial design and performance of clinical study suggests that company "must have thought that positive results were possible"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("[T]he initiation of Phase 3 cost millions of dollars and required FDA approval, rendering it improbable that defendants would have continued if they did not believe their interpretation of the interim results or if they thought the drug a complete failure."); *In re Columbia Lab'ys, Inc. Sec. Litig.*, 2013 WL 10914123, at *4 (given facts such as Defendants' continued investment in drug and its NDA, FDA's acceptance of the NDA filing and decision to convene an Advisory Panel, and the four panel votes in favor of approval of the NDA the "more compelling inference is that there were not glaring flaws in [drug development] that Defendants knew or should have known directed non-approval.").

Dated: July 25, 2023
New York, New York

**PAUL HASTINGS LLP**

*s/ Kevin P. Broughel*
Kevin P. Broughel
James L. Ferguson
200 Park Avenue
New York, New York 10166
Telephone: 212-318-6000
Facsimile: 212-319-4090
kevinbroughel@paulhastings.com
jamesferguson@paulhastings.com

**PAUL HASTINGS LLP**
Christopher H. McGrath
(admitted *pro hac vice*)
695 Town Center Drive
17th Floor
Costa Mesa, California 92626-1924
Telephone: 714-668-6200
Facsimile: 714-979-1921
chrismcgrath@paulhastings.com

*Counsel for Defendants*