# EXHIBIT 8

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2022**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 001-35006**

**SPECTRUM**
PHARMACEUTICALS
*Redefining Cancer Care*

# SPECTRUM PHARMACEUTICALS, INC.
**(Exact name of registrant as specified in its charter)**

| Delaware | | | | 93-0979187 |
|---|---|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | | | | **(I.R.S. Employer Identification No.)** |
| **Pilot House - Lewis Wharf, 2 Atlantic Ave** | **6th Floor** | **Boston** | **MA** | **02110** |
| **(Address of principal executive offices)** | | | | **(Zip Code)** |

**(617) 586-3900**

**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | SPPI | The NASDAQ Global Select Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of August 8, 2022, 188,164,186 shares of the registrant's common stock were outstanding.

Table of Contents

**Spectrum Pharmaceuticals, Inc.**
**Quarterly Report on Form 10-Q**
**For the Three and Six Months Ended June 30, 2022**

**TABLE OF CONTENTS**

| Item | | Page |
|------|---|------|
| | **PART I. FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements (unaudited): | |
| | Condensed Consolidated Balance Sheets | 3 |
| | Condensed Consolidated Statements of Operations | 4 |
| | Condensed Consolidated Statements of Comprehensive Loss | 5 |
| | Condensed Consolidated Statements of Stockholders' Equity | 6 |
| | Condensed Consolidated Statements of Cash Flows | 8 |
| | Notes to Condensed Consolidated Financial Statements | 9 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 4. | Controls and Procedures | 29 |
| | **PART II. OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 30 |
| Item 1A. | Risk Factors | 30 |
| Item 6. | Exhibits | 33 |
| | Signatures | 34 |

Items 2 through 5 of Part II have been omitted because they are not applicable with respect to the current reporting period.

S*PECTRUM PHARMACEUTICALS, INC.* ® *is a registered trademark of Spectrum Pharmaceuticals, Inc. and its affiliates. REDEFINING CANCER CARE™ and the Spectrum Pharmaceuticals' logos are trademarks owned by Spectrum Pharmaceuticals, Inc. Any other trademarks are the property of their respective owners.*

2

Table of Contents

**Part I: Financial Information**

**Item 1: Financial Statements**

**SPECTRUM PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share and par value amounts)**
**(Unaudited)**

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 25,512 | $ | 88,539 |
| Marketable securities | | 42,447 | | 12,108 |
| Other receivables | | 608 | | 1,028 |
| Prepaid expenses and other current assets | | 5,012 | | 2,277 |
| Total current assets | | 73,579 | | 103,952 |
| Property and equipment, net | | 347 | | 455 |
| Facility and equipment under lease | | 1,703 | | 2,505 |
| Other assets | | 3,800 | | 4,636 |
| Total assets | $ | 79,429 | $ | 111,548 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and other accrued liabilities | $ | 33,123 | $ | 41,258 |
| Accrued payroll and benefits | | 7,918 | | 11,971 |
| Total current liabilities | | 41,041 | | 53,229 |
| Other long-term liabilities | | 4,946 | | 10,766 |
| Total liabilities | | 45,987 | | 63,995 |
| Commitments and contingencies (*Note 6*) | | | | |
| Stockholders' equity: | | | | |
| Preferred stock, $0.001 par value; 5,000,000 shares authorized; no shares issued and outstanding | | - | | - |
| Common stock, $0.001 par value; 300,000,000 shares authorized; 184,870,273 and 164,502,013 issued and outstanding at June 30, 2022 and December 31, 2021, respectively | | 185 | | 165 |
| Additional paid-in capital | | 1,124,625 | | 1,094,353 |
| Accumulated other comprehensive loss | | (2,955) | | (3,042) |
| Accumulated deficit | | (1,088,413) | | (1,043,923) |
| Total stockholders' equity | | 33,442 | | 47,553 |
| Total liabilities and stockholders' equity | $ | 79,429 | $ | 111,548 |

See accompanying notes to these unaudited condensed consolidated financial statements.

3

Table of Contents

**SPECTRUM PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Operating costs and expenses: | | | | |
| Selling, general and administrative | $ 9,385 | $ 14,957 | $ 19,255 | $ 29,272 |
| Research and development | 16,007 | 29,114 | 20,200 | 48,485 |
| Total operating costs and expenses | 25,392 | 44,071 | 39,455 | 77,757 |
| Loss from continuing operations before other income (expense) and income taxes | (25,392) | (44,071) | (39,455) | (77,757) |
| Other income (expense): | | | | |
| Interest income, net | 117 | 26 | 128 | 110 |
| Other expense, net | (3,757) | (5,876) | (5,091) | (7,957) |
| Total other expense | (3,640) | (5,850) | (4,963) | (7,847) |
| Loss from continuing operations before income taxes | (29,032) | (49,921) | (44,418) | (85,604) |
| Provision for income taxes from continuing operations | (13) | (16) | (29) | (9) |
| Loss from continuing operations | (29,045) | (49,937) | (44,447) | (85,613) |
| Loss from discontinued operations, net of income taxes | (3) | (195) | (43) | (216) |
| Net loss | $ (29,048) | $ (50,132) | $ (44,490) | $ (85,829) |
| | | | | |
| Basic and diluted loss per share: | | | | |
| Loss from continuing operations | $ (0.17) | $ (0.32) | $ (0.26) | $ (0.57) |
| Loss from discontinued operations | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) |
| Net loss per share, basic and diluted | $ (0.17) | $ (0.32) | $ (0.26) | $ (0.57) |
| Weighted average shares outstanding, basic and diluted | 175,566,757 | 155,243,402 | 172,558,831 | 150,334,548 |

See accompanying notes to these unaudited condensed consolidated financial statements.

4

Table of Contents

**SPECTRUM PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(In thousands)**
**(Unaudited)**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | **2022** | **2021** | **2022** | **2021** |
| Net loss | $ (29,048) | $ (50,132) | $ (44,490) | $ (85,829) |
| Other comprehensive income (loss): |  |  |  |  |
| Unrealized loss on available-for-sale securities, net of tax | (46) | (11) | (46) | (1,129) |
| Foreign currency translation adjustments | (1) | 191 | 133 | (369) |
| Other comprehensive income (loss) | (47) | 180 | 87 | (1,498) |
| Total comprehensive loss | $ (29,095) | $ (49,952) | $ (44,403) | $ (87,327) |

See accompanying notes to these unaudited condensed consolidated financial statements.

5

Table of Contents

**SPECTRUM PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(In thousands, except share data)**
**(Unaudited)**

| | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity |
| --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | | |
| **Balance as of December 31, 2021** | 164,502,013 | $      165 | $   1,094,353 | $     (3,042) | $ (1,043,923) | $      47,553 |
| Net loss | - | - | - | - | (15,442) | (15,442) |
| Other comprehensive income, net | - | - | - | 134 | - | 134 |
| Recognition of stock-based compensation expense | - | - | 3,011 | - | - | 3,011 |
| Restricted stock award grants, net of forfeitures | 1,675,472 | 2 | (2) | - | - | - |
| Issuance of common shares to Hanmi Pharmaceutical Co., Ltd. | 12,500,000 | 12 | 19,988 | - | - | 20,000 |
| Issuance of common stock upon vesting of performance units | 150,000 | - | - | - | - | - |
| **Balance as of March 31, 2022** | 178,827,485 | $      179 | $   1,117,350 | $     (2,908) | $ (1,059,365) | $      55,256 |
| Net loss | - | - | - | - | (29,048) | (29,048) |
| Other comprehensive loss, net | - | - | - | (47) | - | (47) |
| Recognition of stock-based compensation expense | - | - | 2,077 | - | - | 2,077 |
| Issuance of common shares pursuant to at-the-market offering, net of offering costs | 5,619,827 | 6 | 4,941 | - | - | 4,947 |
| Issuance of common stock for employee stock purchase plan | 388,541 | - | 257 | - | - | 257 |
| Restricted stock award grants, net of forfeitures | 34,420 | - | - | - | - | - |
| **Balance as of June 30, 2022** | 184,870,273 | $      185 | $   1,124,625 | $     (2,955) | $ (1,088,413) | $      33,442 |

6

Table of Contents

| | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance as of December 31, 2020** | 146,083,110 $ | 146 $ | 1,021,221 $ | (1,829) $ | (885,295) $ | 134,243 |
| Net loss | - | - | - | - | (35,697) | (35,697) |
| Other comprehensive loss, net | - | - | - | (1,678) | - | (1,678) |
| Recognition of stock-based compensation expense | - | - | 4,212 | - | - | 4,212 |
| Issuance of common shares under an at-the-market sales agreement | 5,678,893 | 6 | 21,351 | - | - | 21,357 |
| Restricted stock award grants, net of forfeitures | 1,966,333 | 2 | - | - | - | 2 |
| **Balance as of March 31, 2021** | 153,728,336 $ | 154 $ | 1,046,784 $ | (3,507) $ | (920,992) $ | 122,439 |
| Net loss | - | - | - | - | (50,132) | (50,132) |
| Other comprehensive income, net | - | - | - | 180 | - | 180 |
| Recognition of stock-based compensation expense | - | - | 4,360 | - | - | 4,360 |
| Issuance of common stock for employee stock purchase plan | 163,463 | - | 474 | - | - | 474 |
| Issuance of common stock upon exercise of stock options | 1,250 | - | 2 | - | - | 2 |
| Restricted stock award grants, net of forfeitures | 39,127 | - | - | - | - | - |
| Issuance of common stock upon vesting of restricted stock units | 1,386 | - | - | - | - | - |
| Issuance of common shares under an at-the-market sales agreement | 10,172,498 | 10 | 31,255 | - | - | 31,265 |
| **Balance as of June 30, 2021** | 164,106,060 $ | 164 $ | 1,082,875 $ | (3,327) $ | (971,124) $ | 108,588 |

See accompanying notes to these unaudited condensed consolidated financial statements.

7

Table of Contents

**SPECTRUM PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**
**(Unaudited)**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2022 | 2021 |
| **Cash Flows From Operating Activities:** | | |
| Loss from continuing operations | $ (44,447) | $ (85,613) |
| Loss from discontinued operations, net of income taxes | (43) | (216) |
| Net loss | (44,490) | (85,829) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 147 | 138 |
| Stock-based compensation | 5,088 | 8,572 |
| Non-cash lease expense | 724 | 766 |
| Other non-cash items | 183 | 188 |
| Loss on disposal of assets | 4 | - |
| Realized gain on sale of equity holdings | (1,390) | (4,121) |
| Unrealized loss on equity holdings | 5,488 | 12,387 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | - | 68 |
| Other receivables | 414 | (1,063) |
| Prepaid expenses and other current assets | (2,735) | 804 |
| Other assets | 834 | (1) |
| Accounts payable and other accrued liabilities | (8,362) | 5,933 |
| Accrued payroll and benefits | (4,053) | (2,971) |
| Other long-term liabilities | (5,594) | 988 |
| Net cash used in operating activities | (53,742) | (64,141) |
| **Cash Flows From Investing Activities:** | | |
| Proceeds from maturities of investments | 2,695 | 92,023 |
| Proceeds from sale of equity holdings | 985 | 4,062 |
| Purchases of investments | (38,108) | (16,351) |
| Purchases of property and equipment, net | (45) | (140) |
| Net cash (used in) provided by investing activities | (34,473) | 79,594 |
| **Cash Flows From Financing Activities:** | | |
| Issuance of common shares to Hanmi Pharmaceutical Co., Ltd. | 20,000 | - |
| Proceeds from sale of common stock under an at-the-market sales agreement, net | 4,947 | 52,622 |
| Proceeds from sale of stock under our employee stock purchase plan | 257 | 474 |
| Proceeds from employees for exercises of stock options | - | 2 |
| Net cash provided by financing activities | 25,204 | 53,098 |
| Effect of exchange rates on cash and cash equivalents | (16) | 13 |
| Net (decrease) increase in cash and cash equivalents | (63,027) | 68,564 |
| Cash and cash equivalents-beginning of period | 88,539 | 46,009 |
| Cash and cash equivalents-end of period | $ 25,512 | $ 114,573 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for facility and equipment under operating leases | $ 1,164 | $ 1,187 |
| Cash paid for income taxes | $ - | $ 12 |

See accompanying notes to these unaudited condensed consolidated financial statements.

8

Table of Contents

**Spectrum Pharmaceuticals, Inc.**
**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

**Note 1.**
**Description of Business, Basis of Presentation, And Operating Segment**

*(a)*
*Description of Business*

Spectrum Pharmaceuticals, Inc. ("Spectrum," the "Company," "we," "our," or "us") is a biopharmaceutical company with a strategy of acquiring, developing, and commercializing novel and targeted oncology therapies. Our in-house development organization includes clinical development, regulatory, quality and data management.

We have two drugs in late-stage development:

•Eflapegrastim, a novel long-acting granulocyte colony-stimulating factor ("G-CSF") for the treatment of chemotherapy-induced neutropenia. On August 6, 2021, the Company announced the receipt of a complete response letter ("CRL"), that cited manufacturing deficiencies related both to the drug substance and drug product manufacturers. The Company believes it has completed the remediation of these deficiencies and resubmitted the Biologics License Application ("BLA") on March 11, 2022. On April 11, 2022, the Company announced that it had received notice that the BLA had been accepted and received a Prescription Drug User Fee Act ("PDUFA") date of September 9, 2022; and

•Poziotinib, a novel irreversible tyrosine kinase inhibitor under investigation for non-small cell lung cancer ("NSCLC") tumors with various mutations. On December 6, 2021, the Company announced it submitted its New Drug Application ("NDA") for poziotinib to the FDA for use in patients with previously treated locally advanced or metastatic NSCLC with HER2 exon 20 insertion mutations. The NDA submission is based on the positive results of Cohort 2 from the ZENITH20 clinical trial, which assessed the safety and efficacy of poziotinib. The product has received Fast Track designation and there is currently no treatment specifically approved by the FDA for this indication. On February 11, 2022, the Company announced that it had received notice that the NDA had been accepted and received a PDUFA action date of November 24, 2022.

Our business strategy is the development of late-stage assets through commercialization and the sourcing of additional assets that are synergistic with our existing portfolio (through purchase acquisitions, in-licensing transactions, or co-development and marketing arrangements).

*(b) Basis of Presentation*

*Interim Financial Statements*

The interim financial data for the three and six months ended June 30, 2022 and 2021 is unaudited and is not necessarily indicative of our operating results for a full year. We believe the interim data includes normal and recurring adjustments necessary for a fair presentation of our financial results for the three and six months ended June 30, 2022 and 2021. Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP") have been condensed or omitted pursuant to the Securities and Exchange Commission ("SEC") rules and regulations relating to interim financial statements. Certain prior period amounts have been reclassified for consistency with the current year presentation. The accompanying Condensed Consolidated Financial Statements should be read in conjunction with our audited Consolidated Financial Statements and Notes thereto included within our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 (filed with the SEC on March 17, 2022).

*Discontinued Operations - Sale of our Commercial Product Portfolio*

In March 2019, we completed the Commercial Product Portfolio Transaction (see Note 7) to Acrotech Biopharma LLC ("Acrotech") (the "Commercial Product Portfolio Transaction"). In accordance with applicable GAAP (*ASC 205-20, Presentation of Financial Statements*), the revenue-deriving activities and allocable expenses of our sold commercial

9

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

operations, connected to the Commercial Product Portfolio, are separately classified as "discontinued" for all periods presented within the accompanying Condensed Consolidated Statements of Operations.

### *Principles of Consolidation*

The accompanying Condensed Consolidated Financial Statements have been prepared in accordance with GAAP and with the rules and regulations of the SEC. These financial statements include the financial position, results of operations, and cash flows of Spectrum and its subsidiaries, all of which are wholly-owned. All inter-company accounts and transactions among these legal entities have been eliminated in consolidation. Substantially all of the accumulated other comprehensive loss is comprised of foreign currency translation adjustments at June 30, 2022.

