**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STEVEN B. CHRISTIANSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SPECTRUM PHARMACEUTICALS, INC., THOMAS J. RIGA, FRANCOIS J. LEBEL, NORA E. BRENNAN,<br><br>Defendants. | Case No. 1:22-cv-10292 (VEC)<br><br>Consolidated with<br>Case No. 1:22-cv- 10677 (VEC);<br>Case No. 1:23-cv-00767 (VEC)<br><br><u>ORAL ARGUMENT REQUESTED</u> |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
Brandon Fox
800 Third Avenue, 38th Floor
New York, NY 10022
T:  212-687-1980
F:  212-687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
bfox@kaplanfox.com

Kathleen A. Herkenhoff
(admitted *pro hac vice*)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
T: (415) 772-4700
F: (415) 772-4707
kherkenhoff@kaplanfox.com

*Lead Counsel for Lead Plaintiff Steven B. Christiansen and the Proposed Class*

Dated: September 6, 2023

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................................1

I.   FACTS ..............................................................................................................................3

 A. Spectrum's New Drug Application for Pozi at 16mg QD dose .............................3

 B. Defendants Mislead Spectrum Investors .............................................................5

  1. 3/17/22: Defendant Riga Falsely Represents That Spectrum Had Learned to "Optimize" the Dosage for Pozi ...........................................5

  2. 5/12/22: Defendants Riga and Lebel Falsely Represent that Patients Were Enrolling in the PINNACLE Study ...................................6

  3. 5/12/22: Defendants Falsely Represent Spectrum and the FDA Were Aligned on the Design of the PINNACLE Study ..............................7

  4. 8/11/22: Defendants Repeat False and Misleading Statement That Patients Are Enrolling in the PINNACLE Study.......................................7

  5. Defendants' Fraudulent Conduct is Revealed..............................................8

II.   ARGUMENT.....................................................................................................................9

 A. False and Misleading Statements about Patient Enrollment in the PINNACLE Study (¶¶125-26, 138, 140, 142).......................................................10

 B. False and Misleading Statements about Defendants' Alignment with FDA on the Design of the PINNACLE Study (¶128). ..........................................14

 C. False and Misleading Statements about Dose Data Optimization (¶¶123, 130). ...........................................................................................................18

 D. Defendants' False and Misleading Risk Warnings (¶¶133, 145)..........................20

 E. Additional False and Misleading Statements (¶¶136-35, 147). ...........................21

 F. The Complaint Adequately Alleges Defendants' Scienter ...................................22

  1. Facts Showing Strong Circumstantial Evidence of Defendants' Conscious Misbehavior or Recklessness ....................................................22

  2. Facts Showing Motive and Opportunity...................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)........................................................................ 11, 16, 17

*Alpha Cap. Anstalt v. New Gen. Biofuels, Inc.*,
2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)................................................ *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................ 10

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018)............................................................. 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................ 2, 10, 12

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)........................................................................... 10

*City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)............................................................. 22

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)............................................................. 10

*Constr. Laborers Pen. Trust for So. CA. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)............................................................. 15

*DoubleLine Cap. LP v. Odebrecht Fin., LTD*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)......................................................... 17, 22

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. 2019)............................................................. 13

*Fort Worth Emps.' Ret. Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009)............................................................. 19

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................. 25

*N.E. Carpenters Guaran. Ann. & Pen. Funds v. DeCarlo*,
2023 WL 5419147 (2d Cir. Aug. 23, 2023)..................................................... 16

*Galestan v. OneMain Holds., Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................................. 12

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................. 25

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)................................................................. 19

*Gregory v. ProNai Thera. Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018)................................................................. 14

*Ha. Struct. Iron Pen. Tr. Fund v. AMC Ent. Hold., Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)............................................................ 23, 24

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)................................................... 14

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 453 (S.D.N.Y. 2008) ..................................................................... 19

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010)................................................................. 14

*In re Columbia Labs., Inc. Sec. Litig.*,
2013 WL 10914123 (D.N.J. June 11, 2013)....................................................... 19

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)............................................................... 23, 24

*In re Fannie Mae 2008 Sec. Litig.*,
2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011).................................................. 25

*In re Hain Celestial Group, Inc. Sec. Litig.*,
20 F.4th 131 (2d Cir. 2021) ................................................................................ 22

*In re IPO Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003)................................................................. 25

*In re Medimmune, Inc. Sec Litig.*,
873 F. Supp. 953 (D. Md. 1995)..................................................................... 17, 18

*In re MELA Sci. Sec. Litig.*,
2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012).................................................... 17

*In re Mindbody, Inc. Sec. Litig.*,
489 F. Supp. 3d 188 (S.D.N.Y. 2020)................................................................. 17

*In re NovaGold Res. Inc. Secs. Litig.,*
 629 F. Supp. 2d 272 (S.D.N.Y.2009).................................................................................... 14

*In re Oxford Health Pls., Inc.,*
 187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................................... 16

*In re Philip Morris Int'l Inc. Sec. Litig.,*
 437 F. Supp. 3d 329 (S.D.N.Y. 2020) ................................................................................. 19

*In re Romeo Power Inc. Sec. Litig.,*
 2022 WL 1806303 (S.D.N.Y. June 2, 2022) ................................................................. 10, 13

*In re Romeo Power Inc. Sec. Litig.,*
 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022)............................................................... 10, 20

*In re Salix Pharms., Ltd.,*
 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...................................................................... 24

*In re Sanofi Sec. Litig.,*
 87 F. Supp. 3d 510 (S.D.N.Y. 2015)............................................................................. 17, 19

*In re Schol. Corp. Sec. Litig.,*
 252 F.3d 63 (2d Cir. 2001).................................................................................................. 25

*In re SSA Bonds Antitrust Litig.,*
 2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018)..................................................................... 25

*In re Turquoise Hill Res. Ltd. Sec. Litig.,*
 625 F. Supp. 3d 164 (S.D.N.Y. 2022).................................................................................. 17

*In re Twinlab Corp. Sec. Litig.,*
 103 F. Supp. 2d 193 (E.D.N.Y. 2000) ................................................................................. 25

*In re Vivendi, S.A. Sec. Litig.,*
 838 F.3d 223 (2d Cir. 2016)..................................................................................... 14, 17, 22

*In re Wells Fargo & Co. Sec. Litig.,*
 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)............................................................... 12, 17

*IWA Forest Ind. Pen. Plan v. Textron Inc.,*
 14 F.4th 141 (2d Cir. 2021) ........................................................................................... 11, 12

*Lapin v. Goldman Sachs Grp., Inc.,*
 506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................................... 15, 21, 22

*Luv N' Care, Ltd. v. Goldberg Cohen, LLP,*
 703 Fed. Appx. 26 (2d Cir. 2017).......................................................................................... 10

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..................................................................................................... 9, 17

*Meyer v. Jinkosolar Hldgs. Co.*,
   761 F.3d 245 (2d Cir. 2014)...................................................................................... *passim*

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................................. 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pen. Fund*,
   575 U.S. 175 (2015)........................................................................................... 16, 17, 18

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) .......................................................................................... 24

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)............................................................................................. 10

*Setzer v. Omega Health. Inv'rs., Inc.*,
   968 F.3d 204, 215 (2d Cir. 2020)..................................................................................... 23

*Skiadas v. Acer Thera. Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ............................................................. 18, 24, 25

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)............................................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................................... 22

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)............................................................................................. 19

*Transkaryotic Thera., Inc. Sec. Litig.*,
   319 F. Supp. 2d 152 (D. Mass. 2004) ......................................................................... 21, 22

