**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN B. CHRISTIANSEN, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-10292 (VEC) |
| Plaintiff, | Consolidated with Case No. 1:22-cv-10677 (VEC) Case No. 1:23-cv-00767 (VEC) |
| v. | |
| SPECTRUM PHARMACEUTICALS, INC., THOMAS J. RIGA, and FRANCOIS J. LEBEL, | Related to: 1:24-cv-08138 (VEC) |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES AND APPOINTMENT OF CLASS COUNSEL**

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
Brandon Fox
Chang Hahn
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
bfox@kalpanfox.com
chahn@kaplanfox.com

*Lead Counsel for Lead Plaintiff Steven B. Christiansen and the Proposed Class, and Counsel for Additional Plaintiff Nizar Sami Ayoub*

Dated: October 30, 2024

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... iii

I.      PRELIMINARY STATEMENT ............................................................................... 1

II.     SUMMARY OF THE ALLEGED FRAUD ............................................................. 2

        A.     Defendants' Materially False and Misleading Representations on May 12,
               2022 ............................................................................................................... 3

        B.     Defendants' Additional Materially False and Misleading Representations
               on August 11, 2022 ....................................................................................... 5

III.    PROCEDURAL HISTORY ...................................................................................... 7

IV.     ARGUMENT ........................................................................................................... 8

        A.     Legal Standard for Class Certification ......................................................... 9

        B.     This Case Meets the Requirements of Rule 23(a) ...................................... 10

               1.     The Class Is Numerous ..................................................................... 10

               2.     Questions of Law and Fact Are Common to the Class ..................... 11

               3.     Plaintiffs' Claims Are Typical of the Class ..................................... 13

               4.     Plaintiffs Will Fairly and Adequately Protect the Interests of the
                      Class ................................................................................................. 14

        C.     This Case Meets the Requirements of Rule 23(b)(3) .................................. 15

               1.     Common Questions of Law and Fact Predominate .......................... 15

                      a.     Plaintiffs Are Entitled to the Fraud-on-the-Market
                             Presumption of Reliance Pursuant to *Basic* ................... 16

                             i.     Average Trading Volume ................................... 18

                             ii.    Analyst Coverage ............................................... 18

                             iii.   Presence of Market Makers ................................ 19

                             iv.    Eligibility to File an S-3 Registration Statement .............. 19

v.      Price Reaction of Spectrum Securities to
        Unexpected Information ................................................. 20

vi.     Market Capitalization........................................................... 20

vii.    Float ....................................................................................... 21

viii.   Bid-Ask Spread..................................................................... 21

b.      Plaintiffs' Damages Methodology is Consistent with Its
        Theory of Liability and is Capable of Measuring Damages
        on a Class-wide Basis ................................................................ 22

2.      A Class Action Is Superior to Alternative Methods for Resolving
        This Dispute ............................................................................................ 23

D.      The Proposed Class Satisfies the Requirement of Ascertainability......................24

E.      Kaplan Fox Satisfies the Rule 23(g) Prerequisites for Appointment as
        Class Counsel..............................................................................................................24

V.      CONCLUSION.................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
　406 U.S. 128 (1972) ................................................................................................... 22

*Amchem Prods., Inc. v. Windsor,*
　521 U.S. 591 (1997) .......................................................................................... 9, 14, 16

*Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds,*
　568 U.S. 455 (2013) ................................................................................................ 10, 12

*Annunziato v. Collecto, Inc.,*
　293 F.R.D. 329 (E.D.N.Y. 2013) ................................................................................. 13

*Basic Inc. v. Levinson,*
　485 U.S. 224 (1988) ...................................................................................... 16, 17, 21

*Brecher v. Rep. of Argentina,*
　806 F.3d 22 (2d Cir. 2015) ......................................................................................... 10

*Califano v. Yamasaki,*
　442 U.S. 682 (1979) .................................................................................................... 24

*Cammer v. Bloom,*
　711 F. Supp. 1264 (D.N.J. 1989) ............................................................... 17, 18, 19, 20

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
　310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................. 17, 18, 19, 23

*Cent. States. Se. v. Merck-Medco,*
　504 F.3d 229 (2d Cir. 2007) ....................................................................................... 10

*Christiansen v. Spectrum Pharms., Inc.,*
　No. 1:22-cv-10292 (VEC), 2024 WL 246020 (S.D.N.Y. Jan. 23, 2024) .................................. 2

*Comcast Corp. v. Behrend,*
　569 U.S. 27 (2013) ...................................................................................................... 22

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,*
　502 F.3d 91 (2d Cir. 2007) ........................................................................................... 9

*Dadona I, LLC v. Goldman, Sachs & Co.,*
　296 F.R.D. 261 (S.D.N.Y. 2014) ................................................................................. 23

*Dandong v. Pinnacle Performance Ltd.*,
No. 10 Civ. 8086 (JMF), 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013).....................................8

*Dover v. British Airways, PLC (UK)*,
321 F.R.D. 49 (E.D.N.Y. 2017).....................................................................................................11

*Erica P. John Fund v. Halliburton Co.*,
131 S.Ct. 2179 (2011)...................................................................................................................10

*Fogarazzo v. Lehman Bros. Inc.*,
263 F.R.D. 90 (S.D.N.Y. 2009)....................................................................................................10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S.Ct. 2398 (2014)...................................................................................................................16

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021)..................................................................................................14

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004) .............................................................................................................8

*In re Barrick Gold Secs. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016).....................................................................................11, 16, 23

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17 Civ. 1580 (LGS), 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020).....................................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
245 F.R.D. 147 (S.D.N.Y. 2007)..................................................................................................12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) .....................................................................................................12, 14

*In re Ind. Energy Holdings PLC Sec. Litig.*,
210 F.R.D. 476 (S.D.N.Y. 2002)....................................................................................................9

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .....................................12

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
310 F.R.D. 230 (S.D.N.Y. 2016)..................................................................................................13

*In re Nassau Cty. Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006) .........................................................................................................11

*In re NYSE Specialists Sec. Litig.*,
260 F.R.D. 55 (S.D.N.Y. 2009)..............................................................................................11, 12