### *Liquidity and Going Concern*

The Company expects to incur future net losses as it continues to fund the advancement and commercialization of its product candidates. As of June 30, 2022, the Company had approximately $68.0 million in aggregate cash, cash equivalents and marketable securities and an accumulated deficit of $1.1 billion. Based on its available cash resources, the Company does not have sufficient cash on hand to fund its current operations for more than twelve months from the date of filing this Quarterly Report on Form 10-Q. This condition raises substantial doubt about the Company's ability to continue as a going concern.

The Company is subject to a number of risks, including the need for substantial additional capital to continue its development programs and to fulfill its planned operating goals. In particular, the Company's currently planned operating and capital requirements include the need for substantial working capital to support the development and commercialization activities for its lead product candidates, eflapegrastim and poziotinib. The Company resubmitted a BLA to the FDA on March 11, 2022 for eflapegrastim for the treatment of chemotherapy-induced neutropenia and on April 11, 2022 announced that it had received notice that the BLA had been accepted and received a PDUFA date of September 9, 2022. In addition, an NDA was submitted to the FDA for poziotinib for use in patients with previously treated locally advanced or metastatic NSCLC with HER2 exon 20 insertion mutations on December 6, 2021. On February 11, 2022, the Company announced that it had received notice that the NDA had been accepted and received a PDUFA action date of November 24, 2022. The transition to profitability is dependent on the successful development, approval, and commercialization of eflapegrastim and poziotinib, as well as the achievement of a level of revenues adequate to support our cost structure.

Given the Company's projected operating requirements and its existing cash, cash equivalents and marketable securities, management's plans include evaluating different strategies to obtain the required funding of future operations. These plans may include, but are not limited to, public or private sales of debt or equity securities, out-licensing arrangements, funding from joint-venture or strategic partners, debt financing or short-term loans, or a combination of the foregoing. However, there can be no assurance that the Company will be able to secure such additional financing, or if available, that it will be sufficient to meet its needs or be on favorable terms. Therefore, the plans cannot be deemed probable of being implemented. As a result, the Company's plans do not alleviate substantial doubt about our ability to continue as a going concern.

The accompanying financial statements have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the ordinary course of business. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might result from the outcome of the uncertainties described above.

### *(c) Operating Segment*

We operate one reportable operating segment that is focused exclusively on developing (and eventually marketing) oncology and hematology drug products. For the three and six months ended June 30, 2022 and 2021, all of our operating costs and expenses were solely attributable to these activities (and as applicable, classified as "discontinued" within the accompanying Condensed Consolidated Statements of Operations).

**Note 2.**
**Summary of Significant Accounting Policies And Use of Estimates**

The preparation of financial statements in conformity with GAAP requires our management to make informed estimates and assumptions that affect our reported amounts of assets, liabilities, revenues, and expenses. These amounts may materially differ from the amounts ultimately realized and reported due to the inherent uncertainty of any estimate or assumption. On an on-going basis, our management evaluates (as applicable) its most critical estimates and assumptions, including those related to: (i) the realization of our tax assets and estimates of our tax liabilities; (ii) the fair value of our investments; (iii) the valuation of our stock options and the periodic expense recognition of stock-based compensation; (iv) the potential outcome of our ongoing

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

or threatened litigation; and (v) the future undiscounted cash flows and revenues, as well as assesses our ability to fund our operations for at least the next twelve months from the date of issuance of these financial statements.

Our accounting policies and estimates that most significantly impact the presented amounts within these Condensed Consolidated Financial Statements are further described below:

*(i) Cash and Cash Equivalents*

Cash and cash equivalents consist of bank deposits and highly liquid investments with maturities of three months or less from the purchase date.

*(ii) Marketable Securities*

Marketable securities consist of our holdings in equity securities (including mutual funds), bank CDs, government-related debt securities, and corporate debt securities. For equity securities and mutual funds, any realized or unrealized gains (losses) are recognized in "other income (expense), net" within the Condensed Consolidated Statements of Operations. Debt securities and bank CDs are classified as "available-for-sale" investments and (1) realized gains (losses) are recognized in "other income (expense), net" within the Condensed Consolidated Statements of Operations and (2) unrealized gains (losses) are recognized as a component of "accumulated other comprehensive loss" within the Condensed Consolidated Statements of Stockholders' Equity.

*(iii) Property and Equipment, Net*

Our property and equipment, net, is stated at historical cost, and is depreciated on a straight-line basis over an estimated useful life that corresponds with its designated asset category. We evaluate the recoverability of long-lived assets (which includes property and equipment) whenever events or changes in circumstances in our business indicate that the asset's carrying amount may not be recoverable. Recoverability is measured by a comparison of the carrying amount to the net undiscounted cash flows expected to be generated by the asset group. An impairment loss would be recorded for the excess of net carrying value over the fair value of the asset impaired. The fair value is estimated based on expected discounted future cash flows or other methods such as orderly liquidation value based on assumptions of asset class and observed market data.

*(iv) Stock-Based Compensation*

Stock-based compensation expense for equity awards granted to our employees and members of our Board of Directors is recognized on a straight-line basis over each award's vesting period. Recognized compensation expense is net of an estimated forfeiture rate, representing the percentage of awards that are expected to be forfeited prior to vesting, though is ultimately adjusted for actual forfeitures. We use the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights (as of the date of grant) that have service conditions for vesting. We use the Monte Carlo valuation model to value equity awards (as of the date of grant) that have combined market conditions and service conditions for vesting.

The recognition of stock-based compensation expense and the initial calculation of stock option fair value requires uncertain assumptions, including (a) the pre-vesting forfeiture rate of the award, (b) the expected term that the stock option will remain outstanding, (c) our stock price volatility over the expected term (and that of our designated peer group with respect to certain market-based awards), and (d) the prevailing risk-free interest rate for the period matching the expected term.

With regard to (a)-(d) above: we estimate forfeiture rates based on our employees' overall forfeiture history, which we believe will be representative of future results. We estimate the expected term of stock options granted based on our employees' historical exercise patterns, which we believe will be representative of their future behavior. We estimate the volatility of our common stock on the date of grant based on the historical volatility of our common stock for a look-back period that corresponds with the expected term. We estimate the risk-free interest rate based upon the U.S. Department of the Treasury yields in effect at award grant, for a period equaling the expected term of the stock option.

*(v) Basic and Diluted Net Loss per Share*

We calculate basic and diluted net loss per share using the weighted average number of common shares outstanding during the periods presented. In periods of a net loss, basic and diluted loss per share is the same. For the diluted earnings per

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

share calculation, we adjust the weighted average number of common shares outstanding to include only stock options, warrants, and other common stock equivalents outstanding during the period to the extent that they are dilutive.

There were
24.3 million shares and 12.7 million shares of outstanding securities (including stock options, restricted stock units, unvested restricted stock awards, stock appreciation rights, and performance awards) as of June 30, 2022 and 2021, respectively, that were excluded from the calculation of diluted net loss per share because their inclusion would have been anti-dilutive.

### (vi) Income Taxes

Deferred tax assets and liabilities are recorded based on the estimated future tax effects of temporary differences between the tax basis of assets and liabilities and amounts reported in the financial statements, as well as operating losses and tax credit carry forwards using enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. Realization of deferred tax assets is dependent upon future earnings, the timing and amount of which are uncertain.

We apply an estimated annual effective tax rate ("ETR") approach for calculating a tax provision for interim periods. Our ETR differs from the U.S. federal statutory tax rate primarily as a result of nondeductible expenses and the impact of a valuation allowance on our deferred tax assets, which we record because we believe that, based upon a weighting of positive and negative factors, it is more likely than not that these deferred tax assets will not be realized. If/when we were to determine that our deferred tax assets are realizable, an adjustment to the corresponding valuation allowance would increase our net income in the period that such determination was made.

In the event that we are assessed interest and/or penalties from taxing authorities that have not been previously accrued, such amounts would be included in "provision for income taxes from continuing operations" within the accompanying Condensed Consolidated Statements of Operations for the period in which we received the notice.

### (vii) Research and Development Expenses

Our research and development costs are expensed as incurred. Research and development costs consist primarily of salaries, benefits, and other staff-related costs including associated stock-based compensation, laboratory supplies, clinical trial and related clinical manufacturing costs, costs related to manufacturing preparations, fees paid to other entities that conduct certain research and development activities on our behalf and payments made pursuant to license agreements. Clinical trial and other development costs incurred by third parties are expensed as the contracted work is performed. We accrue for costs incurred as the services are being provided by monitoring the status of activities and the invoices received from our external service providers. We adjust our accruals as actual costs become known. Where contingent milestone payments are due to third parties under research and development or license agreements, the milestone payment obligations are expensed in the earliest period that we determine the respective milestone achievement is probable or has occurred.

### (viii) Fair Value Measurements

We determine measurement-date fair value based on the proceeds that would be received through the sale of the asset, or that we would pay to settle or transfer the liability, in an orderly transaction between market participants. We utilize valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. Fair value measurements are based on a three-tier hierarchy that prioritizes the inputs used to measure fair value. These tiers include the following:

Level 1: Quoted prices (unadjusted) in active markets for identical assets or liabilities that are publicly accessible at the measurement date.

Level 2: Observable prices that are based on inputs not quoted on active markets, but that are corroborated by market data. These inputs may include quoted prices for similar assets or liabilities or quoted market prices in markets that are not active to the general public.

Level 3: Unobservable inputs are used when little or no market data is available.

### (ix) Recently Issued Accounting Standards

12

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

There are several new accounting pronouncements issued by the FASB, which we don't believe had or will have a material impact on our consolidated financial statements, unless otherwise described below.

In June 2022 the Financial Accounting Standards Board issued Accounting Standards Update No. 2022-03, Fair Value Measurement of Equity Securities Subject to Contractual Sale Restrictions. This standard clarifies that a contractual restriction on the sale of an equity security is not considered part of the unit of account of the equity security and, therefore, is not considered in measuring fair value. This standard becomes effective for us on January 1, 2024, and is not expected to have a material impact on our condensed consolidated financial statements and related disclosures.

**Note 3.**
**Fair Value Measurements**

The table below summarizes certain asset and liability fair values that are included within our accompanying Condensed Consolidated Balance Sheets, and their designations among the three fair value measurement categories:

| | June 30, 2022 Fair Value Measurements | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| *Assets:* | | | | |
| Money market funds | $ 6,037 | $ - | $ - | $ 6,037 |
| Equity securities | 1,499 | - | - | 1,499 |
| Government-related debt securities | 44,845 | - | - | 44,845 |
| Mutual funds | 3,603 | 8 | - | 3,611 |
| Key employee life insurance, cash surrender value[1] | - | 3,667 | - | 3,667 |
| | $ 55,984 | $ 3,675 | $ - | $ 59,659 |
| *Liabilities:* | | | | |
| Deferred executive compensation liability[2] | $ - | $ 7,648 | $ - | $ 7,648 |
| | $ - | $ 7,648 | $ - | $ 7,648 |

[1] Included within other assets on our Condensed Consolidated Balance Sheets, and the amount is based on the stated cash surrender value of life insurance policies of named current and former employees at each period-end.

[2] Included $3.9 million within accounts payable and other accrued liabilities and $3.7 million within other long-term liabilities on our Condensed Consolidated Balance Sheets.

| | December 31, 2021 Fair Value Measurements | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| *Assets:* | | | | |
| Equity securities | $ 5,718 | $ - | $ - | $ 5,718 |
| Money market funds | 66,322 | - | - | 66,322 |
| Mutual funds | 6,390 | 9 | - | 6,399 |
| Key employee life insurance, cash surrender value[1] | - | 4,507 | - | 4,507 |
| | $ 78,430 | $ 4,516 | $ - | $ 82,946 |
| *Liabilities:* | | | | |
| Deferred executive compensation liability[2] | $ - | $ 11,243 | $ - | $ 11,243 |
| | $ - | $ 11,243 | $ - | $ 11,243 |

[1] Included within other assets on our Condensed Consolidated Balance Sheets, and the amount is based on the stated cash surrender value of life insurance policies of named current and former employees at each period-end.

[2] Included $2.0 million within accounts payable and other accrued liabilities and $9.2 million within other long-term liabilities on our Condensed Consolidated Balance Sheets.

We did not have any transfers between *"Level 1"* and *"Level 2"* measurement categories for any periods presented.

Our carrying amounts of financial instruments such as cash equivalents, accounts receivable, prepaid expenses, accounts payable, and other accrued liabilities approximate their fair values due to their short-term nature of settlement.

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

**Note 4.**
**Balance Sheet Account Detail**

The composition of selected financial statement captions that comprise the accompanying Condensed Consolidated Balance Sheets are summarized below:

**(a) Cash and Cash Equivalents and Marketable Securities**

We maintain cash balances with select major financial institutions. The Federal Deposit Insurance Corporation (FDIC) and other third parties insure a fraction of these deposits. Accordingly, these cash deposits are not insured against the possibility of a substantial or complete loss of principal and are inherently subject to the credit risk of the corresponding financial institution.

Our investment policy requires that purchased investments may only be in highly-rated and liquid financial instruments and limits our holdings of any single issuer (excluding any debt or equity securities that may be received from our strategic partners in connection with an out-license arrangement).

The carrying amount of our equity securities, money market funds, and bank CDs approximates their fair value (utilizing "Level 1" or "Level 2" inputs) because of our ability to immediately convert these instruments into cash with minimal expected change in value. There were no material unrealized losses on our investment securities at June 30, 2022 or December 31, 2021.

The following is a summary of our presented composition of "cash and cash equivalents" and "marketable securities":

| | Historical or Amortized Cost | | Fair Value | | Cash and Cash Equivalents | | Marketable Securities |
|---|---|---|---|---|---|---|---|
| **June 30, 2022** | | | | | | | |
| Money market funds | $ | 6,037 | $ | 6,037 | $ | 6,037 | $ - |
| Equity securities[1] | | 350 | | 1,499 | | - | 1,499 |
| Government-related debt securities | | 44,891 | | 44,845 | | 7,500 | 37,345 |
| Mutual funds | | 2,318 | | 3,603 | | - | 3,603 |
| Bank deposits | | 11,975 | | 11,975 | | 11,975 | - |
| Total cash and cash equivalents and marketable securities | $ | 65,571 | $ | 67,959 | $ | 25,512 | $ 42,447 |
| **December 31, 2021** | | | | | | | |
| Equity securities | $ | 3,512 | $ | 5,718 | $ | - | $ 5,718 |
| Money market funds | | 66,322 | | 66,322 | | 66,322 | - |
| Bank deposits | | 22,217 | | 22,217 | | 22,217 | - |
| Mutual funds | | 5,218 | | 6,390 | | - | 6,390 |
| Total cash and cash equivalents and marketable securities | $ | 97,269 | $ | 100,647 | $ | 88,539 | $ 12,108 |

[1]Our aggregate equity holdings consist of 0.3 million common shares of CASI Pharmaceuticals, Inc., a NASDAQ-listed biopharmaceutical company, with a fair market value of $1.0 million as of June 30, 2022. We completed the sale of 0.6 million shares of common stock and recognized a $0.7 million gain within "other expense, net" within the accompanying Condensed Consolidated Statements of Operations for the six months ended June 30, 2022. Additionally, we hold 0.6 million common shares of Unicycive Therapeutics, Inc., a NASDAQ-listed biopharmaceutical company, with a fair market value of $0.5 million as of June 30, 2022. We completed the sale of 0.2 million shares of common stock and recognized a $0.2 million gain within "other expense, net" within the accompanying Condensed Consolidated Statements of Operations for the six months ended June 30, 2022.