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013)......................................................................... 24, 25

**Statutes**

15 U.S.C. § 78j(b) ................................................................................................................ 1

15 U.S.C. § 78t(a) ................................................................................................................ 1

15 U.S.C. § 78u-4(b)(1)-(2) ................................................................................................ 3

15 U.S.C. § 78u–4(b)(1)(B) .............................................................................................. 11

15 U.S.C. §78u-5(c)(1)(A).........................................................................................................22

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................................... 3, 10, 11

Fed. R. Civ. P. 15(a)(2)............................................................................................................ 25

**Regulations**

17 C.F.R. § 240.10b-5.................................................................................................................. 1

**PRELIMINARY STATEMENT**

The Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 67) (the "Complaint"), alleges that during the Class Period (March 17 through September 22, 2022), Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company") and its most senior executives engaged in blatant securities fraud.[1] Before and during the Class Period, Defendants had a new drug application ("NDA") pending before the U.S. Food and Drug Administration ("FDA") for a drug called poziotinib, or pozi, for treatment of patients with non-small cell lung cancer ("NSCLC"). During the Class Period, Defendants represented: (1) that Spectrum was enrolling patients in an FDA-required Phase 3 randomized study (called the PINNACLE Study), when in fact no patients had been enrolled, (2) that the Company and the FDA were "aligned" on the design of the PINNACLE Study, which was not true, and that (3) Defendants had learned to "optimize" the dosage of pozi (data demonstrating dosage provided patients optimal efficacy and safety), when, in fact, the FDA had informed the Company that Spectrum did not have sufficient data and that additional data and studies were required to demonstrate that the dosage was optimized. Based on meetings and communications with the FDA in which Riga and/or Lebel participated on behalf of Spectrum, as corroborated by multiple FDA officials and records, Defendants knew, or at least recklessly ignored, that the representations to investors were materially false and misleading at the time they were made. At the same time as Defendants were misleading investors, Riga and Brennan, at various times during the Class Period, caused Spectrum

---

[1] Lead Plaintiff Steven Christiansen ("Plaintiff") asserts claims against Spectrum, Thomas J. Riga ("Riga"), the Company's President and Chief Executive Officer ("CEO") and a member of the Company's board of directors, Francois J. Lebel ("Lebel"), the Company's former Executive Vice President ("EVP") and former Chief Medical Officer ("CMO"), and Nora E. Brennan ("Brennan"), the Company's EVP and Chief Financial Officer ("CFO") and former member of the Company's board of directors, and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Citations to "¶_" refer to paragraphs of the Complaint, and citations to "Defs. Br." refer to ECF No. 70 (Defs. Memo. of Points and Authorities in Supp. of Their Mot. to Dismiss the Complaint).

to sell over $26 million of its common stock, which was critical to keep Spectrum afloat, as it was due to run out of cash by the end of 2022.  Ultimately, when the truth was revealed at the end of the Class Period, Spectrum's stock crashed over 59%, and shortly thereafter, Spectrum abandoned pozi's development and Lebel "resigned" from the Company.

Defendants assert that none of their statements were materially false, that they had no duty to disclose material, negative facts that sharply contradicted what they told investors, and that, when viewed in context, their statements were not materially misleading. These arguments fail because they ignore well-settled law that holds "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Meyer v. Jinkosolar Hldgs. Co.*, 761 F.3d 245, 250 (2d Cir. 2014), and that on a motion to dismiss, courts accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007);  *Alpha Cap. Anstalt v. New Gen. Biofuels, Inc.*, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014) (Caproni, J.) ("The discrepancy between the two parties' interpretation of the facts . . . cannot be resolved on a motion to dismiss.").  Furthermore, Defendants ignore, contradict and mischaracterize facts alleged, and raise questions of fact, all of which are improper and irrelevant on a motion to dismiss.

Defendants' arguments concerning scienter fare no better. Viewed holistically, the Complaint alleges facts supporting an inference of scienter that is cogent and at least as compelling as Defendants' alternative inferences: Defendants were motivated to take a risky gamble and mislead investors because of Spectrum's precarious financial condition and cash crunch. Indeed, Defendants' suggested inferences—that they genuinely believed that they could address the FDA's questions and concerns, and had no knowledge of how, in the future, the FDA would view the NDA for pozi—are weak because they are contradicted by the facts alleged and are based on the

2

faulty premise that the Complaint alleges Defendants' failure to predict the outcome of FDA review of the pozi NDA, which is not alleged in the Complaint.[2]  Nor do such arguments negate the fact that Defendants lied about present, verifiable facts.  As a result, the Complaint adequately alleges the elements of Section 10(b) of the Exchange Act, and satisfies Rule 9(b) of the Federal Rules of Civil Procedure and the particularity requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. § 78u-4(b)(1)-(2)).  Accordingly, Defendants' motion to dismiss should be denied.

## I.  FACTS

### A.  Spectrum's New Drug Application for Pozi at 16mg QD dose

In 2017, Spectrum commenced a clinical development program for pozi (called ZENITH-20) that included an independent Phase 2 study, referred to as Cohort 2, concerning the efficacy and safety of pozi at a dose of 16 mg QD in previously treated NSCLC patients with HER2 exon 20 insertion mutations.  ¶¶5, 67-68.  "QD" means the drug is taken once per day, and "BID" means the drug is taken twice per day. ¶¶5, 11. Cohort 2 comprised 90 patients with previously treated NSCLC and all patients were to be treated with 16 mg of pozi QD. ¶¶5, 68.

In November 2021, based on Cohort 2's Phase 2 efficacy and safety data results, Spectrum filed an NDA under the FDA's Accelerated Approval ("AA") Pathway for pozi at the 16 mg QD dose (the "Pozi NDA").  ¶80.  While the FDA typically requires Phase 1, 2 and 3 trial data to support a drug's approval, the FDA developed the AA Pathway to speed the commercialization of drugs based on Phase 2 clinical data, however, AA requires additional trials, typically randomized, controlled Phase 3 studies, called confirmatory studies or postmarketing requirements, to confirm a drug's safety and efficacy. ¶¶3-4, 58-62.  As required by the AA Pathway, Spectrum and Lebel

---

[2] Defendants repeatedly attempt to recast the Complaint as alleging that Defendants knew in advance that the Pozi NDA would not be approved or that they failed to predict the outcome of the ODAC meeting and FDA review, which is not alleged. Defs. Br. at 2, 8, 9, 18-19, 19 n. 19, 20, 24.

proposed a Phase 3 confirmatory trial (the PINNACLE Study), and in November 2021 Defendant Lebel publicly acknowledged that FDA industry guidance required the PINNACLE Study to be underway at the time the Pozi NDA was filed. ¶¶6, 59-62, 79-80.

Before a drug can be approved, the FDA requires that data demonstrating a drug's proposed dosing regimen provides the optimal balance of efficacy and safety for patients, which is called dose optimization. ¶¶9, 70. Data demonstrating that a dose is optimized is a prerequisite to FDA approval and provides the basis of an approved drug's dosage stated on the proscribing label for doctors and patients. ¶123 n.10. In support of the 16 mg QD dosage, the Pozi NDA included data from a small, Phase 1 study in South Korea treating eight patients with 16 mg of pozi QD, and data from Cohort 2, which was designed to treat patients with 16 mg of pozi QD. ¶¶69, 70, 72, 80. However, due to the fact that 89% of Cohort 2 patients experienced adverse events at that dosage, most Cohort 2 patients did not receive the intended dosage of 16 mg QD, with 74% receiving dosages of 12 mg QD or less. ¶¶73, 77. In response to FDA concerns about adverse events at the 16 mg QD dosage level and that the dose was not "optimized," Spectrum submitted dosing data from separate studies that treated patients (only some of whom had the specific genetic mutation of patients in Cohort 2) under different dosing regimens, *i.e.*, 6 mg or 8 mg BID. ¶¶77, 80-81.