*In re Petrobras Sec. Litig.*,
  312 F.R.D. 354 (S.D.N.Y. 2016) ................................................................. 13

*In re Petrobras*,
  862 F.3d 250 (2d Cir. 2017) .............................................................. 13, 24

*In re Pfizer Inc. Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) ......................................................... 14, 16

*In re SCOR Holding (Switzerland) AG Litig.*,
  537 F. Supp. 2d 566 (S.D.N.Y. 2008) .................................................. 9, 24

*In re Vivendi Universal, S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) .................................................................. 9

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) ........................................................ 18, 19

*In re Xcelera.com Sec. Litig.*,
  430 F.3d 503 (1st Cir. 2005) ................................................................... 18

*Johnson v. Nextel Commc'ns Inc.*,
  780 F.3d 128 (2d Cir. 2015) .................................................................... 11

*Katz v. Image Innovations Holdings, Inc.*,
  No. 06 Civ. 3707 (JGK), 2010 WL 2926196 (S.D.N.Y. July 22, 2010) ............ 8, 23

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ....................................................... 17, 21

*Madden v. Midland Funding, LLC*,
  237 F. Supp. 3d 130 (S.D.N.Y. 2017) ....................................................... 13

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................... 17, 18

*Merryman v. Citigroup, Inc.*,
  No. 15 Civ. 9185 (CM), 2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018) ................. 9

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
  772 F.3d 111 (2d Cir. 2014) .................................................................... 10

*Pearlstein v. Blackberry Ltd.*,
  No. 13 Civ. 7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) .................. 12

*Pa. Ave. Funds v. Inyx Inc.*,
  No. 08 Civ 6857 (PKC), 2011 WL 2732544 (S.D.N.Y. July 5, 2011) .............. 13, 20

*Pirnik v. Fiat Chrysler Auto., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................. 10, 15

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ........................................................................ 22

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ........................................................................ 13

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................... 17, 19

*Sykes v. Mel Harris & Assocs., LLC*,
    285 F.R.D. 279 (S.D.N.Y. 2012) ............................................................... 14

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ........................................................................ 14, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................... 8

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ............................................................... 13

*UFCW Local 1776 v. Eli Lilly and Co.*,
    620 F.3d 121 (2d Cir. 2010) ........................................................................ 16

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) .......................................................................... 23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................... 10, 12

**Statutes**

15 U.S.C. § 78j(b) ............................................................................................ 1

15 U.S.C. § 78t(a) ............................................................................................ 1

**Rules**

Fed. R. Civ. P. 23 ................................................................................... *passim*

**Regulations**

17 C.F.R. § 239.13 ........................................................................................ 19

17 C.F.R. § 240.10b-5 ..................................................................................... 1

**Other Authorities**

*The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*,
  19 J. Corp. L. 285 (1994) ........................................................................................................ 17

Lead Plaintiff Steven B. Christiansen ("Lead Plaintiff") and additional plaintiff Nizar Sami Ayoub (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for class certification and appointment of class representatives, and appointment of class counsel.[1]

## I.    PRELIMINARY STATEMENT

This is a securities fraud class action (the "Action") brought against Defendants Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company"), Thomas J. Riga ("Riga"), the Company's former President and Chief Executive Officer ("CEO"), and Francois J. Lebel ("Lebel"), the Company's former Executive Vice President and Chief Medical Officer (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

Plaintiffs respectfully request that the Court certify a class under Rules 23(a) and 23(b)(3) that consists of:

> All purchasers of Spectrum common stock during the period from May 12, 2022, through September 22, 2022, inclusive (the "Class Period"), who were damaged thereby (the "Class").[2]

Plaintiffs also seek an Order under Rule 23 of the Federal Rules of Civil Procedure: (a) appointing Mr. Christiansen and Mr. Ayoub as Class Representatives; and (b) appointing the law firm of Kaplan Fox & Kilsheimer LLP ("Kaplan Fox") as Class Counsel.

As detailed below, the Action satisfies all the requirements for class certification under

---

[1] On October 25, 2024, Mr. Ayoub, a member of the proposed class, filed a complaint alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) ("Exchange Act"), and Rule 10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. *Ayoub v. Spectrum Pharmaceuticals, Inc., et al.*, No. 24-cv-8138 (VEC) (S.D.N.Y.) (the "Ayoub Action"). On October 28, 2024, Plaintiff Ayoub filed a Related Case Statement, noting that the Ayoub Action is related to the Christiansen Action. Ayoub Action, ECF No. 11.

[2] Excluded from the Class are: Defendants, current and former directors and officers of Spectrum, and their families and affiliates.

Rule 23(a): numerosity; commonality; typicality; and adequacy of representation.[3]  Further, the

Action satisfies the requirements for certification under Rule 23(b)(3): predominance of common

questions of law or fact; and superiority of a class over other available methods for adjudication.

For these reasons, as further described below, Plaintiffs' motion should be granted.

## II.  SUMMARY OF THE ALLEGED FRAUD

Before and during the Class Period, Defendants were seeking accelerated approval from

the U.S. Food and Drug Administration ("FDA") for a lung cancer treatment drug, called

poziotinib ("pozi").[4]  ¶¶ 4, 58-62, 75, 78; *Christiansen v. Spectrum Pharms., Inc.*, No. 1:22-cv-

10292 (VEC), 2024 WL 246020, at *1 (S.D.N.Y. Jan. 23, 2024) ("Order").  It was crucial for the

Company to obtain accelerated approval, and Defendants misled the public into believing that the

Company was on the path to approval when, in fact, it was not meeting key criteria for accelerated

approval.  ¶¶ 17, 33, 61, 76, 84-6, 98; Order at *2.  FDA guidance provides that, at the time it

considers an application for accelerated approval, a drug developer must have a "confirmatory"

Phase 3 study underway with a substantial enrollment of patients.  ¶¶ 4, 59, 117.  Receiving

accelerated approval for pozi in 2022 was critical to Spectrum because the Company was on track

to run out of cash by the end of 2022 and it did not generate revenue from commercial sales.  ¶¶

18, 156.