**(b) Accounts Payable and Other Accrued Liabilities**

14

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

"Accounts payable and other accrued liabilities" consists of the following:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
| Trade accounts payable and other | $ 26,154 | $ 33,408 |
| Lease liability - current portion | 715 | 1,282 |
| Commercial Product Portfolio accruals (Note 7) | 6,254 | 6,568 |
| Accounts payable and other accrued liabilities | $ 33,123 | $ 41,258 |

Amounts presented within "accounts payable and other accrued liabilities" in the accompanying Condensed Consolidated Balance Sheets for our categories of gross-to-net ("GTN") estimates related to the Commercial Product Portfolio accruals were as follows:

|  | Commercial/Medicaid Rebates and Government Chargebacks | Distribution, Data, Inventory and GPO Administrative Fees | Product Return Allowances | Total |
|---|---|---|---|---|
| Balance as of December 31, 2020 | $ 2,601 | $ 942 | $ 4,299 | $ 7,842 |
| (Less): Payments and credits against GTN accruals | (1,159) | - | (115) | (1,274) |
| Balance as of December 31, 2021 | 1,442 | 942 | 4,184 | 6,568 |
| (Less): Payments and credits against GTN accruals | (50) | - | (264) | (314) |
| Balance as of June 30, 2022 | $ 1,392 | $ 942 | $ 3,920 | $ 6,254 |

**Note 5.**
**Stock-Based Compensation**

In June 2018, we adopted the 2018 Long-Term Incentive Plan (the "2018 Plan") which provides for the issuance of restricted stock awards and units, incentive and nonqualified stock options, performance unit awards, stock appreciation rights, and other stock-based awards to employees, consultants and members of our Board of Directors. On June 21, 2022, our shareholders approved an additional 18 million shares to be reserved for issuance under the 2018 Plan.

We report our stock-based compensation expense (inclusive of our incentive stock plan and employee stock purchase plan) in the accompanying Condensed Consolidated Statements of Operations within "total operating costs and expenses" for the three and six months ended June 30, 2022 and 2021, as follows:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2022 | 2021 | 2022 | 2021 |
| Selling, general and administrative | $ 1,197 | $ 3,005 | $ 3,112 | $ 5,803 |
| Research and development | 880 | 1,355 | 1,976 | 2,769 |
| Total stock-based compensation | $ 2,077 | $ 4,360 | $ 5,088 | $ 8,572 |

**Restricted Stock Awards and Restricted Stock Units**

Stock-based award grants to employees generally vest one-third on the first anniversary of the date of grant, and in equal annual installments thereafter over the remaining two years vesting period. In the event of a change in control, all award types with the exception of performance unit awards, will vest in full effective immediately prior to the consummation of the change in control. A total of 1.8 million restricted stock units were granted with a weighted average grant date fair value of $0.65 during the six months ended June 30, 2022.

We granted 2.2 million restricted stock awards with a weighted average grant date fair value of $1.20 during the six months ended June 30, 2022. At June 30, 2022, we had 6.3 million restricted stock awards and units outstanding with a weighted average grant date fair value of $1.73.

15

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

As of June 30, 2022, there was approximately $9.6 million of unrecognized compensation expense related to the unvested portions of restricted stock awards and restricted stock units. This expense is expected to be recognized over a weighted-average period of approximately 1.9 years.

**Stock Options**

Stock option grants to employees, consultants, and members of our Board of Directors generally should be exercised no later than 10 years from the date of grant.

We granted 6.5 million stock options with a weighted average exercise price of $0.65 during the six months ended June 30, 2022. At June 30, 2022, we had 14.6 million options outstanding with a weighted average exercise price of $3.81.

As of June 30, 2022, there was approximately $4.8 million of unrecognized compensation expense related to unvested stock options. This expense is expected to be recognized over a weighted-average period of approximately 2.2 years.

**Note 6.**
**Financial Commitments and Contingencies and Key License Agreements**

**(a) Facility and Equipment Leases**

*Overview*

In the ordinary course of our business, we enter into leases with unaffiliated parties for the use of (i) office and research facilities and (ii) office equipment. Our current leases have remaining terms ranging from less than one year to four years and none include any residual value guarantees, restrictive covenants, term extensions, or early-termination options.

We lease our principal executive office in Boston, Massachusetts under a non-cancelable operating lease expiring December 31, 2024. We also lease our research and development facility, in addition to other administrative office leases, in Irvine, California under a non-cancelable operating lease which expired on July 31, 2022. In June 2022, we entered into a new office facility lease in Irvine, California under a non-cancelable operating lease expiring July 31, 2025. We also lease an office facility in Henderson, Nevada under a non-cancelable operating lease expiring October 31, 2022. We recognize lease expense on a straight-line basis over the expected term of these operating leases, as reported within "selling, general and administrative" expense on the accompanying Condensed Consolidated Statements of Operations.

Our facility leases have minimum annual rents, payable monthly, and some carry fixed annual rent increases. Under some of these arrangements, real estate taxes, insurance, certain operating expenses, and common area maintenance are reimbursable to the lessor. These amounts are expensed as incurred, as they are variable in nature and therefore excluded from the measurement of our reported lease asset and liability discussed below. As of June 30, 2022 and 2021, we had no sublease arrangements with us as lessor, and no finance leases, as defined in ASU 2016-02, *Leases* ("Topic 842").

The reported asset and liability, respectively, represents (i) the economic benefit of our use of leased facilities and equipment and (ii) the present-value of our contractual minimum lease payments, applying our estimated incremental borrowing rate as of the lease commencement date (since an implicit interest rate is not readily determinable in any of our leases). The recorded asset and liability associated with each lease is amortized over the respective lease term using the effective interest rate method. During the three and six months ended June 30, 2022 and 2021, we recognized no additional ROU assets in exchange for lease liabilities.

We elected to not separate "lease components" from "non-lease components" in our measurement of minimum payments for our facility leases and office equipment leases. Additionally, we elected to not recognize a lease asset and liability for a term of 12 months or less.

*Financial Reporting Captions*

The below table summarizes the lease asset and liability accounts presented on our accompanying Condensed Consolidated Balance Sheets:

16

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

| Operating Leases | Condensed Consolidated Balance Sheet Caption | June 30, 2022 | December 31, 2021 |
|---|---|---|---|
| Operating lease right-of-use assets - non-current | Facility and equipment under lease | $ 1,703 | $ 2,505 |
| | | | |
| Operating lease liabilities - current | Accounts payable and other accrued liabilities | 715 | 1,282 |
| Operating lease liabilities - non-current | Other long-term liabilities | 1,139 | 1,452 |
| Total operating lease liabilities | | $ 1,854 | $ 2,734 |

As of June 30, 2022 and December 31, 2021, our "facility and equipment under lease" consisted of office and research facilities of $1.3 million and $2.1 million, respectively, and office equipment of $0.4 million and $0.4 million, respectively.

*Components of Lease Expense*

We recognize lease expense on a straight-line basis over the term of our operating leases, as reported within "selling, general and administrative" expense on the accompanying Condensed Consolidated Statements of Operations. The components of our aggregate lease expense is summarized below:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Operating lease cost | $ 421 | $ 427 | $ 843 | $ 893 |
| Variable lease cost | 99 | 99 | 198 | 200 |
| Short-term lease cost | 20 | 15 | 44 | 32 |
| Total lease cost | $ 540 | $ 541 | $ 1,085 | $ 1,125 |

*Weighted Average Remaining Lease Term and Applied Discount Rate*

| | Weighted Average Remaining Lease Term | Weighted Average Discount Rate |
|---|---|---|
| Operating leases as of June 30, 2022 | 2.7 years | 2.8% |
| Operating leases as of December 31, 2021 | 2.7 years | 3.8% |

*Future Contractual Lease Payments*

The below table summarizes our (i) minimum lease payments over the next five years, (ii) lease arrangement implied interest, and (iii) present value of future lease payments:

| Operating Leases - future payments | June 30, 2022 |
|---|---|
| 2022 (remaining) | $ 423 |
| 2023 | 657 |
| 2024 | 669 |
| 2025 | 98 |
| 2026 and thereafter | 73 |
| Total future lease payments, undiscounted | $ 1,920 |
| (Less): Implied interest | (66) |
| Present value of operating lease payments | $ 1,854 |

**(b) In/Out Licensing Agreements and Co-Development Arrangements**

*Overview*

17

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

The in-license agreements for our development-stage drug products provide us with territory-specific rights to their manufacture and distribution (including further sub-licensing/out-licensing rights). We are generally responsible for all related clinical development costs, patent filings and maintenance costs, marketing costs, and liability insurance costs. We also may enter into out-license agreements for territory-specific rights to these drug products which include one or more of: upfront license fees, royalties from our licensees' sales, and/or milestone payments from our licensees' sales or regulatory achievements. For certain drug products, we may enter into cost-sharing arrangements with licensees and licensors.

We are also obligated to make specified milestone payments to our licensors upon the achievement of certain regulatory and sales milestones, and to pay royalties based on our net sales of all in-licensed products. Depending on the milestone achievement type and whether the product has been approved, we will either (a) capitalize the value to "intangible assets" in the Condensed Consolidated Balance Sheets or (b) recognize the payment value within "research and development" or "cost of sales" on the Condensed Consolidated Statements of Operations. The liability relating to the payment due to the licensor will be recognized in the earliest period that we determine the respective milestone achievement is probable or has occurred.

The most significant remaining agreements associated with our operations, along with the key financial terms and our corresponding accounting and reporting conventions for each, are as follows:

### (i) Eflapegrastim: Co-Development and Commercialization Agreement with Hanmi

In October 2014, we exercised our option under a License Option and Research Collaboration Agreement dated January 2012 (as amended) with Hanmi Pharmaceutical Co., Ltd ("Hanmi") for eflapegrastim, a drug based on Hanmi's proprietary LAPSCOVERY™ technology for the treatment of chemotherapy induced neutropenia. Under the terms of this agreement, as amended, we have primary financial responsibility for the eflapegrastim development plan and hold its worldwide rights (except for Korea, China, and Japan).

Effective January 1, 2022, we executed an amendment to this license agreement, whereby we are contractually obligated to pay Hanmi a flat mid-single digit royalty on our aggregate annual net sales of eflapegrastim. Additionally, Hanmi has agreed to release the Company from a prior purchase obligation for eflapegrastim drug substance which resulted in a reduction in accrued liabilities of $11.2 million with a corresponding reduction in research and development expense. In addition, beginning in year three after the commercial launch, we are responsible for a supplemental mid-single digit royalty on aggregate annual net sales. This supplemental royalty will terminate once the aggregate payments made to Hanmi meet the milestone limit of $10 million, based on the supplemental royalty. There were no obligations to Hanmi for the three or six months ended June 30, 2022.

### (ii) Poziotinib: In-License Agreement with Hanmi and Exclusive Patent and Technology License Agreement with MD Anderson

In February 2015, we executed an in-license agreement with Hanmi for poziotinib, a pan-HER inhibitor in Phase 2 clinical trials, (which has also shown single agent activity in the treatment of various cancer types during Phase 1 studies, including breast, gastric, colorectal, and lung cancers) and made an upfront payment to Hanmi for these distribution rights. Under the terms of this agreement, we received the exclusive global rights to commercialize poziotinib, except for Korea and China. Hanmi and its development partners are fully responsible for the completion of on-going Phase 2 trials in Korea. We are financially responsible for all other clinical studies.

Effective January 1, 2022, we executed an amendment to this in-license agreement, whereby the payments to Hanmi upon our achievement of various regulatory milestones now aggregate to $18.0 million, which includes eliminating the first approval milestone payment in return for a supplemental mid-single digit royalty on aggregate annual net sales beginning in year three after the commercial launch. This supplemental royalty will terminate once the aggregate payments made to Hanmi meet the milestone limit of $15.0 million, based on the supplemental royalty. There were no contractual obligations to Hanmi under the previous agreement for the three or six months ended June 30, 2022.

In April 2018, we executed an exclusive patent and technology agreement for the use of poziotinib in treating patients with EGFR and HER2 exon 20 mutations in cancer and HER2 exon 19 mutations in cancer with The University of Texas M.D. Anderson Cancer Center ("MD Anderson"). MD Anderson discovered poziotinib's use in treating these patient-types. We made an upfront payment to MD Anderson of $0.5 million upon the execution of this agreement.

We are contractually obligated to pay nominal fixed annual license maintenance fees to MD Anderson and pay additional fees upon our achievement of various regulatory and sales milestones. These regulatory milestones aggregate to $6.0 million

18

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

and the sales milestones aggregate to $24.0 million. We are also contractually obligated to pay MD Anderson royalties in the low single-digits on our net sales of poziotinib.

### *(iii) In-License Agreement with ImmunGene for FIT Drug Delivery Platform*

In April 2019, we executed an asset transfer, license, and sublicense agreement with ImmunGene, Inc. ("ImmunGene") for an exclusive license for the intellectual property related to (a) Anti-CD20-IFNα, an antibody-interferon fusion molecule directed against CD20 that is in Phase 1 development for treating relapsed or refractory non-Hodgkin's lymphoma, including diffuse large B-cell lymphoma patients, representing a considerable unmet medical need, and (b) an antibody-interferon fusion molecule directed against GRP94, a target for which currently there are no existing approved therapies that have the potential for treating both solid and hematologic malignancies. Both molecules are based on the Focused Interferon Therapeutics ("FIT") drug delivery platform.

In November 2021, we provided notice to terminate the asset transfer, license, and sublicense agreement with ImmunGene, Inc. Pursuant to the agreement, we will transfer the rights, title or interest with respect to the transferred product back to ImmunGene. There were no contractual obligations to ImmunGene for the three or six months ended June 30, 2022.

We are also contractually obligated to pay nominal fixed annual license maintenance fees to one licensor.

### *(iv) In-License Agreement with Therapyx*

In December 2020, we executed an asset transfer and license agreement with Therapyx, Inc. ("Therapyx") for an exclusive worldwide license for the intellectual property related to any pharmaceutical or biological product for use in human oncology containing, whether as its sole active or in combination with other active ingredients, an encapsulated IL-12, in any injectable dosage form or formulation.

We made an upfront payment of $0.8 million to Therapyx upon contract execution, which was recorded to "research and development" expense within our Consolidated Statements of Operations for the year ended December 31, 2020. We will make an additional payment of $2.2 million upon our acceptance of certain transferred materials from Therapyx. We will make further payments to Therapyx upon our achievement of various (i) regulatory milestones aggregating up to $30 million for the first approved IL-12 product, plus an additional $2.5 million milestone payment for each new indication approved for each product in the U.S., Europe, or Japan; and (ii) sales milestones aggregating up to $167.5 million based on worldwide annual net sales. We are contractually obligated to pay royalties in the mid-single digits on our net sales of all IL-12 products, potentially reduced by royalties due to third parties, the loss of IP protection within one or more countries, or the introduction of a competing product within one or more countries.

Depending on the nature of the milestone achievement type we will either (a) capitalize the payment value to "intangible assets" in the Consolidated Balance Sheets or (b) recognize the payment value within "research and development" or "cost of sales" within the Consolidated Statements of Operations. The corresponding liability for the payment due to this licensor will be recognized in the Consolidated Balance Sheets within "accounts payable and other accrued liabilities" in the earliest period that we determine the respective milestone achievement is probable or has occurred.

### (c) Service Agreements for Research and Development Activities

We have entered into various contracts with numerous third-party service providers for the execution of our research and development initiatives. These vendors include raw material suppliers, clinical trial sites, clinical research organizations, and data monitoring centers, among others. The financial terms of these agreements are varied and generally obligate us to pay in stages, depending on the achievement of certain events specified in the agreements - such as contract execution, progress of service completion, delivery of drug supply, and the dosing of patients in clinical studies.