On November 24, 2021, Spectrum submitted the final components of the Pozi NDA to the FDA. ¶80. On February 11, 2022, Spectrum disclosed that the FDA accepted the Pozi NDA for substantive review, and that the FDA set November 24, 2022 as the date on or before which it would decide whether to grant AA to the Pozi NDA (the so-called PDUFA date). ¶86. Under FDA guidance available for over a decade, by the PDUFA date, confirmatory trials should be underway and should be ongoing and substantially enrolled, if not fully enrolled, at the time of AA. ¶¶4, 59-

4

61, 117.  Indeed, Riga and Lebel publicly acknowledged that the FDA reiterated the importance of having the PINNACLE Study substantially enrolled by the PDUFA date.  ¶¶86, 102.

**B.     Defendants Mislead Spectrum Investors**

**1.     3/17/22: Defendant Riga Falsely Represents That Spectrum Had Learned to "Optimize" the Dosage for Pozi**

The Class Period begins on March 17, 2022, when Riga represented to investors that "we have learned to optimize some of the tolerability and abate some of the AEs [adverse events] here with the BID [twice per day] dosage" for pozi.  ¶¶9, 123-24.  This was false and misleading because before and during the Class Period, the FDA review team, which included Nicole Drezner, M.D., Jeanne Fourie Zirkelbach, Ph.D., and Harpreet Singh, M.D, reiterated the FDA's concerns to Lebel and Riga that Spectrum did not have adequate study data that confirmed optimal dose selection, and that additional data and studies were required.  ¶¶71, 75-77, 83-85, 96, 98, 104, 109, 111-12, 124.

The sticking point for the FDA was that while patients in Cohort 2 were treated with 16 mg QD and the Pozi NDA sought AA to treat patients with a 16 mg QD dose, Riga and Lebel proposed to treat patients in the PINNACLE Study with a different dosage regimen, 8 mg BID, in an effort to mitigate adverse events experienced by Cohort 2 patients while maintaining efficacy. ¶¶11, 83-85.  The incongruent dosing schedules (16 mg QD versus 8 mg BID) troubled and concerned FDA officials because, while Spectrum had submitted with the Pozi NDA dosing data from Cohort 2 and additional supportive dosing data in which a few patients were treated with 8 mg BID, far from having "learned to optimize" the dosage, before the Class Period the FDA privately told Riga and Lebel that the data were inadequate and that additional dosing data and studies were required to determine the optimal dose for further evaluation of the 8 mg BID dose in the PINNACLE Study.  *Id*.  As later disclosed by FDA officials at the end of the Class Period

at a meeting of the FDA's Oncologic Drugs Advisory Committee ("ODAC"), before and during the Class Period, FDA officials privately "informed the applicant that their plans for dose optimization were not adequate to support a registrational program, and Spectrum's failure to have a "well-founded dose" was "literally building a house on quicksand."  ¶¶16 n.2, 109, 112-13. Following Riga's materially false and misleading statement, Spectrum sold $1.4 million of its common stock.  ¶¶19, 88.

### 2.    5/12/22: Defendants Riga and Lebel Falsely Represent that Patients Were Enrolling in the PINNACLE Study

On the March 17, 2022 conference call with investors, Lebel promised that Spectrum would disclose the design and details of the PINNACLE Study "**after** the first patient was enrolled," a fact that Defendants ignore. ¶12 (emphasis added). Then, on May 12, 2022, Riga and Lebel disclosed the design and details of the PINNACLE Study, and further represented that patients were enrolling in the PINNACLE Study: "Patients are being randomized 2-to-1 into one of two treatment arms using 8mg of poziotinib orally administered BID (twice daily) versus 75mg/m2 of docetaxel administered intravenously every three weeks." ¶¶13, 37, 89-90, 125-26.

This representation was false and misleading.  While Defendants assert in their brief that this representation related only to the PINNACLE Study's design, rather than current patient enrollment, the Complaint alleges that unwitting investors and analysts understood this representation to mean that patients were enrolling in the PINNACLE Study.  Indeed, an analyst that covered Spectrum (JMP Securities LLC ("JMP")) published a report on May 16, 2022 that stated "Spectrum noted that it has started enrolling patients" in the PINNACLE Study "'which needs to be substantially enrolled by' November 2022." ¶¶17, 132. Thus, Riga and Lebel's representations created the false impression that the PINNACLE Study had at least enrolled the first patient and was then enrolling patients, when, in fact, no patients had enrolled. ¶¶91, 132.

6

### 3.    5/12/22: Defendants Falsely Represent Spectrum and the FDA Were Aligned on the Design of the PINNACLE Study

Also on May 12, 2022, during a Spectrum conference call with investors, Riga stated "we believe that 16 QD is a safe and effective dose **and obviously aligned with FDA on the confirmatory study to go with the 8-milligram BID**." (Emphasis in original). ¶¶14, 128.  This statement was false and misleading.  Unknown to investors, far from being "obviously aligned" with FDA on the 8 mg BID dose for the design of the PINNACLE Study, there was no agreement. ¶¶83-85. As later revealed at the end of the Class Period, FDA review team members Dr. Singh and Dr. Zirkelbach repeated what they had been privately telling Lebel and Riga since before the start of the Class Period—that initiating the PINNACLE Study was at Spectrum's own risk in light of lack of dose optimization data and that there was no agreement with the FDA on the design of the PINNACLE Study at the 8mg BID dosage.  ¶¶15-16, 83-85, 111-12, 129.  In the weeks following Riga and Lebel's misrepresentations, Spectrum sold $3.5 million of its common stock. ¶¶21, 95.

On May 18 and July 28, 2022, Riga and Lebel met with FDA officials, and the FDA review team reiterated that uncertainties remained regarding whether the proposed pozi dosage for AA of 16 mg QD was optimized and that additional dose optimization data were required. ¶¶20, 22, 96, 98.  Furthermore, while Riga and Lebel had previously told investors that patients were enrolling in the PINNACLE Study, the FDA privately expressed concern to Riga and Lebel about the delayed enrollment in the PINNACLE Study because, in fact, no patients had enrolled.  ¶¶20, 22, 96, 98.  Following Riga and Lebel's July 2022 meeting with the FDA (July through August 2022), Spectrum sold $4.5 million of its common stock. ¶¶23, 97.

### 4.    8/11/22: Defendants Repeat False and Misleading Statement That Patients Are Enrolling in the PINNACLE Study

On August 11, 2022, Riga, Lebel and Brennan caused Spectrum to issue a press release

7

that repeated the false representation that patients were enrolling in the PINNACLE Study. ¶¶98-99, 138.  Also on August 11, 2022, Lebel repeated this false representation during a conference call with analysts and investors and further stated "[o]ur randomized [confirmatory] study is underway." ¶140.  Moments after Lebel's false statement during the conference call, an analyst, who was under the false impression that patients had been enrolling, asked Lebel "[w]hat percentage of your target patients have been enrolled in Phase III [(the PINNACLE Study)]?" ¶¶99, 142.  In response, Lebel made highly misleading statements that assured investors that Spectrum had and was continuing to enroll patients in the PINNACLE Study and that Spectrum was on track for the PINNACLE Study to be substantially enrolled by November 24, 2022 as required by the FDA: "we're very active in opening site[s]. But as I'm sure you know, it takes a long time to open sites. We have some site[s] open. I'm not going to give you numbers today. I'm not going to speak directly to enrollment today. And so we're moving as fast as we can internationally as well as in North America." ¶¶26, 100, 142.  In fact, as of August 11, 2022 no patients had enrolled in the PINNACLE Study and, as recently as July 28, 2022, the FDA had expressed concerns to Riga and Lebel about the delayed enrollment in the PINNACLE Study. ¶¶98, 143.  In the following weeks, Spectrum sold over $17 million of its common stock. ¶¶28 n.3, 103.