Defendants misled investors into believing that there was a reasonable chance of

accelerated approval for pozi.  Specifically, Defendants misrepresented that the Company had been

enrolling patients in the required Phase 3 confirmatory study (the "Pinnacle Study"), when in fact,

---

[3] The Declaration of Jeffrey P. Campisi in Support of Plaintiffs' Motion for Class Certification
and Appointment of Class Representatives and Class Counsel, dated October 30, 2024 ("Campisi
Decl."), accompanies this memorandum of law.  Citations to "Ex. __" refer to exhibits attached to
the Campisi Declaration.
[4] All references to "¶ _" are to paragraphs in the Consolidated Class Action Complaint for
Violations of the Federal Securities Laws ("Complaint") (ECF No. 67), unless indicated otherwise.

no patients had been enrolled. Defendants further misrepresented that the Company and the FDA were "aligned" on the design of the Pinnacle Study, which was not true. ¶¶ 8, 12, 14-7, 20, 22, 25-6, 29, 31, 35, 86, 89-92, 105, 127-29, 132, 134, 137, 139, 141-44, 146, 164; Order at *2. On the contrary, the FDA had warned Defendants that they were proceeding with the Pinnacle Study at their own risk. ¶¶ 111-12. Defendants capitalized on the illusions created by their false statements by, for example, selling over $17 million of Spectrum stock on behalf of the Company in "at-the-market" ("ATM") sales in the weeks before the end of the Class Period. ¶ 103.

### A. Defendants' Materially False and Misleading Representations on May 12, 2022

On May 12, 2022, the start of the Class Period, Defendants disclosed the design of the Pinnacle Study—a disclosure that, Defendant Lebel, on March 17, 2022, stated Spectrum would make after Spectrum enrolled the first patient—and created the misleading impression that at least the first patient had enrolled. ¶¶ 12-3. Defendants falsely represented that patients had enrolled in the Pinnacle Study ("Patients are being randomized 2:1 into this [PINNACLE] study"). ¶¶ 125-27. Furthermore, Defendants represented that Defendants and the FDA had reached an agreement on the design of the Pinnacle Study: ("16 QD [once daily] is a safe and effective dose and obviously aligned with FDA on the confirmatory study to go with the 8-milligram BID" dose). ¶¶ 125-27.

Research analysts who covered Spectrum viewed Defendants' May 12, 2022 disclosures as positive news regarding Spectrum's accelerated approval application for pozi. For example, in a May 16, 2022 research report concerning Defendants' May 12, 2022 disclosures, JMP Securities stated that "Spectrum noted that it has started enrolling patients in a confirmatory trial, SPI-POZ 301." Campisi Decl., Ex. C, at 1. Moreover, Jefferies noted in a May 13, 2022 report that the Company "says they have started [the Pinnacle] trial." *Id.*, Ex. D, at 1. Market analysts further recognized that Riga's representation that Spectrum and the FDA were aligned on the design of the Pinnacle Study indicated that the Company and the FDA had reached an agreement on a critical

criteria for accelerated approval: "SPPI's 1Q also announced alignment w/ FDA on confirmatory ph.III (n=268; 2:1 vs docetaxel) design, which will assess pozi 8mg BID in 2L HER2 exon20 NSCLC w/ primary endpt mPFS; the confirmatory study is an important moving part, b/c FDA has iterated the importance of having the confirmatory trial 'substantially enrolled' by the time of approval." *Id.*

However, at that time, no patients had been enrolled in the Pinnacle Study. *Id.*, Ex. E (Res. 7 to Defs' Objs. and Res. to LP's Request for Admission, dated April 24, 2024, at 3-4); *Id.*, Ex. F, at 15 (stating that on May 18, 2022, the "FDA expressed concern about the delayed confirmatory trial status."). Likewise, Defendant Riga's May 12, 2022 representation that the Company and the FDA were "obviously aligned" on the design of the Pinnacle Study was materially false and misleading. At the Mid-Cycle meeting on May 18, 2022, the "FDA expressed concerns regarding the safety profile of poziotinib, particularly at the 16 mg QD dose … [The] FDA stated that additional clinical data was necessary to assess the risk-benefit profile … and communicated that based on the ongoing review, uncertainties remain regarding whether the proposed dosage of 16 mg QD is optimized from both the efficacy and safety perspectives." *Id.*, Ex. F, at 15. Indeed, at the September 22, 2022 ODAC[5] meeting, Dr. Singh sharply rebuked Defendant Lebel for his assertion to the ODAC panel that "the agency and [Defendants] agreed that the 8-milligram BID would be the way to go forward" for the dosage in the Pinnacle Study, stating "we did not come to any formal agreement about the 8-milligram BID dose. It's very limited data, and **we told the sponsor that it would be at their own risk to move forward with this incongruent dose** . . ." ¶ 112 (emphasis in original).

---

[5] ODAC is an independent panel of clinical experts that reviews and evaluates data concerning the efficacy and safety of investigational products for use in the treatment of cancer. ¶16, n.2.

**B.  Defendants' Additional Materially False and Misleading Representations on August 11, 2022**

On August 11, 2022, in a press release and during a conference call with investors and analysts, Defendants repeated the false representations that patients had been enrolling in the Pinnacle Study, when in fact, no patients had been enrolled.  ¶¶ 138-41.  During the conference call, a research analyst asked: "on the confirmatory Phase III, how many sites are active right now? What percentage of your target patients have been enrolled in Phase III? And where do you need to be on enrollment to satisfy FDA's focus on substantial enrollment by [the] PDUFA date?"  In response, Defendant Lebel represented that Defendants are "very active in opening sites.  But as I'm sure you know, it takes a long time to open sites.  We have some sites open.  I'm not going to give you numbers today.  I'm not going to speak directly to enrollment today.  And so we're moving as fast as we can internationally as well as in North America."  ¶¶ 141-42.  The Order found Defendant Lebel's misleading statement actionable because he "falsely implied that the Pinnacle Study was sufficiently underway for there to be patient enrollment 'numbers,' even if the Company declined to provide those numbers . . ."  Order, at *19-20.