We recognize these "research and development" expenses and corresponding "accounts payable and other accrued liabilities" in the accompanying financial statements based on estimates of our vendors' progress of performed services, patient enrollments and dosing, completion of clinical studies, and other events. Should we decide to discontinue and/or slow-down the work on any project, the associated costs for those projects would typically be limited to the extent of the work completed, as we are generally able to terminate these contracts with adequate notice.

### (d) Supply and Service Agreements Associated with Product Production

19

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

We have various product supply agreements and/or have issued vendor purchase orders that obligate us to agreed-upon raw material purchases from certain vendors. We also have certain drug production service agreements with select contract manufacturers that obligate us to service fees during the contractual period.

### (e) Employment Agreements

We entered into revised employment agreements with certain of our named executive officers (chief executive officer, chief legal officer, and chief medical officer) in April/June 2018 and June 2019, which supersede any prior change in control severance agreements with such individuals. Also, we entered into an employment agreement with our current chief financial officer in April 2022. These agreements provide for the payment of certain benefits to each executive upon their separation of employment under specified circumstances. These arrangements are designed to encourage each to act in the best interests of our stockholders at all times during the course of a change in control event or other significant transaction.

We previously entered into an employment agreement with our former Chief Executive Officer, Joseph Turgeon, under which cash compensation and benefits would become payable in the event of termination by us for any reason other than cause, his resignation for good reason, or upon a change in control of our Company. Effective December 31, 2021, Mr. Turgeon's employment with the Company was terminated without cause in accordance with his employment agreement. We have accrued $2.6 million and $3.1 million for all contractual amounts due and unpaid to Mr. Turgeon as of June 30, 2022 and December 31, 2021, respectively, within "accrued payroll and benefits" on the accompanying Consolidated Balance Sheets.

### (f) Deferred Compensation Plan

The Spectrum Pharmaceuticals, Inc. Deferred Compensation Plan (the "DC Plan") is governed by our Compensation Committee and is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended.

The DC Plan is maintained to provide special deferred benefits for a select group of our employees (the "DC Participants"). DC Participants make annual elections to defer a portion of their eligible cash compensation which is then placed into their DC Plan accounts. We match a fixed percentage of these deferrals, and may make additional discretionary contributions. At June 30, 2022 and December 31, 2021, the aggregate value of this DC Plan liability was $7.6 million and $11.2 million, respectively, and is included within "accounts payable and other accrued liabilities" and "other long-term liabilities" in the accompanying Condensed Consolidated Balance Sheets.

### (g) Litigation

We are involved from time-to-time with various legal matters arising in the ordinary course of business. These claims and legal proceedings are of a nature we believe are normal and incidental to a pharmaceutical business, and may include product liability, intellectual property, employment matters, and other general claims. We may also be subject to derivative lawsuits from time to time.

We make provisions for liabilities when it is both probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Such provisions are assessed at least quarterly and adjusted to reflect the impact of any settlement negotiations, judicial and administrative rulings, advice of legal counsel, and other information and events pertaining to a particular case. Litigation is inherently unpredictable. Although the ultimate resolution of these various matters cannot be determined at this time, we do not believe that such matters, individually or in the aggregate, will have a material adverse effect on our consolidated results of operations, cash flows, or financial condition.

*Bioverativ Patent Litigation*

On May 28, 2021, Bioverativ Therapeutics Inc. ("Bioverativ") filed a complaint against us in the U.S. District Court for the District of Delaware, which alleges that our proposed manufacture, use and sale of eflapegrastim would, if approved, infringe claims of three patents owned by Bioverativ (the "Subject Patents"). Bioverativ sought an unspecified amount of damages and injunctive relief.

Pursuant to our agreements with Hanmi, we hold worldwide rights (except for Korea, China, and Japan) to develop and commercialize eflapegrastim. The agreements with Hanmi contain typical license terms including, without limitation,

20

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

indemnification rights in favor of the Company with respect to any claims of infringement from a third party with respect to our use of a licensed technology, product or compound pursuant to such agreements.

Related to the *Bioverativ* litigation, on December 20, 2021, we were named as respondents in an International Trade Commission (ITC) action filed in the ITC. The complaint alleged importation into the United States, the sale for importation, and the sale within the United States after importation of certain monomer-dimer hybrid immunoconjugates in violation of section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).

On February 18, 2022, Spectrum, Hanmi and Bioverativ entered into a license and settlement agreement which included a stipulation to dismiss the *Bioverativ* litigation and withdraw the ITC complaint. On February 18, 2022, the ITC action against us was withdrawn, and on March 2, 2022, the *Bioverativ* case was dismissed by the U.S. District Court.

*Luo v. Spectrum Pharmaceuticals, Inc., et al.* On August 31, 2021, a shareholder lawsuit was filed against us in the U.S. District Court for the District of Nevada, which alleges that we and certain of our executive officers made false or misleading statements and failed to disclose material facts about our business and the prospects of approval for our BLA to the FDA for eflapegrastim in violation of Section 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934, as amended. On November 1, 2021, four individuals and one entity filed competing motions to be appointed lead plaintiff and for approval of counsel in this putative securities class action. The plaintiffs seek damages, interest, costs, attorneys' fees, and other unspecified equitable relief. We believe that these claims are without merit and intend to vigorously defend against these claims. On March 2, 2022, the Court entered an order partially granting and partially denying without prejudice a stipulated order eliminating defendants' obligation to answer the initial pleading pending an amended complaint and addressing related briefing scheduling for an anticipated motion to dismiss. On July 28, 2022, the Court appointed a lead plaintiff and counsel for the class.

*Csaba v. Turgeon, et. al,* (filed December 15, 2021 in the U.S. District Court District of Nevada); *Shumacher v. Turgeon, et. al,* (filed March 15, 2022 in the U.S. District Court District of Nevada); *Johnson v. Turgeon, et. al,* (filed March 29, 2022 in the U.S. District Court District of Nevada); *Raul v. Turgeon, et. al,* (filed April 28, 2022 in the U.S. District of Delaware); and *Albayrak v. Turgeon, et al,* (filed June 9, 2022 in the U.S. District Court District of Nevada). These putative stockholder derivative actions were filed against us (as a nominal defendant), certain of our executive officers, and certain of our past and present members of the board of directors. The stockholder derivative complaints allege that certain of our executive officers are liable to Spectrum, pursuant to Section 10(b) and 21(d) of the Securities Exchange Act of 1934, as amended, for contribution and indemnification, if they are deemed (in the Luo class action), to have made false or misleading statements and failed to disclose material facts about our business and the prospects of approval for our BLA to the FDA for eflapegrastim. The complaints generally but not uniformly further allege that certain of our executive officers and certain of our past and present directors breached their fiduciary duties, and certain of our present directors negligently violated Section 14(a) of the Exchange Act, by allegedly causing such false or misleading statements to be issued and/or failing to disclose material facts about our business and the prospects of approval for our BLA to the FDA for eflapegrastim. The allegations state that as a result of the violations, certain of our executive officers and past and present board members committed acts of gross mismanagement, abuse of control, or were unjustly enriched. The plaintiffs generally seek corporate reforms, damages, interest, costs, attorneys' fees, and other unspecified equitable relief.

The parties are in the process of seeking court approval for the consolidation of the Nevada derivative actions and staying all derivative actions until there is an adverse decision on a motion to dismiss in the Nevada securities class action. We believe that these claims are without merit and intend to vigorously defend against these claims.

**Note 7.**
**Discontinued Operations**

*Overview*

In March 2019 we completed the sale of our seven then-commercialized drugs (the "Commercial Product Portfolio") to Acrotech Biopharma LLC ("Acrotech") (the "Commercial Product Portfolio Transaction"). Upon closing we received $158.8 million in an upfront cash payment. We are also entitled to receive up to an aggregate of $140 million upon Acrotech's future achievement of certain regulatory milestones (totaling $40 million) and sales-based milestones (totaling $100 million) relating to the Commercial Product Portfolio.

Substantially all of the contractual rights and obligations associated with the Commercial Product Portfolio were transferred to Acrotech at the closing of the Commercial Product Portfolio Transaction. However, under the terms of this transaction we retained our trade "accounts receivable, net" and GTN liabilities included within "accounts payable and other

21

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

accrued liabilities" associated with our product sales made on and prior to February 28, 2019. Accordingly, these Condensed Consolidated Financial Statements reflect the corresponding revenue-deriving activities and allocable expenses of this commercial business within "discontinued operations."

***Condensed Consolidated Statements of Operations***

The following table presents the various elements of "loss from discontinued operations, net of income taxes" as reported in the accompanying Condensed Consolidated Statements of Operations:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2022 | 2021 | 2022 | 2021 |
| Revenues: | | | | |
| Product sales, net | $ 39 | $ - | $ 39 | $ - |
| Total revenues | 39 | - | 39 | - |
| Operating costs and expenses: | | | | |
| Cost of sales (excluding amortization of intangible assets) | 42 | 127 | 44 | 127 |
| Selling, general and administrative | - | - | - | - |
| Research and development | - | 68 | 38 | 89 |
| Total operating costs and expenses | 42 | 195 | 82 | 216 |
| Loss from discontinued operations before income taxes | (3) | (195) | (43) | (216) |
| Provision for income taxes from discontinued operations | - | - | - | - |
| Loss from discontinued operations, net of income taxes | $ (3) | $ (195) | $ (43) | $ (216) |

**Note 8.**
**Stockholders' Equity**

***Sale of Common Stock Under ATM Agreement***

On April 5, 2019, we entered into a collective at-the-market-issuance ("ATM") sales agreement with Cantor Fitzgerald & Co., H.C. Wainwright & Co., LLC and B. Riley FBR, Inc. (the "April 2019 ATM Agreement"), pursuant to which we may offer and sell shares of our common stock by any method deemed to be an "at the market" offering (the "ATM Offering"). From April 5, 2019 to March 2, 2020, the ATM Offering was conducted pursuant to a sales agreement prospectus filed with our automatic shelf registration statement on Form S-3ASR, filed with the SEC on April 5, 2019, which registered an aggregate offering price of $150 million under the April 2019 ATM Agreement. From May 8, 2020 to June 30, 2020, the ATM Offering was conducted pursuant to a sales agreement prospectus (the "Initial Sales Agreement Prospectus") filed with our shelf registration statement on Form S-3, filed with the SEC on March 20, 2020, as amended by Pre-Effective Amendment No. 1 thereto, and declared effective by the SEC on May 8, 2020 (the "Registration Statement"), which registered an aggregate offering price of up to $75 million under the April 2019 ATM Agreement. On July 29, 2020, we terminated the Initial Sales Agreement Prospectus, but left the April 2019 ATM Agreement in full force and effect. On November 6, 2020, we filed a new sales agreement prospectus to the Registration Statement, which registered an aggregate offering price of up to $60 million under the April 2019 ATM Agreement.

On July 13, 2021, we filed a shelf registration statement with the SEC on Form S-3, which was declared effective by the SEC on July 21, 2021 (the "Registration Statement"). The Registration Statement registered an aggregate offering price of up to $300 million of securities that may be issued and sold by us from time to time, including up to an aggregate offering price of $150 million of common stock (which amount is included in the $300 million aggregate offering price set forth in the base prospectus) that may be issued and sold pursuant to the April 2019 ATM Agreement.

During January 2022, the Company entered into a Securities Purchase Agreement with Hanmi, pursuant to which Hanmi purchased 12,500,000 shares of our common shares at a purchase price of $1.60 per share, for an aggregate purchase price equal to $20 million.

We sold and issued common shares under the April 2019 ATM Agreement as follows:

Table of Contents

**Notes to Condensed Consolidated Financial Statements**
**(all tabular amounts presented in thousands, except share, per share, interest rate, and number of years)**
**(Unaudited)**

| Period in Which Issued | No. of Common Shares Issued | | Proceeds Received (Net of Broker Commissions and Fees ) |
|---|---|---|---|
| Year ended December 31, 2021 | 15,851,391 | $ | 52,621 |
| Quarter ended June 30, 2022 | 5,619,827 | $ | 4,947 |

**Note 9.**
**Subsequent Events**

During July 2022 and through the date of this filing, we sold and issued 5.1 million shares of our common stock for net proceeds of $4.5 million under the April 2019 ATM Agreement.

23

Table of Contents

**Item 2.**

**Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Cautionary Note Regarding Forward-Looking Statements**

This Quarterly Report on Form 10-Q contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in reliance upon the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, without limitation, statements regarding our future product development and commercialization activities and costs, the revenue potential (licensing, royalty and sales) of our products and product candidates, the impact of the ongoing resurgences in coronavirus ("COVID-19") infections or new strains of the virus on our business, the success, safety and efficacy of our drug products, revenues and revenue assumptions, clinical studies, including designs and implementation, development and commercialization timelines, product acquisitions, accounting principles, litigation expenses, liquidity and capital resources and trends, and other statements containing forward-looking words, such as, "believes," "may," "could," "would," "will," "expects," "intends," "estimates," "anticipates," "plans," "seeks," "continues," or the negative thereof or variation thereon or similar terminology (although not all forward-looking statements contain these words). Such forward-looking statements are based on the reasonable beliefs of our management as well as assumptions made by and information currently available to our management. All forward-looking statements included in this Form 10-Q speak only as of the date of this Form 10-Q and readers should not put undue reliance on these forward-looking statements. Forward-looking statements are inherently subject to risks and uncertainties, some of which cannot be predicted or quantified; therefore, our actual results may differ materially from those described in any forward-looking statements. Factors that might cause such a difference include, but are not limited to, those discussed in our periodic reports filed with the U.S. Securities and Exchange Commission (the "SEC"), including our Annual Report on Form 10-K for the fiscal year ended December 31, 2021, as well as those discussed elsewhere in this Quarterly Report on Form 10-Q, and the following factors, among others:

•our ability to successfully develop, obtain regulatory approval of, and market our products;

•the approval, or timing of approval, of our products or new indications for our products by the U.S. Food and Drug Administration (the "FDA")

and other international regulatory agencies;

•the overall impact of COVID-19 on our business, including, without limitation, delays caused by COVID-19 related travel restrictions;

•actions by the FDA and other regulatory agencies, including international agencies;

•the timing and/or results of pending or future clinical trials, and our reliance on contract research organizations;

•our ability to maintain sufficient cash resources to fund our business operations;

•our history of net losses;

•our ability to enter into strategic alliances with partners for manufacturing, development and commercialization;

•our competitors' progress with their drug development programs, which could adversely impact the perceived or actual value of our in-

development drugs;

•our dependence on the production capabilities of contract manufacturing organizations ("CMOs") and other third-parties for active pharmaceutical

ingredients ("APIs"), drug products, related supplies and logistical services;

•the ability of our manufacturing partners to satisfy regulatory requirements and to meet our product demands and timelines;

•our ability to identify and acquire new product candidates and to successfully integrate those product candidates into our operations;

•our ability to protect our intellectual property rights;

•the impact of legislative or regulatory reform on the pricing for pharmaceutical products;

•the impact of any litigation to which we are, or may become a party;

24

Table of Contents

•our ability, and that of our suppliers, development partners, and manufacturing partners, to comply with laws, regulations and standards that govern or affect the pharmaceutical and biotechnology industries;

•our ability to maintain the services of our key executives and other personnel; and

•our ability to continue as a going concern.

All subsequent written and oral forward-looking statements attributable to us or by persons acting on our behalf are expressly qualified in their entirety by these cautionary statements. We expressly disclaim any intent or obligation to update information contained in any forward-looking statement after the date thereof to conform such information to actual results or to changes in our opinions or expectations.