### 5.    Defendants' Fraudulent Conduct is Revealed

Starting on September 20, 2022, before the market opened, investors began to learn the truth when the FDA released its Briefing Document for the ODAC meeting scheduled for September 22, 2022 (the "FDA Briefing Document"). ¶¶30, 105.  Investors were shocked because, in stark contrast to Defendants' representations during the Class Period, it was revealed that the FDA had repeatedly told Riga and Lebel that they had inadequate data on dosing, that additional data and studies were needed to determine whether Spectrum's dose selection for pozi was

optimized, that the FDA had concerns regarding the efficacy and safety study data results from Cohort 2, and that as of September 20, 2022 no patients had enrolled in the PINNACLE Study, disclosures that caused Spectrum's stock to crash over 37%.  ¶¶31-33, 105-06.

On September 22, 2022, the FDA's ODAC met concerning the Pozi NDA and members of the FDA review team revealed to investors what they had been privately telling Riga and Lebel since before the Class Period. ¶¶35, 108-17.  As confirmed by FDA officials, no patients had enrolled in the PINNACLE Study, FDA officials had warned Riga and Lebel that there was no agreement on the design of the PINNACLE Study and that Spectrum proceeded with the study at its own risk, and Spectrum did not "have sufficient information to determine the optimal poziotinib dosage." ¶¶111-13.  ODAC members agreed with the FDA review team's assessment and voted to recommend that the FDA not approve the Pozi NDA. ¶¶35, 118-19.  In response, shares of Spectrum stock crashed again, declining over 31%. ¶¶36, 119.

On November 25, 2022, having lost its risky gamble on the Pozi NDA, Spectrum disclosed that the Company would "deprioritize" development of pozi because the FDA declined to grant AA. ¶¶38, 120.  Weeks later, given his blatantly false and misleading representations to investors, unsurprisingly, Spectrum announced Lebel "resigned" from the Company. ¶¶39, 121.

## II.   ARGUMENT

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must allege that Defendants: (1) made a material misstatement or omission; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; (5) economic loss; and (6) loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants' motion only challenges the adequacy of the Complaint's falsity and scienter

9

allegations.[3]  In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiff's favor.  *See Twombly*, 550 U.S. at 555.  Dismissal is appropriate only where "[Plaintiff] can prove no set of facts consistent with the complaint that would entitle" him to relief.  *Meyer*, 761 F.3d at 249.  The Complaint alleges sufficient facts "to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and satisfies the PSLRA's pleading requirements and Rule 9(b).  Extraneous materials cannot be considered on a motion to dismiss, or the court must convert the motion to one for summary judgment and allow discovery.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (stating conversion rule strictly enforced).[4]

## A. False and Misleading Statements about Patient Enrollment in the PINNACLE Study (¶¶125-26, 138, 140, 142)

On May 12 and August 11, 2022, in corporate press releases and conferences calls with investors, each of the Individual Defendants made, or caused Spectrum to make, representations

---

[3] Defendants' reference to FDA approval of a different drug (Enhertu) in August 2022 and their suggestion that it may have influenced the ODAC panel's negative vote is a loss causation argument, which Defendants do not assert.

[4] Defendants prematurely seek to expand the factual record before discovery and dispute facts in an attempt to introduce their own version of events to refute the Complaint's allegations. In a footnote (Defs. Br. at 3 n.1), Defendants seek judicial notice of documents not mentioned or relied upon in the Complaint—ECF Nos. 71-3-4, 12-15, 17-20 (the "Extraneous Documents."). Arguments raised in footnotes are typically forfeited and for this reason alone the request should be denied. *Luv N' Care, Ltd. v. Goldberg Cohen, LLP*, 703 Fed. Appx. 26, 29 (2d Cir. 2017). Assuming, *arguendo*, the Court considers Defendants' argument, Plaintiff opposes judicial notice of the Extraneous Documents because on a motion to dismiss, Defendants are limited to arguing from the facts alleged in the Complaint, with certain limited exceptions for documents that are integral to a Plaintiff's claims, or documents that are incorporated by reference into the Complaint. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *1, n.1 (S.D.N.Y. June 2, 2022) ("*Romeo I*"), *recon. denied*, 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ("*Romeo II*"); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 411, n.5 (S.D.N.Y. 2011). The Court should deny judicial notice of the Extraneous Documents and the arguments upon which they rely because they are not integral to the Complaint or incorporated by reference. *See* Defs. Br. at 5 n.4 (summary minutes of 9/22/22 ODAC meeting, whereas the Complaint cites the full transcript, which Defendants declined to submit) (relying on ECF No. 71-3); at 5 n.5 (news article) (relying on ECF No. 71-4); at 15 n.11 (pre-Class Period press releases) (relying on ECF Nos. 71-12-15); at 17 n.16 (cite to scientific journal); at 16 n. 14 (analyst reports) (relying on ECF Nos. 71-17-20). If the Court considers any documents for which Defendants seek judicial notice, consideration is limited to determine what the documents state, but not to prove the truth of their contents. *Roth*, 489 F.3d at 509.

to investors that patients were enrolling in the PINNACLE Study, when in fact no patients had enrolled (and none ever did). ¶¶125-27 (Riga and Lebel), 138-43 (Riga, Lebel and Brennan).[5] Defendants assert that their representations relate only to the PINNACLE Study's design and protocol, did not represent "the current status of implementation" and that Defendants' statements "implied" a "prospective context" in which Defendants were speaking of Spectrum's future plans, not current patient enrollment. Defs. Br. at 14-16. Defendants' arguments rely on extraneous documents, dispute facts, ignore key facts, and assert inferences in their favor, which are improper on a motion to dismiss and should not be credited. Where, as here, Defendants' arguments are inconsistent with the facts alleged in a complaint, courts must resolve such disputes in Plaintiff's favor. *See IWA Forest Ind. Pen. Plan v. Textron Inc.*, 14 F.4th 141, 146-48 (2d Cir. 2021); *Alpha Cap.*, 2014 WL 6466994, at *9.

Relying on extraneous documents, Defendants argue that "on prior occasions, Spectrum had specifically announced when it had enrolled its first patient, and the only fair inference is that it would have done so here had it intended to convey that message." Defs. Br. at 15. Defendants ignore that on March 17, 2022, Defendant Lebel stated that the Company "would disclose the design and details of the PINNACLE Study **after** the first patient was enrolled." ¶12 (emphasis added). Then, on May 12, 2022, Defendants disclosed the design and details of the PINNACLE Study and further represented that patients "are being randomized 2-to-1 into one of two treatment arms using 8mg of poziotinib orally administered BID . . . ." ¶¶12-13. Read in the light most favorable to Plaintiff, a reasonable investor could believe that Riga and Lebel represented that as

---

[5] In assessing falsity, the PSLRA requires Plaintiff to "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . all facts on which that belief is formed.' Similarly, Rule 9(b) requires that 'a complaint . . . specify the statements that the plaintiff contends were fraudulent' and 'explain why the statements were fraudulent.'" *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (citing 15 U.S.C. § 78u–4(b)(1)(B) and Rule 9(b)). The Complaint satisfies these requirements.

of May 12, 2022 at least the first patient had enrolled in the PINNACLE Study.  Indeed, the JMP analyst covering the Company understood Defendants' representations to indicate that Spectrum "has started enrolling patients" in the PINNACLE Study (¶¶17, 94, 132), a fact that strengthens and corroborates the Complaint's allegations.  *See Galestan v. OneMain Holds., Inc.*, 348 F. Supp. 3d 282, 292 n.3, 304 n.5 (S.D.N.Y. 2018) (finding analyst reports demonstrate market's understanding).  On August 11, 2022, Defendants repeated substantially similar false statements. ¶¶138-44.