As of August 11, 2022, no patients had been enrolled. Campisi Decl., Ex. E (Res. 10 to Defs' Objs. and Res. to LP's Request for Admission, dated April 24, 2024).  In the days after Defendants' August 11, 2022 disclosures, Spectrum's common stock reached a class period high of $1.57 per share and Defendants capitalized on the artificial inflations in Spectrum's stock price. During the period from August 13, 2022 through the end of the Class Period, Defendant Riga caused Defendant Spectrum to sell over 13.7 million shares of Spectrum common stock on behalf of the Company for proceeds of over $17 million through ATM stock sales.  ¶ 103.

Spectrum investors began to learn the truth through partial disclosures that caused Spectrum common stock price to crash.  On September 20, 2022, the FDA publicly released its

Briefing Document in anticipation of its September 22, 2022 ODAC meeting with Defendants Spectrum and Lebel (the "FDA Briefing Document"). Campisi Decl., Ex. F. The FDA Briefing Document disclosed to investors what FDA officials had been privately discussing with Defendants before and during the Class Period—that Spectrum had inadequate data on dosing, that additional data and studies were needed to determine whether Defendants' dose selection for pozi was optimized, and that enrollment in the Pinnacle Study was delayed (no patients as of July 28, 2022). In response, shares of Spectrum common stock declined from a closing price of $1.06 per share on September 19, 2022 to close at $0.66 per share on September 20, 2022, a decline of $0.40 per share, or over 37% on heavier than usual volume. ¶ 32. On September 21, 2022, Spectrum shares further declined by $0.03 per share, or by over 3%, to close at $0.63 per share. ¶ 36.

However, shares of Spectrum stock continued to trade at artificially inflated prices after disclosure of the Briefing Document because Defendants continued to conceal that Spectrum had not enrolled any patients in the Pinnacle Study since July 28, 2022 and that the FDA and Spectrum did not reach an agreement on the design and details of the Pinnacle Study. Indeed, market analysts noted that while the Briefing Document indicated FDA concerns about "lack of confirmatory ph. III progress," showing progress at the ODAC meeting "over [the] last few w[ee]ks could be important." Campisi Decl., Ex. G, at 1. (Jefferies 9/20 report).

On September 22, 2022, Nasdaq halted trading in Spectrum stock pending the outcome of the ODAC panel hearing. ¶ 34. On September 22, 2022, the FDA's ODAC conducted its meeting concerning accelerated approval for pozi, in which Defendant Lebel participated on behalf of the Company. FDA officials stated that the FDA and the Company had not reached an agreement on the design of the Pinnacle Study to treat patients at the 8 mg BID dose and that the FDA had warned the "sponsor [Spectrum] that it would be at their own risk to move forward with this

incongruent dose." ¶¶ 111-12.

In addition, during the ODAC meeting, a member of the ODAC panel asked Defendant Lebel: "[i]s the confirmatory trial really underway? . . . the FDA documents seem to indicate that it's much delayed, but [your] discussion seems to suggest it's well under way, although patients are not enrolled. Where is that at this point?" ¶ 114. In response, Defendant Lebel disclosed that "there are no patients right now." ¶ 115. At the end of the meeting, ODAC members voted and found that pozi's risks did not outweigh its benefits, in effect, recommending that the FDA not grant pozi accelerated approval. ¶ 118.

As a result of this news, when trading in Spectrum common stock resumed on September 23, 2022, shares of Spectrum common stock further declined from a closing price of $0.63 per share on September 20, 2022, before trading was halted, to a close at $0.43 per share on September 23, 2022, a decline of $0.20 per share, or over 31% on heavier than usual volume. ¶ 36. Furthermore, in response to the adverse ODAC vote, market analysts observed that the "FDA had some issues w/ ph. III design." Campisi Decl., Ex. H, at 1 (9/23/24 Jefferies report). After the Class Period, on November 25, 2022, the Company disclosed that the FDA issued a "Complete Response" letter formally rejecting accelerated approval for pozi and further indicated that it was deprioritizing the development of pozi. ¶ 38. On or around December 31, 2022, Defendant Lebel "resigned" from the Company. ¶ 121.

## III. PROCEDURAL HISTORY

On March 21, 2023, the Court appointed Mr. Christiansen Lead Plaintiff, and on May 26, 2023, Lead Plaintiff filed the Complaint. ECF Nos. 63, 66. On July 25, 2023, Defendants moved to dismiss. ECF No. 69. On January 23, 2024, the court denied Defendants' motion to dismiss in part. ECF No. 91. Then, the parties negotiated a civil case management plan and a stipulated schedule, which was entered by the Court on February 15, 2024 (the "Scheduling Order"). On

March 25, 2024, Defendants answered the Complaint.  To date, the parties have engaged in substantial document discovery.  ECF Nos. 105-06, 111-15.  Lead Plaintiff has noticed depositions of several Spectrum witnesses and issued subpoenas for testimony from certain non-parties.  Under the Scheduling Order, the fact discovery deadline is January 23, 2025.  ECF No. 99.

On October 25, 2024, the Ayoub Action was filed.  Through this motion, Mr. Ayoub, a member of the proposed class, requests that the Court appoint him a class representative.  *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) (noting the "[Private Securities Litigation Reform Act] does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

## IV. ARGUMENT

The Supreme Court has repeatedly recognized the importance of class actions in redressing wrongs committed under the federal securities laws.  *See*, *e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14, 320 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions.").  Likewise, "[c]ourts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) (citing *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010).  Indeed, courts in the Second Circuit have overwhelmingly found securities fraud actions appropriate for class treatment.  *See Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) ("Courts have held that class actions are particularly

appropriate in federal securities actions.").[6]

By providing a single forum to litigate the same or similar claims, class actions afford an indispensable mechanism for the conservation of judicial resources. *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 566, 579 (S.D.N.Y. 2008) ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources" and "risk disparate results among those seeking redress."). As demonstrated below, all of Rule 23's requirements are satisfied, and the proposed Class should be certified.