### Impact of COVID-19 Pandemic

On March 11, 2020, COVID-19 was declared a pandemic by the World Health Organization. Concerns related to the spread of COVID-19 have created global business disruptions as well as disruptions in our operations. The ongoing COVID-19 pandemic has adversely impacted economic activity and conditions worldwide, including workforces, liquidity, capital markets, consumer behavior, supply chains, and macroeconomic conditions. Despite progress in vaccination efforts, global economic activity remains uncertain and cannot be predicted with confidence. Further, in the first half of 2021, a new Delta variant of COVID-19 began to spread globally and caused an increase in COVID-19 cases in many places in the United States, and in November 2021, a new Omicron variant, which appears to be the most transmissible variant to date, was detected, and has since caused an increase in COVID-19 cases in multiple countries, including the United States, and of which the potential severity is currently being evaluated.

The extent to which the COVID-19 pandemic may continue to impact our results of operations, including the long-term nature of the impacts, depends on numerous evolving factors, which are highly uncertain and difficult to predict, including the adoption rate of the COVID-19 vaccines, the emergence and spread of variants, the scope and the timing to further contain the virus or treat its impact, and to what extent normal economic and operating conditions can resume, among others. For more information related to the impact of COVID-19 on our business, refer to the risk factors included in our Annual Report on Form 10-K for the year ended December 31, 2021, as filed with the SEC on March 17, 2022.

### Company Overview

Spectrum Pharmaceuticals, Inc. ("Spectrum", the "Company", "we", "our", or "us") is a biopharmaceutical company, with a primary strategy comprised of acquiring, developing, and commercializing novel and targeted oncology therapies. Our in-house development organization includes clinical development, regulatory, quality and data management.

We have two drugs in late-stage development:

•Eflapegrastim, a novel long-acting granulocyte colony-stimulating factor ("G-CSF") for the treatment of chemotherapy-induced neutropenia. On August 6, 2021, the Company announced the receipt of a CRL, that cited manufacturing deficiencies related both to the drug substance and drug product manufacturers. The Company believes it has completed the remediation of these deficiencies and resubmitted the BLA on March 11, 2022. On April 11, 2022, the Company announced that it had received notice that the BLA had been accepted and received a PDUFA date of September 9, 2022; and

•Poziotinib, a novel irreversible tyrosine kinase inhibitor under investigation for NSCLC tumors with various mutations. On December 6, 2021, the Company announced it submitted its NDA for poziotinib to the FDA for use in patients with previously treated locally advanced or metastatic NSCLC with HER2 exon 20 insertion mutations. The NDA submission is based on the positive results of Cohort 2 from the ZENITH20 clinical trial, which assessed the safety and efficacy of poziotinib. The product has received Fast Track designation and there is currently no treatment specifically approved by the FDA for this indication. On February 11, 2022, the Company announced that it had received notice that the NDA had been accepted and received a PDUFA action date of November 24, 2022.

Our business strategy is the development of our late-stage assets through commercialization and the sourcing of additional assets that are synergistic with our existing portfolio (through purchase acquisitions, in-licensing transactions, or co-development and marketing arrangements).

### Recent Highlights of Our Business, Product Development Initiatives, and Regulatory Approvals

25

Table of Contents

Our product pipeline is summarized below:

### *Eflapegrastim, a novel long-acting G-CSF:*

We submitted our BLA for eflapegrastim to the FDA on October 24, 2019 that is supported by data from two similarly designed Phase 3 clinical trials, ADVANCE and RECOVER, which evaluated the safety and efficacy of eflapegrastim in 643 early-stage breast cancer patients for the treatment of neutropenia due to myelosuppressive chemotherapy. Both studies met the pre-specified endpoint of non-inferiority in duration of severe neutropenia and met all of the secondary endpoints. In addition, the safety profile was similar to pegfilgrastim. On August 6, 2021, we announced the receipt of a CRL based on manufacturing deficiencies identified at both the drug substance and drug product manufacturers. The Company believes these manufacturing deficiencies have been remediated and on March 11, 2022, we resubmitted the BLA for eflapegrastim. On April 11, 2022, the Company announced that it had received notice that the BLA had been accepted and received a PDUFA date of September 9, 2022.

A company sponsored clinical trial has been initiated to evaluate the administration of eflapegrastim on the same day as chemotherapy. This Phase 1 clinical trial is a randomized, open label, actively controlled study to evaluate the same-day dosing of eflapegrastim on duration of neutropenia when administered at varying intervals following docetaxel and cyclophosphamide (TC) chemotherapy in patients with early-stage breast cancer. On March 4, 2021, at the virtual 38th Annual Miami Breast Cancer Conference®, the Company presented positive early data showing rapid absolute neutrophil count (ANC) recovery in the first three patients dosed in the 30-minute arm of the same-day dosing. This arm met the prespecified interim safety evaluation criteria and therefore supported the expansion of this arm to 15 patients. The study design included an interim safety evaluation that was conducted once the first three patients in each arm (30 minutes, 3 hours, or 5 hours) completed Cycle 1. Based on this review, the 30-minute arm expanded to a total of 15 patients, while the 3- and 5-hour dosing arms have been discontinued. In the 30-minute dosing arm, ANC recovery was more rapid compared to the 3- and 5-hour arms. The overall safety profile for the 30-minute arm was similar to what has been seen previously in large randomized studies with G-CSF given 24 hours after chemotherapy.

### *Poziotinib, a Pan ErbB inhibitor targeting HER2 exon20 mutations:*

Poziotinib is a novel, pan-HER inhibitor that irreversibly blocks signaling through the Epidermal Growth Factor Receptor (EGFR) family of tyrosine-kinase receptors, including HER1 (erbB1; EGFR), HER2 (erbB2), HER4 (erbB4), and HER receptor mutations. This, in turn, leads to the inhibition of the proliferation of tumor cells that over-express these receptors. Mutations of over-expression/amplification of EGFR family receptors have been associated with a number of different cancers, including NSCLC, breast cancer, and gastric cancer. In March 2015, we entered into a co-development and commercialization agreement with Hanmi for poziotinib worldwide rights, except in Korea and China.

Our clinical development program for poziotinib is focused on previously treated NSCLC, first-line treatment of NSCLC and treatment of other solid tumors with HER2 mutations. NSCLC tumors with HER2 exon 20 insertion mutations are rare and have generally not been responsive to other tyrosine kinase inhibitors. Patients with these mutations have a poor prognosis, and available treatment options are limited. Poziotinib, due to its unique chemical structure and characteristics, is believed to inhibit cell growth of tumors with HER2 exon-20 insertion mutations.

In October 2017, we announced the start of our pivotal ZENITH20 Phase 2 global clinical trial with active sites in the U.S., Canada and Europe. The ZENITH20 trial consisted of seven cohorts of NSCLC patients. Cohorts 1, 2, 3 and 4 have completed enrollment while Cohort 5 is continuing to enroll patients. We have closed Cohorts 6 and 7 for enrollment. Cohorts 1 (EGFR) and 2 (HER2) include previously treated NSCLC patients with exon 20 mutations. Cohort 3 (EGFR) and 4 (HER2) include first-line NSCLC patients with exon 20 mutations. Cohorts 1- 4 are each independently powered for a pre-specified statistical hypothesis and the primary endpoint is overall response rate ("ORR"). Cohort 5 includes previously treated NSCLC patients with HER2 exon 20 insertion mutations and is evaluating different dosing regimens. Cohort 6 included NSCLC patients with classical EGFR mutations who progressed while on treatment with first-line osimertinib and developed an additional EGFR mutation. Cohort 7 included NSCLC patients with a variety of less common mutations in EGFR or HER2 exons 18-21 or the extracellular or transmembrane domains.

On December 26, 2019, we announced that the pre-specified primary endpoint was not met in Cohort 1 of the ZENITH20 trial evaluating poziotinib in previously treated NSCLC patients with EGFR exon 20 insertion mutations. Cohort 1 enrolled a total of 115 patients who received 16 mg/day of poziotinib. The intent-to-treat analysis showed that 17 patients had a response (by RECIST) and 62 patients had stable disease for a 68.7% disease control rate ("DCR"). The confirmed ORR was 14.8% (95% CI 8.9%-22.6%). The median duration of response was 7.4 months and the progression free survival was 4.2 months. The safety profile was in-line with other second-generation EGFR tyrosine kinase inhibitors.

Table of Contents

On July 27, 2020, we announced that we met the pre-specified primary endpoint for Cohort 2 in the ZENITH20 trial evaluating previously treated NSCLC patients with HER2 exon 20 insertion mutations. Cohort 2 enrolled a total of 90 patients who received an oral, once daily dose of 16 mg of poziotinib. All the patients had failed at least one line of prior systemic therapy with 60 patients (67%) having failed two or more prior therapies, including chemotherapy and immunotherapy. All responses were read independently and confirmed by a central imaging laboratory using RECIST criteria. The intent-to-treat analysis demonstrated a confirmed ORR of 27.8% (95% CI of 18.9%-38.2%). Based on the pre-specified statistical hypothesis for the primary endpoint, the observed lower bound of 18.9% exceeded the pre-specified lower bound of 17% in this heavily pre-treated population. The safety profile was in-line with the type of adverse events seen with other second-generation EGFR tyrosine kinase inhibitors. These results were presented at the European Society for Medical Oncology ("ESMO") Virtual Congress 2020 Science Weekend held in September 2020.

In December 2020, we reported that its pre-specified primary endpoint in Cohort 3 evaluating poziotinib in first-line NSCLC patients with EGFR exon 20 insertion mutations was not met. Cohort 3 of the ZENITH20 clinical trial enrolled a total of 79 patients who received an oral once daily dose of 16 mg of poziotinib. The median time of follow up of all patients was 9.2 months with 12 ongoing patients still on treatment. The intent-to-treat analysis showed that 22 patients had a partial response (by RECIST) and 68 patients had stable disease for an 86.1% DCR. 91% of patients experienced tumor reduction with a median reduction of 25.5%. The confirmed ORR was 27.8% (95% CI 18.4-39.1%). Based on the pre-specified statistical hypothesis for the primary endpoint, the observed lower bound of 18.4% did not meet the pre-specified lower bound of >20%. The median duration of response was 6.5 months and the median progression free survival was 7.2 months. The safety profile was similar with the type of adverse events observed with other second-generation EGFR tyrosine kinase inhibitors. Grade 3 treatment related rash was 33% and diarrhea was 23%. 94% of patients had drug interruptions with 6 patients (8%) permanently discontinuing due to adverse events.

In March 2021, we announced that the FDA granted Fast Track designation for poziotinib based on data from Cohort 2 of ZENITH20, which evaluated previously treated patients with NSCLC with HER2 exon 20 insertion mutations. On December 6, 2021, the Company announced the submission of its NDA for poziotinib to the FDA for use in patients with previously treated locally advanced or metastatic NSCLC with HER2 exon 20 insertion mutations. The NDA submission is based on the positive results of Cohort 2 from the ZENITH20 clinical trial, which assessed the safety and efficacy of poziotinib. On February 11, 2022, the Company announced that the file had been accepted and an action date of November 24, 2022 had been set.

In March 2022, the Company presented the results of Cohort 4 at the European Society for Medical Oncology Targeted Anticancer Therapies ("ESMO TAT") meeting. Cohort 4 of the ZENITH20 clinical trial enrolled a total of 70 patients, 48 of whom received an oral once daily dose of 16 mg of poziotinib and 22 of who received an oral twice daily dose of 8 mg of poziotinib. The intent-to-treat analysis demonstrated a confirmed ORR of 41% (95% CI of 30%-54%). Based on the pre-specified statistical hypothesis for the primary endpoint, the observed lower bound of 30% exceeded the pre-specified lower bound of 20%. The median duration of response was 5.7 months and median progression free survival was 5.6 months. The most common treatment related Grade $\geq$ 3 adverse events were rash (30%), stomatitis (19%), diarrhea (14%), and paronychia (7%). In addition, the incidence of Grade $\geq$ 3 pneumonitis was low at 3%. The safety profile was consistent with the TKI class.

**Components of Operating Results**

See *Item 7. Components of Operating Results* of our Annual Report on Form 10-K for the year ended December 31, 2021, for a discussion of the nature of our revenue and operating expense line items within our accompanying Condensed Consolidated Statements of Operations.

**Critical Accounting Policies and Estimates**

See *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Critical Accounting Policies and Estimates* of our Annual Report on Form 10-K for the year ended December 31, 2021, for a discussion of significant estimates and assumptions made by our management as part of the preparation of our accompanying Condensed Consolidated Financial Statements. These critical accounting policies and estimates arise in conjunction with the following accounts in the preparation of this Form 10-Q:

•Stock-based compensation; and

•Research and development costs.

**Results of Operations**

Table of Contents

**Comparison of the Three and Six Months Ended June 30, 2022 and 2021**

| | Three Months Ended June 30, | | Change | | Six Months Ended June 30, | | Change | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2022 | 2021 | $ | % | 2022 | 2021 | $ | % |
| | (in thousands) | | (in thousands) | | ($ in thousands) | | (in thousands) | |
| Operating costs and expenses: | | | | | | | | |
| Selling, general and administrative | $ 9,385 | $ 14,957 | $ (5,572) | (37.3)% | $ 19,255 | $ 29,272 | $ (10,017) | (34.2)% |
| Research and development | 16,007 | 29,114 | (13,107) | (45.0)% | 20,200 | 48,485 | (28,285) | (58.3)% |
| Total operating costs and expenses | 25,392 | 44,071 | (18,679) | (42.4)% | 39,455 | 77,757 | (38,302) | (49.3)% |
| Loss from continuing operations before other income (expense) and income taxes | (25,392) | (44,071) | 18,679 | (42.4)% | (39,455) | (77,757) | 38,302 | (49.3)% |
| Interest income, net | 117 | 26 | 91 | 350.0% | 128 | 110 | 18 | 16.4% |
| Other expense, net | (3,757) | (5,876) | 2,119 | (36.1)% | (5,091) | (7,957) | 2,866 | (36.0)% |
| Total other expense | (3,640) | (5,850) | 2,210 | (37.8)% | (4,963) | (7,847) | 2,884 | (36.8)% |
| Loss from continuing operations before income taxes | (29,032) | (49,921) | 20,889 | (41.8)% | (44,418) | (85,604) | 41,186 | (48.1)% |
| Provision for income taxes from continuing operations | (13) | (16) | 3 | (18.8)% | (29) | (9) | (20) | 222% |
| Loss from continuing operations | $ (29,045) | $ (49,937) | $ 20,892 | (41.8)% | $ (44,447) | $ (85,613) | $ 41,166 | (48.1)% |
| Loss from discontinued operations, net of income taxes | (3) | (195) | 192 | (98.5)% | (43) | (216) | 173 | (80.1)% |
| Net loss | $ (29,048) | $ (50,132) | $ 21,084 | (42.1)% | $ (44,490) | $ (85,829) | $ 41,339 | (48.2)% |

**Quarterly Discussion**

*Selling, General and Administrative.* Selling, general and administrative expenses decreased by $5.6 million in the current period. This decrease primarily relates to (i) a decrease in stock-based compensation expense of $1.8 million, (ii) a decrease in deferred compensation expense of $1.8 million given decreases in the overall market compared to the prior year period, (iii) a $1.2 million decrease in personnel expenses primarily related to the reduction in workforce during the strategic restructuring that began in January, and (iv) a decrease of $0.7 million in other general expenses.

*Research and Development.* Research and development expenses decreased by $13.1 million in the current period, primarily due to decreased program activities of $8.0 million for eflapegrastim, $3.0 million for poziotinib, and $0.3 million related to our early-stage compounds. Personnel expenses decreased by $1.8 million related to the reduction in workforce during the strategic restructuring that began in January.

*Total Other Expense.* Total other expense decreased by $2.2 million primarily due to a $3.4 million increase in the market value of our equity holdings compared to the prior year period, which was partially offset by (i) a decrease of $0.5 million of realized gains recorded during the current period for the sale of our equity holdings, and (ii) $0.8 million of decreased value of our deferred compensation plan assets.