Defendants' argument that the JMP analyst was mistaken and should be discredited contravenes *Twombly*'s mandate to accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiff's favor, and raises a fact dispute that cannot be resolved on a motion to dismiss.  *Textron*, 14 F.4th at 146-48; *Alpha Cap.*, 2014 WL 6466994, at *9; *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *17 (S.D.N.Y. Sept. 30, 2021).  That the JMP analyst did not repeat the statement that Spectrum "has started enrolling patients" in later reports is not surprising, as it would not be new information to report to investors.[6]  Defendants' assertion that, when viewed in context, their reading of the statement at issue is superior to Plaintiff's is similar to the argument that the Second Circuit in *Textron* rejected.  *Textron*, 14 F.4th at 146-48 (citations omitted) ("District Court in effect required IWA 'to show that [its] reading was superior to the court's own benign reading' of those statements—a requirement we have described as error.").  Accordingly, the Court cannot resolve this fact dispute in Defendants' favor.

Similarly meritless is Defendants' strained interpretation of their statements, which again dispute facts, raise questions of fact and seek inferences in their favor.  Defendants assert that they implied that "sites were merely being opened or not even yet open" where "patients might be

---

[6] Defendants' argument that corporate officers are not responsible for inaccurate statements in analyst reports (Defs. Br. at 16) misses the point.  The Complaint asserts claims against Defendants, not analysts, for Defendants' materially false and misleading representations.  ¶¶125-26, 138, 140, 142.

recruited." Defs. Br. at 15, 17. However, continuing to open sites and discussing additional patients to be enrolled are not inconsistent with a reasonable investor's understanding that Spectrum had at least enrolled the first patient at that time, which was not true. *See Romeo I*, 2022 WL 1806303, at *4 (rejecting defendants' argument that their other statements show statement at issue was not false and misleading). Defendants' statement that the "primary endpoint *will be* Progression Free Survival" (emphasis in original) refers to a data metric to be evaluated after the study concludes, and communicates nothing regarding patient enrollment. Likewise, Defendants' statements that patients "will be evaluated" and "will be allowed to cross over" are not inconsistent with a reasonable investor's belief, based on Defendants' false statement, that patients were then enrolling. "[W]hether a reasonable investor, in the exercise of due care, would have received a false impression from a statement requires 'delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts [and] is therefore generally a question of fact for the jury'"—not for resolution on a motion to dismiss. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 210 (S.D.N.Y. 2019).

Defendants assert similarly specious and fact-intensive arguments concerning Lebel's false and misleading statements during Spectrum's August 11, 2022 conference call. Defs. Br. at 16-18. The context shows the highly misleading nature of Lebel's statement. On August 11, 2022, during the conference call, Defendant Lebel stated "our randomized [confirmatory] study is underway" and reaffirmed the false representation that patients were enrolling in the PINNACLE Study (¶140), prompting an analyst to ask Lebel: "[w]hat percentage of your target patients have been enrolled [in the PINNACLE Study]?," a question that implied the analyst was under the impression (albeit mistaken) that patients were enrolling. ¶142. Instead of telling the truth, or correcting or updating investors, Lebel reaffirmed the false impression that patients had enrolled:

13

"we're . . .very active in opening site[s] . . . We have some site open. I'm not going to give you numbers today. I'm not going to speak directly to enrollment today. . . ." ¶142. A reasonable investor could believe that at least some number of patients had enrolled based on Lebel's statements, when in truth, no patients had enrolled.[7]

In Defendants' view, Lebel had no duty to disclose interim communications with the FDA. Defs. Br. at 17 n. 17.  However, when Lebel spoke on the topic of patient enrollment and opening sites, he had a duty to speak truthfully about material issues and to be both accurate and complete, *Meyer*, 761 F.3d at 250, and a continuing duty to update or correct past statements when they became known to be misleading.  *See In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010); *In re NovaGold Res. Inc. Secs. Litig.,* 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009). Half-truths—statements that are misleading by virtue of what they omit to disclose—will support claims for securities fraud. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016).[8]

### B. False and Misleading Statements about Defendants' Alignment with FDA on the Design of the PINNACLE Study (¶128).

Defendants argue that Riga's statements that the FDA and Spectrum were "obviously aligned" on the design of the PINNACLE Study was not false because the Complaint fails to establish that the FDA was not in "alignment" with Spectrum regarding the dosing regimen to be used in the PINNACLE study. Defs. Br. at 10-11.  According to Defendants, "a single participant's comment at the September 22 ODAC meeting" that the FDA "did not come to any formal

---

[7] Defendants argument that "Plaintiff has not demonstrated how Defendants could know with certainty on August 11 where enrollment would stand more than three months later" misses the point.  Defs. Br. at 18.  The Complaint alleges that Defendants Riga and Lebel misrepresented the status of enrollment as of August 11, 2022.

[8] Defendants' reliance on *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021), is misplaced. Unlike the undisputed fact that Spectrum did not enroll any patients in the PINNACLE Study and Defendants hid this material fact from investors, the court in *AnaptysBio* found no duty to disclose facts in response to questions from analysts because the allegedly undisclosed facts had already been disclosed to investors. Likewise, in *Gregory v. ProNai Thera. Inc*., 297 F. Supp. 3d 372, 411 (S.D.N.Y. 2018), the alleged undisclosed facts were already disclosed to investors.

14

agreement about the 8-mg BID dose" supports Spectrum's "belief" that there was at least an "'informal agreement.'" *Id*. at 11.

Again, Defendants contradict and ignore the facts alleged in the Complaint. The Complaint alleges that on December 13, 2021 and again on February 7, 2022, just weeks before Riga told investors that Spectrum and the FDA were "obviously aligned," the FDA and Riga and Lebel met to discuss the design of the PINNACLE Study, but failed to reach an agreement. ¶¶84-85 (alleging no agreement had been reached between Spectrum and the FDA). At the ODAC meeting at the end of the Class Period, two key members of the FDA review team (not just a "single participant") corroborated that they had told Riga and Lebel before and during the Class Period that there was no agreement on the design of the PINNACLE Study. ¶111-12.  While the FDA expressed a preference for the 8mg BID dosage because it appeared to be less toxic, FDA officials further warned Riga and Lebel that additional data and studies were required before there could be alignment on the use of the 8 mg BID dosing regimen and that moving forward with the PINNACLE Study was at Spectrum's own risk—contemporaneous warnings that show that Riga's statement that Spectrum and the FDA were "obviously aligned" flew in the face of contradictory facts and was false and misleading. ¶¶83-85, 111-12.[9]  At that time, Riga knew, or at least recklessly ignored, facts that contradicted the implications a reasonable investor would draw from his statement, *i.e.*, that Spectrum and the FDA were aligned on the 8 mg BID for use in the PINNACLE Study, which was not true. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239–40 (S.D.N.Y. 2006); *Constr. Laborers Pen. Trust for So. CA. v. CBS Corp*., 433 F. Supp. 3d 515, 539 (S.D.N.Y. 2020) (Caproni, J.).  Defendants' alternative interpretation of the facts and

---

[9] Defendants' assertion that the FDA authorized the Company to conduct its confirmatory trial (Defs. Br. at 25 n.24) contradicts and disputes the facts alleged in the Complaint and lacks credibility. Far from authorizing the PINNACLE Study, the FDA told Riga and Lebel that the 8 mg BID dose was not optimized for use in the PINNACLE Study and that Spectrum was proceeding at its own risk, and the Complaint alleges there was no agreement. ¶¶83-85, 111-12.