### A. Legal Standard for Class Certification

To certify a class under Rule 23(a) of the Federal Rules of Civil Procedure, a plaintiff must demonstrate that: (1) the class is so numerous that joinder is impracticable, (2) at least one question of law or fact is common to the class, (3) the class representatives' claims are typical of the class wide claims, and (4) the class representatives will be able to fairly and adequately protect the interests of the class. A plaintiff must also show that the action falls within one of the subcategories of Rule 23(b). *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007); *Merryman v. Citigroup, Inc.*, No. 15 Civ. 9185 (CM), 2018 WL 1621495, at *12 (S.D.N.Y. Mar. 22, 2018) (internal citation omitted) ("In addition to satisfying the Rule 23(a) prerequisites, the class proponent must satisfy at least one of the three requirements listed in subsection 23(b)."). Here, Plaintiffs seek certification under Rule 23(b)(3), which requires a showing that (1) common questions of fact and law predominate over any individual questions, and (2) a class action is superior to other available methods for adjudicating the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Finally, the Second Circuit has also

---

[6] *See also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 91-92 (S.D.N.Y. 2007) (collecting cases); *In re Ind. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (holding that courts should err in favor of certifying class where securities fraud claims are alleged).

9

"recognized an 'implied requirement of ascertainability' in Rule 23," which demands that a class be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Rep. of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015).

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 465 (2013). "Merits questions may be considered to the extent, but only to the extent, that they are relevant to determining whether the prerequisites for class certification are satisfied." *Id.* Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance it is not appropriate to delve into merits issues such as scienter, materiality, or loss causation. *Erica P. John Fund v. Halliburton Co.*, 131 S.Ct. 2179, 2186 (2011) ("*Halliburton I*"); *see Amgen*, 568 U.S. at 465-66; *Pirnik v. Fiat Chrysler Auto., N.V.*, 327 F.R.D. 38, 43 (S.D.N.Y. 2018) (quoting *Amgen*, 568 U.S. at 466). As demonstrated below, the Action satisfies both the prerequisites of Rule 23(a) and the requirement of Rule 23(b)(3) and, accordingly, class certification is appropriate.

### B.  This Case Meets the Requirements of Rule 23(a)

#### 1.  The Class Is Numerous

Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all members is impracticable. "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros. Inc.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citing *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC.*, 504 F.3d 229, 244-45 (2d Cir. 2007)). Numerosity is presumed for classes larger than forty members in the Second Circuit. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120

10

(2d Cir. 2014).  "[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."  *In re Barrick Gold Secs. Litig.*, 314 F.R.D. 91, 98 (S.D.N.Y. 2016).[7]

During the Class Period, there were approximately 180 million common shares of Spectrum shares issued and outstanding, and the turnover from the average trading volume for Spectrum stocks was over 9.7%.  *See* Campisi Decl., Ex. A, ¶¶ 14, 30-2 (Expert Report of Cynthia L. Jones, dated October 22, 2024 ("Jones Rep.")).  Likewise, Spectrum's common stock exhibited both a high trading volume and high trading frequency throughout the Class Period and were held by 148 institutional investors.  Jones Report, Ex. 9.  Based on these facts, Plaintiffs believe the Class Members likely number in the thousands – vastly exceeding the 40-member presumptive threshold – and reside in many states.  Joinder is therefore impracticable, and numerosity is satisfied.  *See Dover v. British Airways, PLC (UK)*, 321 F.R.D. 49, 54 (E.D.N.Y. 2017) (numerosity satisfied where "proposed class contains … far more than the 40 members at which numerosity is ordinarily presumed.").

## 2.  Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Rule 23 requires at least one "issue[ ] whose resolution will affect all or a significant number of the putative class members."  *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015).  "[A]n issue is common to the class when it is susceptible to generalized, class-wide proof."  *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006).  "Even a single common legal or factual question will suffice."  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70

---

[7] Unless otherwise noted, all internal citations are omitted, and emphasis is added.

(S.D.N.Y. 2009). Thus, "[t]he commonality requirement, particularly in securities fraud litigation, is generally considered a low hurdle easily surmounted." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009). The proposed Class satisfies the Rule 23(a) commonality requirement.

The Complaint alleges that Defendants made a series of false or misleading statements and omissions to the investing public, which injured each Class member who purchased Spectrum common stock during the Class Period. Common questions thus include: (a) whether Defendants misrepresented or omitted material information; (b) whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading; (c) whether the price of Spectrum common stock was artificially inflated during the Class Period; and (d) the extent of damages sustained by Class Members and the appropriate measure of damages.[8] These questions are susceptible to generalized, class-wide proof and will "generate common *answers* apt to drive resolution of litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis in original). The commonality requirement is therefore satisfied. *See*, *e.g.*, *Pearlstein v. Blackberry Ltd.*, No. 13 Civ. 7060 (CM), 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021) (commonality satisfied by common issues including whether defendants made misrepresentations, whether the misrepresentation were material, and whether they acted with scienter); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007), *order aff'd in relevant part*, 574 F.3d 29 (2d Cir. 2009) (same); *see also Amgen*, 568 U.S. at 473 (observing in securities class action that "market efficiency, publicity, and materiality can all be proved on a classwide basis.").

---

[8] Additionally, Plaintiffs' Section 20(a) claim for control person liability requires proof at trial of an additional element of "control" over the violation by Defendants, which is likewise common to the Class. *See In re NYSE Specialists*, 260 F.R.D. at 75.

### 3. Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality requirement is "not demanding." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2016) (quoting *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012)). It "does not require factual identity between the named plaintiffs and the class members, only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *MF Glob. Holdings*, 310 F.R.D. at 236 (quoting *Pa. Ave. Funds v. Inyx Inc.*, No. 08 Civ 6857 (PKC), 2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011)). Nor does typicality "require that damages be identical among class members." *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 157 (S.D.N.Y. 2017) (citing *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 337 (E.D.N.Y. 2013)). Thus, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, the claims asserted by Plaintiffs are typical of, if not identical to, the claims of the other Class Members. Plaintiffs and the Class allege that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by making statements that misrepresented or omitted material facts. Because the claims of Plaintiffs and the Class: (1) involve the purchase of Spectrum common stock, (2) are based upon the same facts and legal theories, and (3) will be proven with the same evidence, Plaintiffs satisfy the typicality requirement. *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) (plaintiff was typical because class claims were based on same alleged misrepresentations), *aff'd in relevant part*, 862 F.3d 250 (2d Cir. 2017).

### 4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The adequacy requirement of Rule 23(a)(4) demands that "the representative parties will fairly and adequately protect the interests of the class." "Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012), *aff'd sub nom.* 780 F.3d 70 (2d Cir. 2015). *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021) (citing *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012)).