**Year to Date Discussion**

*Selling, General and Administrative.* Selling, general and administrative expenses decreased by $10.0 million in the current year period. This decrease primarily relates to (i) a decrease in stock-based compensation expense of $2.7 million, (ii) a decrease in deferred compensation expense of $2.8 million given decreases in the overall market compared to the prior year period, (iii) a $1.3 million decrease in personnel expenses, primarily related to the reduction in workforce during the strategic restructuring that began in January, (iv) a decrease of $1.7 million in professional services, and (v) a decrease of $1.5 million in other general expenses.

*Research and Development.* Research and development expenses decreased by $28.3 million in the current period, primarily due to the reversal of an $11.2 million eflapegrastim drug substance accrual during the period. A concession was provided by Hanmi Pharmaceutical for drug substance which had been accrued during 2021 and is no longer payable. Expenses also decreased in the current period due to decreased program activities of $9.7 million for eflapegrastim, $4.1 million for poziotinib, and $1.2 million related to our early-stage compounds. Personnel expenses decreased by $2.2 million related to the reduction in workforce during the strategic restructuring that began in January.

*Total Other Expense.* Total other expense decreased by $2.9 million primarily due to a $6.9 million increase in the market value of our equity holdings compared to the prior year period, which was partially offset by (i) a decrease of $2.7

28

Table of Contents

million of realized gains recorded during the current period for the sale of our equity holdings, and (ii) $1.2 million of decreased value of our deferred compensation plan assets.

**Liquidity and Capital Resources**

As of June 30, 2022, we had approximately $68.0 million in aggregate cash, cash equivalents and marketable securities and an accumulated deficit of $1.1 billion. We expect that we will continue to incur significant research and development and selling, general and administrative expenses and, as a result, we will need additional capital to fund our operations.

Based on our available cash resources, we believe that we have insufficient cash on hand to fund our current operations for more than twelve months from the date of filing this Quarterly Report on Form 10-Q. This condition raises substantial doubt about our ability to continue as a going concern.

Our plans to address this condition include evaluating different strategies to obtain the required funding of future operations. These plans may include, but are not limited to, public or private sales of debt or equity securities, out-licensing arrangements, funding from joint-venture or strategic partners, debt financing or short-term loans, or a combination of the foregoing. However, there can be no assurance that we will be able to secure such additional financing, or if available, that it will be sufficient to meet our needs or be on favorable terms.

**Net Cash Used In Operating Activities**

Net cash used in operating activities was $53.7 million for the six months ended June 30, 2022, as compared to $64.1 million in the prior year period. This decrease in net cash used in operating activities was primarily related to decreased research and development program spend.

**Net Cash Used In Investing Activities**

Net cash used in investing activities was $34.5 million for the six months ended June 30, 2022, as compared to $79.6 million provided by investing activities during the prior year period. This increase in net cash used in investing activities was primarily related to a period over period (i) decrease of $89.3 million of proceeds from maturities of our investments, (ii) increase of $21.8 million of purchased investments, and (iii) decrease of $3.1 million of proceeds received from the sale of our equity holdings.

**Net Cash Provided by Financing Activities**

Net cash provided by financing activities was $25.2 million for the six months ended June 30, 2022, as compared to $53.1 million during the prior year period. The cash provided by financing activities for the six months ended June 30, 2022 primarily relates to $20 million of proceeds from shares of common stock sold to Hanmi, $4.9 million of proceeds from shares of common stock sold pursuant to an at-the-market sales agreement, and $0.3 million of proceeds from employee stock purchases under our employee stock purchase plan, which cash provided by financing activities for the six months ended June 30, 2021 primarily related to $52.6 million of proceeds from shares of common stock sold pursuant to an at-the-market sales agreement.

**Off-Balance Sheet Arrangements**

We did not have any off-balance sheet arrangements during the periods presented, nor do we currently have any, as defined under SEC rules.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

Not applicable.

**Item 4. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2022. The term "disclosure controls and procedures," as defined in *Rules 13a-15(e)* and *15d-15(e)* under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

Table of Contents

These include controls and procedures that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate, to allow timely decisions regarding required disclosure.

Based on the evaluation of our disclosure controls and procedures as of June 30, 2022, our chief executive officer and chief financial officer concluded that, as of that date, our disclosure controls and procedures were effective.

### Changes in Internal Controls Over Financial Reporting

There has been no change in our internal controls over financial reporting (as defined in *Rules 13a-15(f)* and *15d-15(f)* under the Exchange Act) during the second fiscal quarter of 2022 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting. We have not experienced any material impact to our internal controls over financial reporting despite the fact that most of our employees are working remotely due to the COVID-19 pandemic. We are continually monitoring and assessing the COVID-19 situation on our internal controls to minimize the impact on their design and operating effectiveness.

### Limitations on Ensuring the Effectiveness of Internal Controls

An internal control system, no matter how well conceived and operated, cannot provide more than reasonable assurance that its objectives are completely met due to inherent limitations. Accordingly, no evaluation can provide absolute assurance that all internal control issues within a company have been detected. As part of our ongoing activities, we continuously seek to improve the efficiency and effectiveness of our business operations and accompanying internal controls.

## Part II. Other Information

### Item 1. Legal Proceedings

We are involved from time-to-time with various legal matters arising in the ordinary course of business. These claims and legal proceedings are of a nature we believe are normal and incidental to a pharmaceutical business, and may include product liability, intellectual property, employment matters, and other general claims. We may also be subject to derivative lawsuits from time to time.

We make provisions for liabilities when it is both probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Such provisions are assessed at least quarterly and adjusted to reflect the impact of any settlement negotiations, judicial and administrative rulings, advice of legal counsel, and other information and events pertaining to a particular case. Litigation is inherently unpredictable. Although the ultimate resolution of these various matters cannot be determined at this time, we do not believe that such matters, individually or in the aggregate, will have a material adverse effect on our consolidated results of operations, cash flows, or financial condition.

Certain of the legal proceedings in which we are involved are discussed in *Note 6(g)*, "Financial Commitments and Contingencies and Key License Agreements," to our accompanying Condensed Consolidated Financial Statements, and are hereby incorporated by reference.

### Item 1A. Risk Factors

As of the date of this filing, except as discussed below, there have been no material changes to the risk factors included in our Annual Report on Form 10-K for the year ended December 31, 2021, as filed with the SEC on March 17, 2022.

### There is substantial doubt about our ability to continue as a going concern.

Our consolidated financial statements are prepared using the generally accepted accounting principles applicable to a going concern, which contemplates the realization of assets and liquidation of liabilities in the normal course of business. However, as shown in our consolidated financial statements, we have sustained substantial recurring losses from operations. In addition, we have used, rather than provided, cash in our continuing operations. The above conditions raise substantial doubt about our ability to continue as a going concern within one year after the date of this filing. Our consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should we be unable to continue in existence. Uncertainty concerning our

Table of Contents

ability to continue as a going concern, among other factors, may hinder our ability to obtain future financing. Continued operations and our ability to continue as a going concern are dependent, among other factors, on our ability to successfully develop and commercialize products, the market acceptance and success of our products and our ability to obtain additional required funding. If we cannot continue as a viable entity, our stockholders would likely lose most or all of their investment in us.

***We will require additional funding to continue as a going concern.***

We incurred significant net losses for the years ended December 31, 2021 and December 31, 2020 and those losses have continued in 2022. The development of our business will require additional capital to help fund the development and commercialization of our products and product candidates, conduct research, development and trials relating to our product candidates, fund our ongoing operations and satisfy our obligations and liabilities. There are no assurances that required funding will be available at all or will be available in sufficient amounts or on reasonable terms. Delays in obtaining, or the inability to obtain, required funding from debt or equity financings, sales of assets, sales or out-licenses of intellectual property or technologies, or other transactions or sources, could adversely affect our ability to develop and commercially introduce products and cause us to be unable to comply with our obligations under outstanding instruments, and could adversely affect our ability to continue operations.

Our ability to obtain required financing will be subject to a number of factors, including without limitation market conditions, our capitalization, our operating performance and investor sentiment. If we are unable to raise additional capital when required or on acceptable terms, we may have to significantly delay, scale back or discontinue the development or commercialization of one or more of our product candidates, restrict our operations or obtain funds by entering into agreements on unattractive terms, which would likely have a material adverse effect on our business, stock price and our relationships with third parties with whom we have business relationships, and which could result in additional dilution to our stockholders. If we do not have sufficient funds to continue operations, we could be required to seek bankruptcy protection or other alternatives that would likely result in our stockholders losing some or all of their investment in us.

***We have not been in compliance with the requirements of the NASDAQ Stock Market for continued listing and if NASDAQ does not concur that we have adequately remedied our non-compliance, our common stock may be delisted from trading on NASDAQ, which could have a material adverse effect on us and our shareholders.***

On June 7, 2022, we received notice from The NASDAQ Stock Market ("Nasdaq") that, because the closing bid price for the Company's common stock has fallen below $1.00 per share for 30 consecutive business days, the Company no longer complies with the minimum bid price requirement for continued listing on the Nasdaq Global Market.

Nasdaq's notice has no immediate effect on the listing of the Company's common stock on the Nasdaq Global Market. Pursuant to Nasdaq Marketplace Rule 5810(c)(3)(A), the Company has been provided an initial compliance period of 180 calendar days, or until December 5, 2022, to regain compliance with the minimum bid price requirement. To regain compliance, the closing bid price of the Company's common stock must meet or exceed $1.00 per share for a minimum of 10 consecutive business days prior to December 5, 2022.

If the Company does not regain compliance by December 5, 2022, the Company may be eligible for an additional grace period if it applies to transfer the listing of its common stock to the Nasdaq Capital Market. To qualify, the Company would be required to meet the continued listing requirement for market value of publicly held shares and all other initial listing standards for the Nasdaq Capital Market, with the exception of the minimum bid price requirement, and provide written notice of its intention to cure the minimum bid price deficiency during the second compliance period by effecting a reverse stock split if necessary. If the Nasdaq staff determines that the Company will not be able to cure the deficiency, or if the Company is otherwise not eligible for such additional compliance period, Nasdaq will provide notice that the Company's common stock will be subject to delisting. The Company would have the right to appeal a determination to delist its common stock, and the common stock would remain listed on the Nasdaq Global Market until the completion of the appeal process.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Mine Safety Disclosure**

Table of Contents

Not applicable.

**Item 5. Other Information**

None.

32

---

Table of Contents

Table of Contents

**Item 6. Exhibits**

| Exhibit Number | Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | Form No. | Exhibit | Filing Date | |
| 2.1 | Asset Purchase Agreement, dated January 17, 2019, by and among Spectrum Pharmaceuticals, Inc., Acrotech Biopharma LLC and Aurobindo Pharma USA, Inc. | 8-K | 001-35006 | 10.1 | 1/17/2019 | |
| 3.1 | Restated Certificate of Incorporation. | 8-K | 001-35006 | 3.1 | 6/18/18 | |
| 3.2 | Third Amended and Restated Bylaws | 8-K | 001-35006 | 3.1 | 3/29/2018 | |
| 10.1 | Employment Agreement, dated May 25, 2022, by and between the Company and Nora Brennan | | | | | X |
| 31.1 | Certification of Principal Executive Officer, pursuant to Rule 13a-14(a)/15d-14(a) promulgated under the Securities Exchange Act of 1934. | | | | | X |
| 31.2 | Certification of Principal Financial Officer, pursuant to Rule 13a-14(a)/15d-14(a) promulgated under the Securities Exchange Act of 1934. | | | | | X |
| 32.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(b)/15d-14(b) promulgated under the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. | | | | | X |
| 32.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(b)/15d-14(b) promulgated under the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350. | | | | | X |
| 101.INS | Inline XBRL Instance Document. The instance document does not appear in the interactive data file because its XBRL tags are embedded within the inline XBRL document. | | | | | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | | | | | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | | | | | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. | | | | | X |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. | | | | | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | | | | | X |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101 filed herewith). | | | | | |

33

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SPECTRUM PHARMACEUTICALS, INC.

| | | |
|---|---|---|
| Date: | August 12, 2022 | By:  /s/ Nora E. Brennan |
| | | Nora E. Brennan |
| | | Executive Vice President and Chief Financial Officer |
| | | (Authorized Signatory and Principal Financial and Accounting Officer) |

34

**EXECUTIVE EMPLOYMENT AGREEMENT**

This Executive Employment Agreement (this "Agreement") is dated as of **April 19, 2022,** by and between Spectrum Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and Nora Brennan ("Executive").

WHEREAS, the Company desires to employ Executive as Chief Financial Officer; and

WHEREAS, the Company and Executive desire to enter into a written employment agreement to reflect the terms upon which Executive shall provide services to the Company.

NOW, THEREFORE, in consideration of the premises and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **EMPLOYMENT/TERM**. The Company hereby employs Executive to perform the duties and responsibilities set forth below under Section 2 of this Agreement, and Executive hereby accepts such employment, in each case on the terms and conditions set forth in this Agreement.  The term of employment under this Agreement shall have a term commencing on **June 6, 2022,** (the "Effective Date") unless Executive agrees to an earlier Effective Date and shall continue on an "at will" basis thereafter until such is terminated by either Company or Executive (the "Term"), unless earlier terminated pursuant to Section 4 of this Agreement.

2. **POSITION AND DUTIES**.

    a. <u>Description of Executive's Position, Duties, Authorities, and Responsibilities</u>. Executive shall serve as the Chief Financial Officer of the Company, subject to the direction of the Chief Executive Officer. In such capacity, Executive shall (i) report to the Chief Executive Officer, (ii) devote her full professional time and attention, best efforts, energy and skills to the services required of her as an employee of the Company, except for paid time off taken in accordance with the Company's policies and practices, and subject to the Company's policies pertaining to reasonable periods of absence due to sickness, personal injury or other disability; (iii) use her best efforts to promote the interests of the Company; (iv) comply with all applicable governmental laws, rules and regulations and with all of the Company's policies, rules and regulations applicable to employees of the Company; and (v) discharge her responsibilities in a diligent and faithful manner,

1

consistent with sound business practices and in accordance with the Chief Executive Officer's directives.

b. Performance of Duties. Executive hereby accepts such employment and agrees to render the services described above in the manner described above.  It is understood and agreed that Executive may not engage in other business activities during the Term, whether or not for profit or other pecuniary advantage; provided, however, that Executive may (i) make financial investments which do not involve her active participation, (ii) participate in charitable, educational, religious, civic, or other similar organizations and activities, and (iii) with the prior written consent of the Board of Directors of the Company (the "Board"), serve as an outside director on the board of directors of other corporations that are not affiliates or competitors of the Company or any of its affiliates, in any case to the extent that such activities collectively do not hinder or interfere with the performance of her duties under this Agreement, conflict with the policies of the Company concerning conflicts of interest or conflict with the businesses of the Company or any of its affiliates in any material way.  For clarity, the Company hereby agrees that Executive may continue to serve on the board of directors of Artios Pharma Limited.