15

bare assertions of their "belief" (Defs. Br. at 11) cannot be credited on a motion to dismiss before discovery. *See Alpha Cap.*, 2014 WL 6466994, at *9.

Defendants further assert that because Riga stated "we believe" that Spectrum and the FDA were "obviously aligned," it is an inactionable opinion. Defs. Br. at 11. Defendants are wrong because insertion of words like "think" or "believe" before statements of verifiable present and historical facts does not convert those statements into opinions. *See In re Oxford Health Pls., Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). "[M]agic words" such as "we think" or "we believe" do not automatically confer protection as they "can preface nearly any conclusion, and the resulting statements … remain perfectly capable of misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pen. Fund*, 575 U.S. 175, 193 (2015). "A statement of fact expresses certainty about a thing, whereas a statement of opinion conveys only an uncertain view as to that thing." *Omnicare*, 575 U.S. at 176. Far from expressing uncertainty, Riga definitively stated that Spectrum and the FDA were "obviously aligned."

Even assuming, *arguendo*, the Court finds that the statement is an opinion, under *Omnicare*, a statement of opinion that contains "embedded factual statements that can be proven false" is actionable. *See Abramson*, 965 F.3d at 175 (quoting *Omnicare*); *see also N.E. Carpenters Guaran. Ann. & Pen. Funds v. DeCarlo*, 2023 WL 5419147, at *7 (2d Cir. Aug. 23, 2023). Riga's "obviously aligned" representation contains an embedded false statement—that Spectrum and the FDA had an agreement—when in fact they did not. In addition, under *Omnicare*, a statement of opinion may be misleading by omission and thus actionable under Rule 10b-5 when the statement "implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted." *Abramson*, 965 F.3d at 175. "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and

16

holding back another." *Omnicare*, 575 U.S. at 192; *Vivendi*, 838 F.3d at 239-40; *Matrixx*, 563 U.S. at 47. The "core inquiry" is whether the omitted facts would "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189. Riga's representation implied an agreement when he knew, or at least recklessly ignored, material, negative facts that conflicted with what FDA officials privately told Riga and Lebel before and during the Class Period. ¶¶14-15, 20, 22, 26, 29, 31, 83-85.[10]

Courts in the Second Circuit have found similar statements of opinion that contain embedded facts or omitted material facts to be actionable under *Omnicare*. *See Abramson*, 965 F.3d at 174-78 (finding statement of executive's "belief" actionable opinion under *Omnicare*); *DoubleLine Cap. LP v. Odebrecht Fin., LTD*, 323 F. Supp. 3d 393, 443 (S.D.N.Y. 2018) (same); *Wells Fargo*, 2021 WL 4482102, at *13-15, 20 (same); *see also In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 206-09, n.12 (S.D.N.Y. 2020) (Caproni, J.) (finding opinion statements that offer was "highest price per share" were actionable.[11]

Finally, Defendants argue that that they had no duty to disclose communications with the FDA regarding trial designs.[12] The lack of an independent duty to disclose is irrelevant: "[e]ven

---

[10] Defendants argue that the Complaint "offers no facts demonstrating that . . . Riga, did not genuinely believe his statements about dose optimization or alignment with the FDA." Defs. Br. at 11. However, *Omnicare* "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson*, 965 F.3d at 175. Accordingly, Defendants' reliance on *In re Sanofi Sec. Litig.* 87 F. Supp. 3d 510 (S.D.N.Y. 2015), and *In re MELA Sci. Sec. Litig.*, 2012 WL 4466604, at *13-14 (S.D.N.Y. Sept. 19, 2012), both decided before *Omnicare*, is misplaced.

[11] Defendants' authorities are inapposite because, unlike Riga's representation that misleadingly conveyed that there was an agreement with certainty, when in fact there was no agreement, Defendants' authorities involve statements concerning unverifiable or vague statements expressing subjective views about future events, estimates, or uncertainties. *In re Turquoise Hill Res. Ltd. Sec. Litig.,* 625 F. Supp. 3d 164, 218-20 (S.D.N.Y. 2022) (finding statement reflected subjective estimates and complaint failed to allege untrue facts or omissions that misled investors); *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743 (S.D.N.Y. 2018) (finding executives' statements that litigation was "without merit" not actionable because no contrary facts were alleged that undermined basis of opinion).

[12] Far different from the allegations in the Complaint, in *In re Medimmune, Inc. Sec Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995), the court found no general duty to disclose "random or sporadic" questions from the FDA about a study design when the company made unrelated statements concerning a drug's efficacy. 873 F. Supp. at 966. Here, Riga's

when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250; *Skiadas v. Acer Thera. Inc.*, 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020). Accordingly, when Defendant Riga falsely represented that Spectrum and the FDA were "obviously aligned," he had a duty to tell the whole truth and not mislead investors.

### C.      False and Misleading Statements about Dose Data Optimization (¶¶123, 130).

Defendants assert that Riga's representation that "I think . . . we have learned to optimize" the pozi dosage was not materially false and misleading because it was an inactionable statement of opinion, that Spectrum and the FDA had a disagreement on the interpretation of data for which Defendants had no duty to disclose contrary facts, and that the Complaint fails to allege facts showing that the statement was false at the time it was made. Defs. Br. at 10-15. Defendants' arguments are meritless.

Under *Omnicare*, Riga's statement that Spectrum had learned to optimize the pozi dosage contained an embedded materially false fact—that Spectrum had data demonstrating dose optimization. In fact, the dosage for pozi was not optimized, and the FDA told Defendants Riga and Lebel before the Class Period that additional data and studies were required. ¶¶83-85. Moreover, this statement was materially misleading because Riga's statement implied facts—that Spectrum had data that demonstrated the pozi dosage was optimized, when in fact, Riga knew, or at least recklessly ignored, highly material, negative facts that contradicted his representation. When Riga assured investors that Spectrum had "learned to optimize" the pozi dosage—his

---

"obviously aligned" statement sharply conflicted with what the FDA had privately communicated to Riga and Lebel. Nevertheless, in *Medimmune*, where the FDA communicated methodological concerns, the motion to dismiss was denied as to statements that "could possibly have misled an investor into thinking that the review process remained totally problem-free." *Id*. at 967-68.

statements on the topic of dose optimization gave rise to a duty to disclose material facts necessary to ensure his statement did not mislead investors.[13]

Defendants assert that courts have rejected claims that statements about the "interpretation of clinical trial results" were false and misleading. Defs. Br. at 12-13. However, the Complaint does not allege a disagreement about data interpretation. The Complaint alleges that the sticking point for the FDA was that Spectrum did not have adequate data to demonstrate that the dose selection for pozi was optimized, and that additional studies and data were required to satisfy the FDA's dose optimization requirement. ¶¶11, 82-85. There cannot be a disagreement about the interpretation of data that the FDA had told Riga and Lebel did not exist.[14]