As Lead Plaintiff, Mr. Christiansen has filed the Complaint, participated in discovery, reviewed and responded to Defendants' Requests for Documents and Interrogatories, and has overseen the prosecution of the Action on behalf of the proposed class. ECF Nos. 67, 105-06. In response, Lead Plaintiff has produced records concerning his investment in Spectrum common stock. ECF No. 113. In short, Lead Plaintiff has vigorously prosecuted the claims of other Class Members and will continue to do so.

Plaintiffs' interests are neither antagonistic to, nor in conflict with, the interests of other Class Members. On the contrary, Mr. Christiansen and Mr. Ayoub purchased Spectrum common stock during the Class Period and sustained damages because of the same alleged material misrepresentations and omissions as other Class Members. ECF No. 28-2, ¶ 4 (Christiansen's certification); ECF No. 1 in the Ayoub Action (Ayoub's certification). Further, Plaintiffs have

demonstrated a willingness and ability to take an active role in the litigation to protect the interests of the absent Class Members.  ECF No. 28-5, ¶ 5; ECF No. 1 in the Ayoub Action.  Mr. Christiansen's and Mr. Ayoub understand the requirements and responsibilities of serving as a class representative in a securities class action under the Private Securities Litigation Reform Act of 1995 and shall provide testimony at deposition and trial, if necessary.  ECF No. 28-5, ¶ 5; ECF No. 1 in the Ayoub Action (Ayoub's certification).

Plaintiffs are also adequate because they retained Kaplan Fox, a firm with extensive experience in securities class actions and complex litigation.  *See* Campisi Decl., Ex. B.  Plaintiffs' chosen counsel has zealously and competently represented the interests of the Class Members and will continue to do so.  For example, Kaplan Fox has vigorously prosecuted the Action for nearly two years (ECF No. 1), prevailed on Defendants' motion to dismiss after extensive briefing (ECF Nos. 91), zealously pursued discovery from Defendants and nonparties, assisted Lead Plaintiff in responding to Defendants' discovery requests, and has regularly updated Plaintiffs on the developments in the litigation.  ECF Nos. 105-06, 111-15.

## C.  This Case Meets the Requirements of Rule 23(b)(3)

In addition to meeting Rule 23(a)'s requirements, a class action must also satisfy at least one of the three conditions imposed by Rule 23(b).  Here, Plaintiffs move for class certification under Rule 23(b)(3), which authorizes certification where: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  *Pirnik*, 327 F.R.D. at 43.  This action satisfies Rule 23(b)(3).

### 1.  Common Questions of Law and Fact Predominate

As the Supreme Court has held, "[p]redominance is a test readily met in certain cases

alleging … securities [claims]." *Amchem*, 521 U.S. at 625; *see*, *generally*, *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010). Indeed, as detailed in the above analysis of Plaintiffs' allegations under Rule 23(a)(2), there are an overwhelming number of questions of law and fact common to Plaintiffs and the proposed Class. The predominance standard of Rule 23(b)(3) is therefore satisfied as these numerous common questions predominate over any perceived or potential individual issues.  *Amchem*, 521 U.S. at 625.  Moreover, as described further below, common questions also predominate in the Action because the Class is entitled to a presumption of reliance in accordance with *Basic*, 485 U.S. at 224.  Therefore, individual reliance issues will not predominate over issues common to the class. *See Barrick Gold*, 314 F.R.D. at 101 (S.D.N.Y. 2016) ("plaintiffs can meet their burden of proving predominance by establishing their entitlement to the *Basic* presumption"); *see also In re Pfizer Inc.*, 282 F.R.D. at 40-41 (S.D.N.Y. 2012).

### a. Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance Pursuant to *Basic*

Under the fraud-on-the-market presumption, reliance on material statements and omissions is presumed if the stock traded in an efficient market.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2407-08 (2014) ("*Halliburton II*"); *Basic*, 485 U.S. at 247.  This is because an efficient market rapidly reacts to new information about a listed company or its prospects, causing the price of its securities to rise or fall as investors trade upon the news. By purchasing a security at the price set by an efficient market, an investor is constructively relying upon all of the public

information about the company.[9]  Thus, proof sufficient to support a finding of an efficient market is all that is required to entitle a class of investors to the presumption of reliance.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 77 (S.D.N.Y. 2015) (finding proof of price impact not necessary under *Halliburton II* to invoke presumption at class certification).

Here, Spectrum common stock traded in an efficient market.  In evaluating whether the market for an individual security is efficient, courts in the Second Circuit have looked to the five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) (the "*Cammer* factors").  *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014).  The *Cammer* factors are: (1) the stock's average trading volume; (2) the number of analysts that followed and reported on the stock; (3) the number of market makers; (4) eligibility to file a S-3 Registration Statement; and (5) the reaction of the stock price to unexpected news events.  *Cammer*, 711 F. Supp. at 1286-87.  In addition to the five *Cammer* factors, courts often consider three factors from *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (the "*Krogman* factors"), which assess: (1) the company's market capitalization, (2) the stock's float, and (3) the typical bid-ask spread.  *See Strougo v. Barclays PLC*, 312 F.R.D. 307, 315-16 (S.D.N.Y. 2016) (applying the *Krogman* factors).  Another relevant factor to market efficiency in academic literature is institutional ownership.  *See* B. Barber et. Al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285, 302 (1994).  Courts have used all these factors as "an analytical tool rather than as a checklist" to evaluate market efficiency.

---

[9] When a company publishes false information about its business (or fails to disclose negative information), the price of its securities traded in an efficient market will be higher than if a truthful disclosure had been made.  An investor that purchases at the inflated price is constructively relying upon the false information, whether that investor personally read or knew anything about the falsehoods.  *Basic*, 485 U.S. at 241-42 ("Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.").

*Carpenters*, 310 F.R.D. at 83.  As demonstrated in the Jones Report, an analysis of these factors supports a finding that Spectrum common stock traded in an efficient market.