3. **COMPENSATION AND BENEFITS**.

a. Base Salary. As of the Effective Date, Executive's base salary (the "Base Salary") shall be $450,000 USD per year payable in periodic installments in accordance with the Company's regular payroll practices as in effect from time to time. The Board or a duly authorized committee thereof will review the Base Salary on an annual basis and may increase, but never decrease, the Base Salary from time to time based on merit or such other considerations as the Board or a duly authorized committee thereof may deem appropriate; provided, however, the Company makes no assurances that the Base Salary will be increased during the Term.  "Base Salary" shall mean the initial base salary or the then-current base salary as later approved by the Board.

b. Bonus. Executive shall be eligible to receive an annual cash bonus in an amount up to 50% of Executive's Base Salary (such 50% of Executive's Base Salary, the "Target Bonus") for the fiscal year for which the annual cash bonus is being paid, as determined in the discretion of the Board or a duly authorized committee thereof, based on the

2

performance of the Company and Executive relative to performance objectives or other metrics as the Board or a duly authorized committee thereof may deem appropriate.  For the first calendar year in which this Agreement is effective, performance objectives or other metrics shall be established within 30 days of the Effective Date of this Agreement.  Thereafter, performance objectives or other metrics shall be established within 60 days of the commencement of the calendar year.

c. Pro Rata Bonus.  Notwithstanding any other provision in this Agreement to the contrary, should Executive's employment be terminated by the Company without Cause (as defined below) or by Executive for Good Reason (as defined below), prior to the end of a calendar year, then the Board shall pay Executive the pro rata amount of the Target Bonus for such year based on the number of days Executive was employed by the Company during the calendar year divided by 365 days (the "Pro Rata Bonus").  Such Pro Rata Bonus shall be paid when bonuses are paid to other senior executives of the Company and within two and one-half months following the end of the calendar year in which Executive is terminated.

d. Benefits and Vacation. Executive shall be eligible to participate in and receive the benefits under any deferred compensation plan, health, life, accident and disability insurance plans or programs, and any other employee benefit or fringe benefit plans or arrangements that the Company makes available generally to other senior executives of the Company, pursuant to the provisions of such plans, programs or arrangements as in effect from time to time. Executive shall be entitled to vacation and sick days in accordance with the policies of the Company for its employees generally, as in effect from time to time.  The benefits described in this Section 3.d. are hereinafter referred to as the "Benefits".

e. Equity Incentive Compensation. Executive shall be eligible to receive grants, at the discretion of the Board or a duly authorized committee thereof, under any long-term equity-based incentive compensation plans established or maintained by the Company for its senior executive officers, in each case subject to the terms and conditions of the applicable plans and award documents with respect to such grants.  The grants described in this Section 3.e. are hereinafter referred to as the "Equity Incentive Compensation".

3

f.  Expenses. The Company shall pay or reimburse Executive for all reasonable, ordinary and necessary business expenses incurred or paid by Executive during the Term in the performance of Executive's services under this Agreement in accordance with the applicable policies and procedures of the Company as in effect from time to time, upon the presentation of proper expense statements or such other supporting documentation as the Company may reasonably require.

g.  Auto Allowance.  Company shall pay an automotive allowance of $2,000 per month to cover costs of business travel in a personal vehicle.

4.  **TERMINATION, OTHER THAN FOLLOWING A CHANGE OF CONTROL**.

a.  General. Executive's employment may be terminated by either party at any time and for any reason; and upon termination of Executive's employment, the Term shall end.

b.  Resignation without Good Reason. Executive shall be required to give the Company at least 60 days' advance written notice (the "Resignation Notice Period") of any voluntary resignation of Executive's employment hereunder (other than resignation for Good Reason (as defined below), in which event the procedures under Section 5.c. shall apply). During the Resignation Notice Period, the Company in its sole discretion may elect to accelerate Executive's date of termination of employment, it being understood that any such termination shall still be treated as a voluntary resignation without Good Reason (as defined below) for purposes of this Agreement.  Even if Executive's date of termination is accelerated, Executive shall be paid her Base Salary, and shall receive Benefits capable of being provided to persons who are not actively employed by the Company, as if she had worked through the end of the Resignation Notice Period.  The Company reserves the right to require Executive not to be in the offices of the Company or any of its affiliates and/or not to undertake all or any of Executive's duties and/or not to contact clients, colleagues or advisors of the Company or any of its affiliates during all or part of the Resignation Notice Period.  During the Resignation Notice Period, Executive's terms and conditions of service and duties of loyalty and confidentiality to the Company shall remain in full force and effect and, during any such Resignation Notice Period, Executive shall continue to perform as an employee in compliance with the terms of this Agreement

4

and all other agreements applicable to Executive with respect to her service with the Company or any of its affiliates.

c. <u>Death</u>. Executive's employment hereunder shall terminate automatically on the date of her death.

d. <u>Disability</u>. At the option of the Company, Executive's employment hereunder may be terminated immediately upon Disability (as defined below) of Executive. For purposes of this Agreement, "<u>Disability</u>" means any physical or mental illness, impairment or incapacity which, in the good faith determination of the Board, has prevented Executive from performing the essential functions of her position hereunder for a period of 90 or more consecutive days (or for shorter periods totaling 120 days) during any period of 12 consecutive months.

e. <u>Termination for Cause</u>. Notwithstanding any other provision of this Agreement, the Company may, upon written notice, terminate Executive's employment for Cause (as defined below). For purposes of this Agreement, "<u>Cause</u>" means the occurrence of any of the following by Executive: (i) fraud, misappropriation, embezzlement or acts of similar dishonesty that can materially impact the Company, (ii) conviction of, or plea of *nolo contendere* to, a felony, (iii) excessive use of alcohol or illegal use of drugs in the workplace, (iv) gross negligence or intentional or willful misconduct by Executive in the performance of her duties that the Company has notified Executive of, (v) breach of Executive's duty of loyalty to the Company or diversion or usurpation of corporate opportunities properly belonging to the Company, (vi) the knowing breach of any Company confidentiality agreement to which Executive is a party, (vii) willful disregard of the Company's written policies and procedures, (viii) act or omission that would materially and adversely impact the business or reputation of the Company. If the alleged basis for asserting "Cause" is capable of being corrected or mitigated, before terminating Executive's employment, the Company will give Executive written notice and thirty (30) days within which to correct or mitigate the issue of concern.

f. <u>Termination Without Cause</u>. The Company may, at any time, upon written notice terminate Executive's employment without Cause.

5

5. **COMPENSATION UPON TERMINATION**. Following any termination of Executive's employment (the date of such termination, "Termination Date"), the obligations of the Company to pay or provide Executive with compensation and benefits under Section 3 shall immediately cease, and the Company shall have no further obligations to Executive under this Agreement, except as otherwise required by law or provided for under this Section 5.

   a. Death or Disability. If, during the Term, Executive's employment is terminated (i) by reason of Executive's death or (ii) by the Company for Disability of Executive, the Company shall pay to Executive (or to her estate or designated beneficiary in the event of Executive's death) (A) any unpaid Base Salary accrued through the Termination Date, (B) any unpaid Benefits accrued through the Termination Date to which Executive is entitled under any plans, programs or arrangements applicable to terminated employees in which Executive participates, and (C) a lump sum amount equal to two years of Executive's Base Salary in effect as of the Termination Date; provided that, in the event Executive is terminated by the Company for Disability during the Change of Control Tail Period, such amount shall be paid monthly over a period of 24 months following such termination. Executive shall also immediately vest in all options, restricted stock and other Equity Incentive Compensation (as defined below), all of which shall be immediately available to exercise during the periods provided in the applicable plans and award documents granted to Executive. All payments under clause (C) of this Section 5.a. are conditioned upon Executive executing and delivering (and not revoking) within 90 days of the Termination Date a general waiver and release agreement in the form of Exhibit A, attached, or in a form and with substance satisfactory to the Company, that is no longer subject to revocation. If Executive is unable to execute and deliver such waiver and release agreement due to death or Disability, then the waiver and release agreement shall be executed and delivered by an authorized agent or representative of Executive and/or Executive's estate. The payments described in clauses (A) and (C) above shall be made within 90 days (or by such earlier date as may be required by applicable law) following the Termination Date, and the payments described in clause (B) above shall be made in accordance with the provisions of the applicable plans, programs and arrangements maintained by the Company with respect to such payments or as otherwise required by applicable law.

b. <u>For Cause or Without Good Reason (not During the Change of Control Tail Period)</u>. If, during the Term (other than during the Change of Control Tail Period (as defined below)), Executive's employment is terminated (i) by the Company for Cause or (ii) by Executive for any reason other than for Good Reason (as defined below), the Company shall pay to Executive (A) any unpaid Base Salary accrued through the Termination Date and (B) any unpaid Benefits accrued through the Termination Date to which Executive is entitled under any plans, programs or arrangements applicable to terminated employees in which Executive participates.  The payments described in clause (A) above shall be made within 90 days (or by such earlier date as may be required by applicable law) following the Termination Date, and the payments described in clause (B) above shall be made in accordance with the provisions of the applicable plans, programs and arrangements maintained by the Company with respect to such payments or as otherwise required by applicable law.

c. <u>Without Cause or for Good Reason (not During the Change of Control Tail Period)</u>. If, during the Term (other than during the Change of Control Tail Period), Executive's employment is terminated (i) by the Company without Cause or (ii) by Executive for Good Reason (as defined below), the Company shall pay to Executive (A) any unpaid Base Salary accrued through the Termination Date, (B) any unpaid Benefits accrued through the Termination Date to which Executive is entitled under any plans, programs or arrangements applicable to terminated employees in which Executive participates, and (C) the following severance benefits (the "<u>Without Cause/For Good Reason Severance Benefits</u>"): (a) two years of Executive's Base Salary in effect as of the Termination Date and two times (2x) the previous year's Bonus, in each case paid as a lump sum (b) 18 months of Company-paid continued coverage (COBRA) for Executive and her eligible dependents under the Company's existing health and benefit plans.  As part of the Without Cause/For Good Reason Severance Benefits, Executive shall also immediately vest in all options, restricted stock and other Equity Incentive Compensation (as defined below), all of which shall be immediately available to exercise during the periods provided in the applicable plans and award documents granted to Executive; provided, that, notwithstanding the foregoing, with respect to any options, restricted stock or other Equity Incentive Compensation that vest based on performance-based criteria

7

("Performance-Based Awards"), Executive shall vest in such Performance-Based Awards as part of the Without Cause/For Good Reason Severance Benefits pro rata based on the Executive's target award for such Performance-Based Awards (irrespective of actual performance) and based on the number of days Executive was employed by the Company during the applicable performance period for such Performance-Based Awards divided by the total number of days in such performance period.  All payments under clause (C) of this Section 5.c. are conditioned upon Executive executing and delivering (and not revoking) within 90 days of the Termination Date a general waiver and release agreement in the form of Exhibit A, attached, or in a form and with substance satisfactory to the Company, that is no longer subject to revocation; provided, further, that in order for Executive to terminate her employment for Good Reason (as defined below), (x) Executive must furnish written notice to the Company setting forth the facts and circumstances claimed to provide a basis for such resignation within 30 days following the occurrence of such facts and circumstances, (y) the Company shall have 30 days after its receipt of such written notice to cure such facts and circumstances in all material respects (and if so cured, then Executive shall not be permitted to resign for Good Reason (as defined below) in respect thereof), and (z) Executive must actually terminate her employment within 30 days following the expiration of the Company's cure period set forth above.  For purposes of this Agreement, "Good Reason" means the occurrence of any of the following events, without the express consent of Executive, (1) a material diminution in Executive's Base Salary, (2) a material diminution in Executive's title, position, duties, authorities or responsibilities (other than temporarily while physically or mentally incapacitated or as required by applicable law), (3) any material breach of this Agreement by the Company, or (4) any relocation of Executive's principal place of employment of more than twenty-five miles from Philadelphia, Pennsylvania, (unless Executive agrees to such relocation).  The payments described in clauses (A) and (C) above shall be made within 90 days (or by such earlier date as may be required by applicable law) following the Termination Date, and the payments described in clause (B) above shall be made in accordance with the provisions of the applicable plans, programs and arrangements maintained by the Company with respect to such payments or as otherwise required by applicable law.

8

d.  Termination During Change of Control Tail Period. In the event that Executive's employment is terminated by the Company or by Executive during the Change of Control Tail Period for any reason other than a termination by reason of Executive's death or by the Company for Disability of Executive, this Section 5 shall not apply, and the terms and conditions of Section 6 shall govern with respect to any compensation payable to Executive as a result of such termination. For purposes of this Agreement, the "Change of Control Tail Period" shall mean the 12 month period following the occurrence of a Change of Control (as defined below). In no event shall Executive be entitled to compensation both under this Section 5 and under Section 6.

e.  Equity Incentive Compensation. Except in circumstances where termination is (i) by reason of Executive's death or by the Company for Disability, (ii) by the Company without Cause, (iii) by Executive for Good Reason, or (iv) during the Change of Control Tail Period and subject to Section 6, upon termination of Executive's employment during the Term, the Equity Incentive Compensation awarded to Executive shall forfeit or vest in accordance with the terms of the applicable plans and award documents with respect to such Equity Incentive Compensation, and shall be subject to such other terms and conditions of such plans and award documents that may apply as a result of such termination.

f.  Benefits. Notwithstanding anything in this Section 5 to the contrary, the Benefits to which Executive is entitled upon or by reason of the termination of her employment with the Company (including during the Change of Control Tail Period) shall be subject to, and shall be governed by, the terms and conditions of the applicable plans, programs and arrangements maintained by the Company with respect to such Benefits.

g.  Expiration of Term. Notwithstanding anything in this Section 5 to the contrary, the expiration of the Term by itself shall not entitle Executive to receipt of any payments under this Section 5.

6.  **CHANGE OF CONTROL.**

a.  Definition. "Change of Control" shall have the meaning prescribed to such phrase (or, if applicable, the phrase, "Change in Control") in the 2009 Incentive Award Plan of the Company, or the latest equity incentive award plan of the Company in effect from time to

9

time. The Board shall have full and final authority, which shall be exercised in its discretion, to determine conclusively whether a Change of Control of the Company has occurred pursuant to the above definition, and the date of the occurrence of such Change of Control and any incidental matters relating thereto.

b. Executive's Rights Upon a Change of Control. If there should occur a Change of Control of the Company (or any successor) and Executive's employment is terminated by the Company without Cause or Executive terminates employment with, Good Reason during the Change of Control Tail Period, Executive shall receive the Without Cause/For Good Reason Severance Benefits, as if she had been terminated without Cause or had terminated for Good Reason under Section 5.c. of this Agreement; provided, that the two years of Executive's Base Salary in effect as of the Termination Date, payable as part of the Without Cause/For Good Reason Severance Benefits, shall be paid monthly over a period of 24 months following such termination; provided further that all equity awards that would have been eligible to vest under Section 5.c. shall vest immediately upon consummation of a Change of Control; and provided further that Executive shall vest in all Performance-Based Awards as part of the Without Cause/For Good Reason Severance Benefits upon consummation of a Change of Control pro rata based on the Executive's target award for such Performance-Based Awards (irrespective of actual performance) and based on the number of days Executive was employed by the Company before the Change of Control during the applicable performance period for such Performance-Based Awards divided by the total number of days in such performance period. All of the provisions of Section 5.c., including but not limited to the notice and cure provisions, shall apply in like manner under this Section 6.b.

7. **COOPERATION**. Upon the receipt of reasonable notice from the Company (including outside counsel), Executive agrees that while employed by the Company and thereafter, Executive will respond and provide information with regard to matters in which Executive has knowledge as a result of Executive's employment with the Company, and will provide reasonable assistance to the Company, its affiliates and their respective representatives in defense of all claims that may be made against the Company or its affiliates, and will assist the Company and its affiliates in the prosecution of all claims that may be made by the Company or its affiliates, to the extent that such claims may relate to the period of Executive's employment with the Company. Executive

10

agrees to promptly inform the Company if Executive becomes aware of any lawsuit involving such claims that may be filed or threatened against the Company or its affiliates. Executive also agrees to promptly inform the Company (to the extent that Executive is legally permitted to do so) if Executive is asked to assist in any investigation of the Company or its affiliates (or their actions), regardless of whether a lawsuit or other proceeding has then been filed against the Company or its affiliates with respect to such investigation, and shall not provide such assistance unless legally required. Upon presentation of appropriate documentation, the Company shall pay or reimburse Executive for all reasonable out-of-pocket travel, duplicating or telephonic expenses incurred by Executive in complying with this Section 7.  For the first five hours of cooperation in any calendar month during the period of Cooperation, Executive shall provide the specified Cooperation services without hourly reimbursement.  For each hour of Cooperation or part thereof after five hours, in any calendar month, Company shall reimburse Executive at the hourly rate determined by this fraction: (final Base Salary / 2,080 hours).