Similarly meritless is Defendants' argument that the Complaint does not allege "contemporaneous facts" "contradicting Defendants' statement that Spectrum had learned to optimize *some* of the tolerability issues faced on the 16mg QD dose." Defs. Br. at 10 (emphasis in original). Again, Defendants ignore the Complaint's allegations. At the time Riga assured investors that Spectrum had "learned to optimize" the pozi dosage, Riga and Lebel had already been told by the FDA that Spectrum did not have dose optimization data for the 8mg BID dosage

---

[13] Defendants' argument that the "law is clear" that there is no affirmative duty to disclose "feedback" received from the FDA is wrong. In *Gillis v. QXR Pharma. Ltd.*, a decision that Defendants rely upon, the court stated that FDA feedback "must be disclosed" where an omission would render another statement materially misleading, which is the case here. 197 F. Supp. 3d 557, 584-85 (S.D.N.Y. 2016). The courts in *Gillis*, *Fort Worth Emps.' Ret. Fund v. Biovail* and *In re Sanofi Sec. Litig.* dismissed claims and found no duty to disclose because the omitted facts were immaterial. 615 F. Supp. 2d 218, 231 (S.D.N.Y. 2009); 87 F. Supp. 3d 510 (S.D.N.Y. 2015). Defendants do dispute that the undisclosed information concerning dose optimization was material to investors. In *Tongue v. Sanofi* and *In re Philip Morris Int'l Inc. Sec. Litig.*, the court found no duty to disclose because, unlike the sharp conflict between what Riga told investors and what the FDA had privately told Riga and Lebel, optimistic opinion statements like the data were "strong and robust" and "encouraging" did not conflict with undisclosed material facts. *Tongue*, 816 F.3d 199, 211 (2d Cir. 2016); *Philip Morris*, 437 F. Supp 3d 329, 352 (S.D.N.Y. 2020).

[14] The decisions in *In re Columbia Labs., Inc. Sec. Litig.*, 2013 WL 10914123 (D.N.J. June 11, 2013), and *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 453 (S.D.N.Y. 2008), are distinguishable and irrelevant. Defs. Br. at 12. In *In re Columbia Labs*, unlike here, the company and the FDA agreed upon the study design at issue. In *AstraZeneca*, the court dismissed claims that the company failed to disclose adverse events because the risks were already disclosed. Defendants do not dispute that the truth about Spectrum's dose optimization data was not disclosed until the end of the Class Period. ¶¶30-33, 105-13.

19

and that additional data and studies were required before the FDA could determine that the dosage was optimized for use in the PINNACLE Study. ¶¶83-85. A reasonable investor could believe that Spectrum had adequate data to demonstrate the dose for pozi was optimized, when in fact, the FDA had informed Riga and Lebel that this was not true because additional data and studies were required to demonstrate dose optimization. ¶¶83-85, 124.

### D. Defendants' False and Misleading Risk Warnings (¶¶133, 145).

The Complaint alleges that Spectrum's SEC filings, signed by Riga and Brennan, warned that Spectrum's clinical trials "may be delayed" by "difficulties" in enrolling patients or "slower than anticipated patient enrollment or our inability to recruit and enroll patients" (¶¶133-34, 145-46), when in fact the PINNACLE Study had already been delayed and no patients had enrolled. Risk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized, as alleged in the Complaint. *See Meyer*, 761 F.3d at 251; *Romeo II*, 2022 WL 3701095, at *1, 3.

Defendants argue that their risk warnings were not false when made in May and August 2022 because the risk had not materialized. Defs. Br. at 20. Again, Defendants ignore the Complaint's allegations and dispute facts—before and during the Class Period, the FDA had expressed concern to Riga and Lebel that enrollment in the PINNACLE Study was delayed because no patients had enrolled. ¶85 (2/7/22); ¶96 (5/18/22). Defendants' argument that because the PDUFA date was at least three months after the August 12, 2022 risk warning, the risk had not materialized, is meritless because it ignores the Complaint's allegations. Accordingly, Defendants' citations to cases where the risk had not materialized are inapposite. Defs. Br. at 20-21.

That Defendants made other risk warnings about FDA approval, which are not at issue in the Complaint, is a red-herring. Defendants distort the specific false risk warnings about potential, future delays in patient enrollment by identifying a different warning that clinical trials may fail to

20

demonstrate efficacy and safety which "could prevent or significantly delay obtaining regulatory approval," a generic, boilerplate warning. Defs. Br. at 8, 20. Defendants attempt to recast the specific false risk warning concerning potential delays in patient enrollment into a warning about the "likelihood of success for the Poziotinib NDA" (Defs. Br. at 18-19) should be rejected because it ignores and contradicts the Complaint's allegations.

### E. Additional False and Misleading Statements (¶¶136-35, 147).

Riga represented (on an analyst call attended by Lebel) that the FDA "could have additional questions on dosing" when in fact the sticking point for the FDA was that Spectrum had not optimized the dosage for pozi and required additional data and clinical studies. ¶¶83-85, 130-31. Defendants' argument that Spectrum "expressly acknowledged the FDA's dosing questions on multiple occasions" (Defs. Br. at 13) misses the point. Defendants stating that the FDA "had some concerns" and "we're fully prepared to address any further questions" is a far cry from informing the market that the FDA had in fact privately stated to Riga and Lebel that the pozi dosage had not been optimized and that the FDA required additional data and clinical studies. *See Transkaryotic Thera., Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 161 (D. Mass. 2004); *see also Lapin*, 506 F. Supp. 2d at 237-39 (rejecting disclaimers as far cry from disclosing fraud and rejecting truth-on-the-market defense). Indeed, analyst's surprise to the FDA Briefing Document's focus on dose optimization at the end of the Class Period eviscerates Defendants' argument. ¶33.

Defendants further argue that Riga's statement that Spectrum was "on the 'cusp of not just one, but two FDA approvals'" (¶¶136-37) is forward-looking and protected by the PSRLA's safe harbor and an inactionable expression of "corporate optimism," and that Riga expressed FDA approval was "far from guaranteed" (which he did not actually state). Defs. Br. at 18-19. This argument fails because Riga's "on the cusp" statement was not identified as forward-looking and was not accompanied by any cautionary statement, thus the safe-harbor does not apply. 15 U.S.C.

§78u-5(c)(1)(A); ECF No. 71-21 (conference transcript with no cautionary language stated). Moreover, Riga's statement was a mix of present and future statements, which is not entitled to safe harbor protection with respect to the part of the statement that refers to the present.  *Vivendi*, 838 F.3d at 246; *Transkaryotic*, 319 F. Supp. 2d at 161-62; *see also Lapin*, 506 F. Supp. 2d at 240-41.  In context, a reasonable investor could believe that Riga's statement implied Spectrum was on the cusp or verge of FDA approval based on present, verifiable facts—the PINNACLE Study was enrolling patients, the FDA and Spectrum had aligned on the design of the PINNACLE Study, and Spectrum had learned to optimize the dose for pozi—none of which was true at that time.[15]

### F.    The Complaint Adequately Alleges Defendants' Scienter

In assessing a complaint's scienter allegations, courts assess cumulatively allegations of circumstantial evidence of intent together with alleged facts relating to motive and opportunity.  *In re Hain Celestial Group, Inc. Sec. Litig.,* 20 F.4th 131, 137-38 (2d Cir. 2021).  When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).  Under *Tellabs*, scienter need be only "at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314.  A tie goes to the plaintiff. *City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

### 1.    Facts Showing Strong Circumstantial Evidence of Defendants' Conscious Misbehavior or Recklessness

Viewed holistically, the Complaint alleges facts that show strong circumstantial evidence of Lebel, Riga and Brennan's conscious misbehavior or recklessness.  Lebel and Riga were specifically informed of the material, negative facts or had access to information that sharply

---

[15] The Complaint alleges that Defendants violated Item 303 of Regulation S-K, which imposes an affirmative duty to disclose, by failing to disclose in Spectrum's SEC filings ongoing material negative uncertainties. ¶¶135, 147; *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).  Defendants ignore these allegations, and thus, have waived any reply and claims based on these statements survive dismissal. *DoubleLine*, 323 F. Supp. 3d at 450-51.

contradicted their statements to investors, as reflected in FDA Briefing Document and corroborating information provided by members of the FDA review team.  ¶¶76-77, 83-84, 85, 96, 98, 104-17. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000); *Alpha Cap.*, 2014 WL 6466994, at \*9.