### i.    Average Trading Volume

An average weekly trading volume for a common stock that meets or exceeds the benchmark of one to two percent of a company's total outstanding shares is widely recognized as a sign of an efficient market.  *McIntire*, 38 F. Supp. 3d at 431 (referencing one to two percent benchmark); *Cammer*, 711 F. Supp. at 1293 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.").

Here, the average trading volume for Spectrum common stock during the Class Period strongly supports finding market efficiency.  Spectrum's stock traded approximately 17.9 million shares per week.  Jones Rep. ¶ 30.  Furthermore, the turnover each week was 9.7%.  *Id.* Such a high turnover percentage supports that the market was active and efficient.  *Id.* ¶ 31.

### ii.    Analyst Coverage

The existence of numerous analysts that followed Spectrum during the Class Period is another indicator of an efficient market, as it indicates that new information is rapidly being disseminated to and acted upon by investors.  Indeed, the presence of even a single analyst can support an efficient market.  *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005); *see In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (market efficient where three analysts followed security).

In this case, during the Class Period, there were at least 25 research reports published about Spectrum from analyst firms including Jefferies, Cantor Fitzgerald, H.C. Wainwright & Co., JMP Securities, and B. Riley.  Jones Rep. ¶ 33.  Spectrum also hosted regular earnings calls and investors conferences, which further suggests that informed research about the Company was

widely available to Spectrum's investors. *Id.* ¶¶ 33-4. Such consistent coverage of Spectrum throughout the Class Period supports a finding of market efficiency for Spectrum's common stock. *Id*. ¶ 35.

### iii.    Presence of Market Makers

Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with individual investors, institutions, and other market makers. *Id.* ¶ 37. The more market makers a security has, the more traders there are and the more efficient the market will be in responding to new information about the issuer, thereby incorporating that information into the market price. *Cammer*, 711 F. Supp. at 1286-87. Also, whether a stock lists on major exchanges, including the NYSE and NASDAQ, confers a relative liquidity advantage to a security. Jones Rep., ¶ 36.

Here, there were 63 market makers during the Class Period, with combined gross volume in excess of 98 million shares. *Id.* ¶ 40. Furthermore, Spectrum's stock is listed on NASDAQ at all relevant times. *Id*. ¶ 36. Such a high number of market makers and the stock's listing on NASDAQ further weighs in favor of market efficiency during the Class Period. *Id*. ¶ 41; *See Strougo*, 312 F.R.D. at 318 ("most courts agree that [ ] listing [on the NASDAQ] is a good indicator of efficiency."); *Carpenters*, 310 F.R.D. at 81 (same).

### iv.    Eligibility to File an S-3 Registration Statement

A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for twelve straight months and possesses a float of at least $75 million. 17 C.F.R. § 239.13. "The ability to file this form indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447. Spectrum satisfied the conditions for S-3 registration eligibility throughout the Class Period, further supporting a conclusion of market efficiency and filed a Form S-3 nine months prior to the beginning of the Class Period, on July 13, 2021. Jones Rep., ¶ 43.

### v.    Price Reaction of Spectrum Securities to Unexpected Information

Evidence that the price of a security regularly reacts to unexpected news about the issuer is strong evidence of an efficient market. *Cammer*, 711 F. Supp. at 1291. "[O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause-and-effect relationship between company disclosures and resulting movements in stock price." *Id*. at 1287. Here, Ms. Jones has demonstrated through an event study that there was a cause-and-effect relationship between unexpected events and Spectrum's stock price. Jones Rep., ¶¶ 46, 50-7. The event study analysis demonstrates a clear cause-and-effect relationship between unexpected material news concerning Spectrum and changes in the price of Spectrum shares, supporting market efficiency. *Id*. ¶ 57.

### vi.    Market Capitalization

Market capitalization is the total value of all outstanding shares. *Id.* ¶ 59. The larger the market capitalization of a company, the more analyst and news media coverage it attracts, and the greater the number of investors, including large institutional investors, it gains. *Id*. These characteristics, which accompany a large market capitalization, promote market efficiency. *Id.*

Here, over the Class Period, the equity market capitalization of Spectrum common stock was approximately $139 million at the beginning of the Class Period, which increased to approximately $256 million in August 2022, and declined to approximately $80 million at the end of the Class Period. *Id.* ¶ 59. Despite its relatively small market capitalization, such fact did not impede Spectrum's ability to raise capital. *Id*. ¶ 61. In fact, during the Class Period, Spectrum was able to sell approximately 23 million shares of common stock to investors, receiving proceeds of approximately $25 million. *Id.* Accordingly, this factor is supportive of market efficiency for Spectrum common stock. *Inyx Inc.*, 2011 WL 2732544, at *9-10 (finding market capitalization "consistently in excess of $22.4 million throughout the Class Period" to be a supportive factor in

finding the market to be efficient.).

### vii.    Float

A security's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities.  Securities with large floats tend to trade more actively, attract more analyst and news media coverage, and garner the attention of greater numbers of investors, including large institutional investors.  Jones Rep. ¶ 62.  Thus, a high float level can be indicative of market efficiency.  *Id*.  Here, 90.6% of the 181 million Spectrum shares were held outsiders and unaffiliated corporate entities.  *Id*.  The large size of Spectrum's float easily satisfies the second *Krogman* factor for market efficiency.  *Id*. ¶ 63.

### viii.    Bid-Ask Spread

The bid-ask spread is the difference between the price at which market makers are offering to buy a security and the price at which they are offering the security for sale.  *Id*. ¶ 64.  If a security is actively traded and information about the security is readily available, the bid-ask spread will tend to be narrow.  *Id*.  Moreover, a narrow bid-ask spread makes trading in the security less costly for investors, and thereby tends to attract greater interest, greater coverage, and greater volume.  *Id*.  Thus, the narrower the bid-ask spread, the greater the indication of an efficient market.  *Id*.

During the Class Period, there were 92 observations and the average and median bid-ask spreads for Spectrum were less than $0.01 per share, or 0.76% and 0.79%, respectively.  *Id*. ¶ 67.  Ms. Jones concluded that the bid-ask spread for Spectrum neither strongly supported nor undermined a finding of market efficiency.  *Id*. ¶ 73.