8. **ARBITRATION**. The parties hereby agree to submit all disputes, claims and controversies ("Claims") between the parties or related to or arising out of their employment relationship (except to the extent otherwise provided in that certain Employee Obligations Agreement, (the "Employee Obligations Agreement"), or that certain Indemnification Agreement, (the "Indemnification Agreement")) to final, binding arbitration to the fullest extent permitted by law. The Federal Arbitration Act., 9 U.S.C. § 1 *et seq.*, shall govern the interpretation and enforcement of this Section 8. The court and not the arbitrator will determine matters of enforceability of this Section 8.

   a. Statute of Limitations. The statutory limitations period applicable to a Claim asserted in a civil action shall apply to any such Claim asserted in any arbitration proceeding under this Section 8. Arbitration is commenced for limitations purposes by submitting the matter to the arbitral forum.

   b. Individual Basis. All Claims that are subject to arbitration under this Section 8 must and will take place on an individual basis only.

   c. Venue. Binding arbitration under this Section 8 shall be conducted in California, unless required by law to be conducted elsewhere, in which case it shall be conducted where required by law.

11

d. Applicable Rules. The arbitration proceeding, including discovery, shall be conducted in accordance with the Federal Arbitration Act, the JAMS Policy on Employment Arbitration Minimum Standards and the JAMS Employment Arbitration Rules and Procedures then in effect (the "JAMS Rules"). Executive understands that if she wishes to receive a copy of the JAMS Rules currently in effect, she may inform the Company in writing, and the Company will provide them to him before she executes this Agreement. Executive also understand that JAMS Rules are available online at http://www.jamsadr.com/rules-employment-arbitration/.

e. Arbitrator Selection. The arbitration shall be conducted before a neutral arbitrator selected by all parties in accordance with JAMS Rules. The parties may also agree on an arbitrator.

f. Cost Allocation. If required by applicable law, the Company shall pay all additional costs peculiar to the arbitration to the extent such costs would not otherwise be incurred in a court proceeding (for instance, the Company shall pay the arbitrator's fees, and the JAMS administration and filing fees, to the extent such fees exceed court filing fees).

g. Attorneys' Fees and Costs. Each party shall pay her or its own costs and attorneys' fees except that the arbitrator shall award costs and attorneys' fees to the prevailing party.

h. Written Decision. The arbitrator shall follow applicable substantive law and, within 30 days after the conclusion of the arbitration, issue a written opinion setting forth the factual and legal bases for her or her decision.

i. Acknowledgement. EXECUTIVE UNDERSTANDS SHE IS GIVING UP HER RIGHT TO A JURY TRIAL BY ENTERING INTO THIS AGREEMENT. EXECUTIVE UNDERSTANDS SHE IS GIVING UP HER RIGHT TO COMMENCE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION AND INSTEAD AGREES TO ARBITRATE ANY EMPLOYMENT-RELATED DISPUTE ON AN INDIVIDUAL BASIS ONLY TO THE MAXIMUM EXTENT PERMITTED BY LAW.

9. **CODE SECTION 409A**.

a. This Agreement is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), including the exceptions

12

thereto, and shall be construed and administered in accordance with such intent. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each separate payment or installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement in connection with a termination of employment shall only be made if such termination of employment constitutes a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

b.  Notwithstanding any other provision of this Agreement, if at the time of Executive's termination of employment, she is a "specified employee," determined in accordance with Section 409A, any payments and benefits provided under this Agreement that constitute "nonqualified deferred compensation" subject to Section 409A that are provided to Executive on account of her separation from service shall not be paid until the first payroll date to occur following the six-month anniversary of Executive's termination date ("Specified Employee Payment Date"). The aggregate amount of any payments that would otherwise have been made during such six-month period shall be paid in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule. If Executive dies before the Specified Employee Payment Date, any delayed payments shall be paid to Executive's estate in a lump sum within one week of Executive's death.

c.  To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following: (i) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each

13

calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (ii) any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and (iii) any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit. Any tax gross-up payments provided under this Agreement shall be paid to Executive on or before December 31 of the calendar year immediately following the calendar year in which Executive remits the related taxes.

d.  Whenever in this Agreement a payment or benefit is conditioned on Executive's execution of a release of claims, such release must be executed and all revocation periods shall have expired within 90 days after the Termination Date; failing which such payment or benefit shall be forfeited.  If such payment or benefit constitutes "nonqualified deferred compensation" subject to Section 409A, and if such 90-day period begins in one calendar year and ends in the next calendar year, the payment or benefit shall not be made or commence before the second such calendar year, even if the release becomes irrevocable in the first such calendar year.

10. **GENERAL PROVISIONS**.

a.  <u>Notices</u>. All notices, requests, demands, statements, reports and other communications provided for by this Agreement shall be in writing (email being sufficient) and shall be sent by (i) certified mail, return receipt requested, postage prepaid, (ii) nationally recognized overnight delivery service, (iii) personal delivery or (iv) email. A notice shall be deemed to be given (x) if notice is delivered by certified mail or nationally recognized overnight delivery service, on the business day following the date of its mailing, (y) if such notice is delivered personally, upon delivery, or (z) if such notice is sent by email, upon sending.  Each party may change her or its address for notices by giving notice in accordance herewith.  All notices shall be addressed and mailed or delivered to the following addresses:

If to the COMPANY: 157 Technology Dr. Irvine, CA 92618

14

If to EXECUTIVE:  402 Midland Avenue, Wayne, PA  19087

b.  Entire Agreement. This Agreement, the Employee Obligations Agreement, and the Indemnification Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, representations and understandings (whether written or oral) of the parties with respect to the subject matter hereof.

c.  Modification and Waiver. No amendment or variation of the terms of this Agreement shall be valid unless made in writing and signed by Executive and a duly authorized representative of the Company (other than Executive). A waiver of any term or condition of this Agreement shall not be construed as a general waiver by the Company.  If one or more provisions of this Agreement are held to be illegal or unenforceable under applicable law, such illegal or unenforceable provision(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms.

d.  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its conflict of law principles, and any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California.

e.  Assignment; Binding Effect. This Agreement is fully assignable and transferable by the Company, but any purported assignment or transfer by Executive is void.  It is hereby agreed that Executive's rights and obligations under this Agreement are personal and not assignable by Executive. This Agreement shall be binding upon and inure to the benefit of the heirs, legal representatives, successors and permitted assigns of the parties. **EXECUTIVE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS AND ACCEPTS THE OBLIGATIONS WHICH IT IMPOSES UPON EXECUTIVE WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO EXECUTIVE TO INDUCE EXECUTIVE TO SIGN THIS AGREEMENT. EXECUTIVE SIGNS THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE**

15

UNDERSTANDING THAT THE COMPANY WILL RETAIN ONE
COUNTERPART AND THE OTHER COUNTERPART WILL BE RETAINED
BY EXECUTIVE.

f.  Injunctive Relief. Executive agrees that any breach of this Agreement will cause
irreparable harm to the Company for which damages would not be an adequate remedy,
and, therefore, to the fullest extent permitted by applicable law, the Company will be
entitled to injunctive relief with respect thereto in addition to any other remedies and
without any requirement to post bond.

g.  Survival.  This Agreement shall terminate upon the expiration of the Term; provided that
the provisions of Sections 5 through 10 shall survive termination of this Agreement and
termination of Executive's employment regardless of the reason for such termination.

h.  Withholding.  The Company may withhold from any and all amounts payable under this
Agreement or otherwise such federal, state and local taxes as may be required to be
withheld pursuant to applicable law.

*[Signature page follows]*

16

In witness whereof, parties have executed this Agreement as of the date first above written.

**COMPANY:**

**Spectrum Pharmaceuticals, Inc.**

By: _____

Jeffrey Vacirca; Chairman, Compensation Committee

**EXECUTIVE:**

*Nora Brennan*
_____

Nora Brennan

*Signature Page to Executive Employment Agreement*

**EXHIBIT A**

**GENERAL RELEASE**

I, Nora Brennan, in consideration of and subject to the performance by Spectrum Pharmaceuticals, Inc. (together with its subsidiaries and successors, the "Company"), of its obligations under the Executive Employment Agreement dated as of April __, 2022 (the "Agreement"), do hereby release and forever discharge as of the date hereof the Company and its respective affiliates, subsidiaries and direct or indirect parent entities and all present, former and future directors, officers, agents, representatives, employees, successors and assigns of the Company and/or its respective affiliates, subsidiaries and direct or indirect parent entities (collectively, the "Released Parties") to the extent provided below (this "General Release"). The Released Parties are intended to be third-party beneficiaries of this General Release, and this General Release may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such Released Parties hereunder. Terms used herein but not otherwise defined shall have the meanings given to them in the Agreement.

1.      I understand that any payments or benefits paid or granted to me under the Agreement represent, in part, consideration for signing this General Release and are not salary, wages or benefits to which I was already entitled. I understand and agree that I will not receive certain of the payments and benefits specified in the Agreement unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter. Such payments and benefits will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Company or its affiliates.

2.      Except as provided in paragraphs 4 and 5 below and except for the provisions of the Agreement which expressly survive the termination of my employment with the Company, I knowingly and voluntarily (for myself, my heirs, executors, administrators and assigns) release and forever discharge the Company and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date that this General Release becomes effective and enforceable) and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties which I, my spouse, or any of my heirs, executors, administrators or assigns, may have, which arise out of or are connected with my employment with, or

1

my separation or termination from, the Company (including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Americans with Disabilities Act Amendments Act of 2008; the Family and Medical Leave Act of 1993; the Labor Management Relations Act; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; the Sarbanes-Oxley Act of 2002; the California Worker Adjustment Retraining and Notification Act; the California Fair Employment and Housing Act; the California Labor Code; the California Family Rights Act; the California Industrial Welfare Commission Wage Orders; the California Constitution; the California Government Code; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance, as well as any amendments to any of the foregoing; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (all of the foregoing collectively referred to herein as the "Claims").

3.     I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 2 above.

4.     I agree that this General Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967 which arise after the date I execute this General Release. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of the Agreement shall not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

5.     I agree that I hereby waive all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever in respect of any Claim, including, without limitation, reinstatement, back pay, front pay, and any form of injunctive relief. Notwithstanding the above, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding; provided, however, that I disclaim and waive any right to

2

share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding. Additionally, I am not waiving (i) any right to the severance benefits to which I am entitled under the Agreement, (ii) any claim relating to directors' and officers' liability insurance coverage or any right of indemnification under the Company's organizational documents or otherwise, (iii) claims under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (iv) claims related to reimbursement of ordinary and reasonable business expenses in accordance with the Company's policies in effect from time to time, and (v) claims relating to any outstanding equity-based award on the date of termination in accordance with the terms thereof.

6.      In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. I expressly consent that this General Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state or local statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver the Company would not have agreed to the terms of the Agreement. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, this General Release shall serve as a complete defense to such Claims to the maximum extent permitted by law. I further agree that I am not aware of any pending claim of the type described in paragraph 2 above as of the execution of this General Release.

7.      I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

8.      I agree that if I violate this General Release by suing the Company or the other Released Parties, I will pay all costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees.

9.      I agree that this General Release and the Agreement are confidential and agree not to disclose any information regarding the terms of this General Release or the Agreement, except to my immediate

3

family and any tax, legal or other counsel that I have consulted regarding the meaning or effect hereof or as required by law, and I will instruct each of the foregoing not to disclose the same to anyone.

10.    Any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any other self-regulatory organization or any governmental entity.

11.    I hereby acknowledge that Sections 4 through 10 of the Agreement shall survive my execution of this General Release.

12.    I represent that I am not aware of any claim by me other than the claims that are released by this General Release.  I acknowledge that I may hereafter discover claims or facts in addition to or different than those which I now know or believe to exist with respect to the subject matter of the release set forth in paragraph 2 above and which, if known or suspected at the time of entering into this General Release, may have materially affected this General Release and my decision to enter into it.

I SPECIFICALLY AND FREELY WAIVE ANY AND ALL RIGHTS I MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH STATES:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HER OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HER OR HER SETTLEMENT WITH THE DEBTOR.

IN WAIVING THE PROTECTIONS OF CIVIL CODE SECTION 1542, I ACKNOWLEDGE AWARENESS OF THE ACTUAL FACTS AND CIRCUMSTANCES SURROUNDING THE AGREEMENT UPON WHICH THIS RELEASE IS GIVEN.  TO EFFECT A FULL AND COMPLETE WAIVER AND RELEASE, I ASSUME THE RISK THAT I MAY LATER DISCOVER FACTS DIFFERENT FROM THOSE I NOW KNOW OR BELIEVE TO BE TRUE.

13.    Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach by the Company or by any Released Party of the Agreement after the date hereof.

14.    Whenever possible, each provision of this General Release shall be interpreted in, such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to

4

be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

1.    I HAVE READ IT CAREFULLY;

2.    I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963, THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

3.    I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

4.    I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

5.    I HAVE HAD AT LEAST 45 DAYS FROM THE DATE OF MY RECEIPT OF THIS RELEASE TO CONSIDER IT, AND THE CHANGES MADE SINCE MY RECEIPT OF THIS RELEASE ARE NOT MATERIAL OR WERE MADE AT MY REQUEST AND WILL NOT RESTART THE REQUIRED 45 DAY PERIOD;

6.    I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

7.    I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

8.    I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

SIGNED:                              DATED:

NAME: Nora Brennan

6

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**

I, Thomas J. Riga, certify that:

1.I have reviewed this quarterly report on Form 10-Q of Spectrum Pharmaceuticals, Inc.;

2.Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
(a)Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
(b)Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
(c)Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
(d)Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
(a)All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
(b)Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

August 12, 2022                                    /s/ THOMAS J. RIGA
                                                   Thomas J. Riga
                                                   President and Chief Executive Officer
                                                   (Chief Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**

I, Nora E. Brennan, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Spectrum Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

August 12, 2022                                                         /s/ NORA E. BRENNAN
                                                                        _____
                                                                        Nora E. Brennan
                                                                        Executive Vice President and Chief Financial Officer
                                                                        (Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**

I, Thomas J. Riga, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge, the Quarterly Report of Spectrum Pharmaceuticals, Inc. on Form 10-Q for the quarterly period ended June 30, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc.

Date:   August 12, 2022

By:   /s/ THOMAS J. RIGA

Name:   Thomas J. Riga

Title:   Chief Executive Officer and President

This certification accompanies the Report pursuant to Rule 13a-14(b) under the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350 and shall not be deemed filed by the Company for purposes of Section 18 of the Securities and Exchange Act of 1934, or otherwise subject to the liability of that section. This certification shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, or, the Securities Exchange Act of 1934, except to the extent that the Company specifically incorporated by reference.

**Exhibit 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**

     I, Nora E. Brennan, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge, the Quarterly Report of Spectrum Pharmaceuticals, Inc. on Form 10-Q for the quarterly period ended June 30, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents in all material respects the financial condition and results of operations of Spectrum Pharmaceuticals, Inc.

| | | |
|---|---|---|
| Date:  August 12, 2022 | By: | /s/ NORA E. BRENNAN |
| | Name: | Nora E. Brennan |
| | Title: | Executive Vice President and Chief Financial Officer |

This certification accompanies the Report pursuant to Rule 13a-14(b) under the Securities Exchange Act of 1934 and 18 U.S.C. Section 1350 and shall not be deemed filed by the Company for purposes of Section 18 of the Securities and Exchange Act of 1934, or otherwise subject to the liability of that section. This certification shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, or, the Securities Exchange Act of 1934, except to the extent that the Company specifically incorporated by reference.