For Lebel and Riga to represent to investors that patients had enrolled in the PINNACLE Study, when in fact no patients had enrolled, that the FDA and Spectrum were "obviously aligned" on the PINNACLE Study, when there was no agreement, and that Spectrum had learned to optimize the dosage for pozi, which was not true, was highly unreasonable given the information they knew or had access to and represented an extreme departure from the standards of ordinary care to the extent that the danger was either known to Riga and Lebel, or so obvious that they must have been aware of it.  *Setzer v. Omega Health. Inv'rs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020).

Moreover, both Riga and Lebel were intimately involved in meetings and communications with FDA officials concerning the Company's development of pozi, and spoke in detail about the subject of the false and misleading statements and their interactions with the FDA on conference calls with investors and in Spectrum press releases (¶¶47-48, 76, 83, 85, 89, 96, 98, 104, 108), facts that show their familiarity with the patient enrollment in the PINNACLE Study and dose optimization data, and that support an inference of scienter. *See Ha. Struct. Iron. Pen. Tr. Fund v. AMC Ent. Hold., Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019) (finding scienter where executive spoke knowledgeably about topics, he must have educated himself and reviewed data); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014) (same).  Furthermore, that both Riga and Lebel acknowledged FDA guidance (¶¶79, 86, 102), coupled with the extreme

23

negativity expressed by the FDA review team at the ODAC meeting concerning zero patient enrollment and lack of dose optimization data (¶¶108-17), supports an inference of scienter. *Delcath*, 36 F. Supp. 3d 335-36.  Furthermore, Lebel's suspicious resignation shortly after the Class Period at a time when Spectrum was "deprioritizing" development of pozi (¶¶38-39) supports an inference of scienter. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013).[16]

Moreover, Spectrum was a small Company with only two drug product candidates and no commercial sales, and Spectrum's prospects hinged on the Pozi NDA (¶¶2, 18, 46), facts that support an inference of scienter. *See Skiadas*, 2020 WL 3268495, at *10; *Delcath*, 36 F. Supp. 3d at 335.  Finally, a core focus of Defendants was the Pozi NDA and related interactions with FDA officials, facts that provide supplemental support for an inference that Riga as CEO, Lebel as CMO and Brennan as former director and CFO, as the Company's most senior officers who periodically disseminated information to investors, knew, or at least recklessly ignored, the undisclosed, material negative facts. ¶¶47-51; 79, 86, 89, 99, 123-47; *Ha. Struct.*, 422 F. Supp. 3d at 852.

### 2.    Facts Showing Motive and Opportunity

**Spectrum's Stock Sales Support Motive**: Defendants Riga and Brennan, on Spectrum's behalf, sold over $26 million in Spectrum common stock, at a time when there was substantial doubt about Spectrum's ability to continue as a going concern, Spectrum had no revenue generating products, and was running out of cash, facts that support a strong inference of motive for Spectrum, Riga and Brennan. ¶¶19, 21, 23, 28 n.3, 46, 49, 88, 97, 103, 154-56.  The decision in *Skiadas* is illuminating because, like Spectrum, in *Skiadas* the company had issued a going

---

[16] Defendants' argument that Lebel's suspiciously timed resignation "goes nowhere" (Defs. Br. at 25 n.23) relies on *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003), which is distinguishable because the resignations were not tied to the fraud alleged.  Lebel's resignation—just weeks after the negative ODAC vote and Spectrum's decision to "deprioritize" pozi—was unusual and suspicious in timing and tied to the fraud, facts supporting an inference of scienter.

24

concern warning and the court found an inference of the company and its executives' scienter was bolstered by fact company sold stock and "needed to fundraise to survive." 2020 WL 3268495, at *8-11. Notably, in contrast to Defendants' argument and authorities stating that this motive is "generic" (Defs. Br. at 23), the *Skiadas* court found the allegation was not generic. *Id.*; *see also CNinsure*, 951 F. Supp. 2d at 474-75.  Moreover, Spectrum's stock sales support an inference of corporate scienter. *See In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 370 (S.D.N.Y. 2003);  *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000).

**Individual Defendants' Stock Sales Support Motive:** Lebel's and Brennan's sales were suspicious in timing—shortly after Defendants made false and misleading statements—and at a time when they knew, or had reason to know of, negative, material, nonpublic information concerning the Pozi NDA and Spectrum's failing financial condition, facts that support an inference of scienter.  ¶¶87-88, 96, 99, 157; *see, e.g., In re Schol. Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001). Defendants' argument that the sales were *de minimis* raises questions of fact and materiality, which are questions for a jury.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Likewise, Defendants' argument that insider sales were pursuant to so-called 10b-5 trading plans asserts an affirmative defense that cannot be credited on a motion to dismiss. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200–01 (S.D.N.Y. 2010).  Finally, Riga's lack of personal stock sales does not negate scienter. *See In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011); *Skiadas*, 2020 WL 3268495, at *11-12.

For the reasons set forth above, Defendants' motion should be denied in its entirety.[17]

---

[17] Defendants' motion to dismiss control person claims under Section 20(a) of the Exchange Act against Riga, Lebel and Brennan, should be denied as the claim is adequately alleged. ¶¶47-51, 177-79; *see also supra* Section F, showing the Individual Defendants' culpable participation.  If the Court dismisses some or all of the claims, Plaintiff respectfully requests leave to amend.  *See* Rule 4(E)(ii), INDIVIDUAL PRACTICES IN CIVIL CASES, Valerie Caproni, U.S.D.J., Rev. 7/26/23; Fed. R. Civ. P. Rule 15(a)(2); *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *8 (S.D.N.Y. Aug. 28, 2018).

Dated: September 6, 2023                    **KAPLAN FOX & KILSHEIMER LLP**

                                            */s/    Jeffrey P. Campisi*
                                            Robert N. Kaplan
                                            Jeffrey P. Campisi
                                            Brandon Fox
                                            800 Third Avenue, 38th Floor
                                            New York, NY 10022
                                            T:  (212) 687-1980
                                            F:  (212) 687-7714
                                            rkaplan@kaplanfox.com
                                            jcampisi@kaplanfox.com
                                            bfox@kaplanfox.com

                                            Kathleen A. Herkenhoff (admitted *pro hac vice*)
                                            1999 Harrison Street, Suite 1560
                                            Oakland, CA 94612
                                            T: (415) 772-4700
                                            F: (415) 772-4707
                                            kherkenhoff@kaplanfox.com

                                            *Lead Counsel for Lead Plaintiff Steven B.*
                                            *Christiansen and the Proposed Class*

26