\*        \*        \*

In sum, the market for Spectrum common stock was efficient throughout the Class Period.  Accordingly, Class Members are entitled to a presumption that they relied upon the false and misleading statements and omissions on which this action is based.  *Basic*, 485 U.S. at 247.

Because Class Members will not have to individually prove reliance, common issues will predominate, and this action should proceed as a class action. *Id*.

In addition, a Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Here, the Class' claims are also grounded on Defendants' failure to disclose the material, adverse facts that there were delays in the Pinnacle Study and that not a single patient enrolled, and that the FDA and the Company were not aligned on the design of the Pinnacle Study— information that the Defendants should have disclosed and proof that positive reliance is not a prerequisite to recovery. Instead, the withheld facts must be material in the sense that a reasonable investor may have considered them important in making investment decisions. Based on the alleged omissions herein, this requirement is satisfied here.

> **b. Plaintiffs' Damages Methodology is Consistent with Its Theory of Liability and is Capable of Measuring Damages on a Class-wide Basis**

In accordance with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), "damages questions should be considered at the certification stage when weighing predominance issues." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015). However, "Comcast [ ] did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis." *Id.* at 407-08. Rather, "[a]ll that is required at class certification is 'that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).

While not necessary for certification, damages related to the Class's claims can be calculated using a common methodology. Here, Plaintiffs assert claims under Section 10(b) of the Exchange Act for investor losses sustained in connection with the purchase of Spectrum commons stock due to Defendants' allegedly fraudulent misrepresentations and omissions. In accordance

with this liability theory, Ms. Jones found that Class Members' out-of-pocket damages may be calculated using economic analyses, including an event study, to determine the amount of artificial inflation in Spectrum's stock during the Class Period caused by the alleged fraud, and removed by the alleged corrective events and disclosures.  Jones Rep. ¶¶ 74-80.  This methodology has been widely accepted at class certification in securities litigation.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017); *Carpenters*, 310 F.R.D. at 99; *In re Barrick Gold Secs. Litig.*, 314 F.R.D. at 105-06; *see also Dadona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 271 (S.D.N.Y. 2014).    Thus, Plaintiffs' damages methodology satisfies class certification requirements.

### 2.  A Class Action Is Superior to Alternative Methods for Resolving This Dispute

Rule 23(b)(3) requires that a class action also be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3) provides four factors for courts to consider in evaluating the superiority requirement: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.

Here, a class action is superior to any other available method of adjudication.  Defendants' alleged violations of the federal securities laws caused economic injury to many geographically dispersed investors, making the cost of pursuing individual claims plainly impracticable.  Resolving the claims in this case on a class-wide basis promotes judicial economy because the alternative is thousands of separate individual actions, which offer no practical recourse for most Class members and would burden the judicial system.  *See Katz*, 2010 WL 2926196, at *6 ("[A]s a general rule, securities fraud cases 'easily satisfy the superiority requirement [because] [m]ost

violations of federal securities laws … inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.").  Finally, there is no reason to expect any difficulty in the management of this case as a class action.  As discussed above, all proposed Class Members were subject to the same alleged misstatements and omissions made by Defendants, thus requiring the same proof to establish Exchange Act violations.

The alternatives to a class action are either to foreclose recourse for thousands of stock purchasers or to permit a multiplicity of suits throughout the U.S., which would result in the inefficient administration of justice and the risk of inconsistent judgments.  *See In re SCOR*, 537 F. Supp. 2d at 579 ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources" and "risk disparate results among those seeking redress.").  This is precisely the "evil that Rule 23 was designed to prevent."  *Califano v. Yamasaki*, 442 U.S. 682, 690, 701 (1979).

### D.   The Proposed Class Satisfies the Requirement of Ascertainability

"The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017).  Where, as here, the class is defined based on "securities purchases identified by subject matter, timing, and location," which "are clearly objective" criteria, and is further limited to domestic transactions bounded by a definite class period, the requirement of ascertainability is met.  *Petrobras*, 862 F.3d at 269-70.

### E.   Kaplan Fox Satisfies the Rule 23(g) Prerequisites for Appointment as Class Counsel

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the

action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Kaplan Fox has extensive experience prosecuting securities class actions. *See* Campisi Decl., Ex. B. Lead Counsel has effectively used its experience to vigorously pursue the interests of all Class Members, including filing a detailed Complaint (ECF No. 67), successfully defending the Complaint against Defendants' motion to dismiss (ECF No. 91), and pursuing a discovery plan. Specifically, Lead Counsel served document requests and served requests for admissions. ECF No. 105. Furthermore, Lead Counsel served eight non-party subpoenas, including the FDA, several investment banks that covered Spectrum, and clinical research organizations that performed work relating to the development of pozi. ECF Nos. 105, 106. Defendants served document requests and interrogatories on Lead Plaintiff, and Lead Counsel advised and assisted Lead Plaintiff in his responses and document production. ECF Nos. 106, 113.

To date, Defendants and non-parties have produced tens of thousands of pages of documents and Lead Counsel has reviewed and analyzed substantially all of the produced documents. ECF Nos. 113-15. Lead Counsel has served deposition notices for testimony from Spectrum witnesses and subpoenas for testimony from several non-parties and has been preparing for fact witness depositions.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this action as a class action pursuant to Rule 23(a) and (b)(3); (2) certify Plaintiffs as class representatives for the certified Class; and (3) appoint Kaplan Fox as Class Counsel.

Dated:  October 30, 2024                    Respectfully submitted,

_/s/ Jeffrey P. Campisi_
Robert Kaplan
Jeffrey P. Campisi
Brandon Fox
Chang Hahn
**KAPLAN FOX & KILSHEIMER LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
bfox@kalpanfox.com
chahn@kaplanfox.com

_Lead Counsel for Lead Plaintiff Steven B._
_Christiansen and the Proposed Class, and Counsel_
_for Additional Plaintiff Nizar Sami Ayoub_

**<u>CERTIFICATE OF SERVICE</u>**

I, Jeffrey P. Campisi, hereby certify that, on October 30, 2024, I caused the foregoing to

be served on all counsel of record by filing the same with the Court using the CM\ECF system

which will send electronic notices of the filing to all counsel of record.


*/s/ Jeffrey P. Campisi*  _____
Jeffrey P. Campisi
